─TRANSCRIBED FROM DIGITAL RECORDING─

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,        )
                                      )  Case No. 2:20-mj-221-DJA
5             Plaintiff,              )
                                      )  Las Vegas, Nevada
6             vs.                     )  Friday, March 27, 2020
                                      )  Courtroom 4B
7    LOUIS DAMATO,                    )
                                      )  INITIAL APPEARANCE
8             Defendant.              )
     _____)  C E R T I F I E D   C O P Y

9

10

11               TRANSCRIPT OF PROCEEDINGS

12        BEFORE THE HONORABLE BRENDA N. WEKSLER,
                UNITED STATES MAGISTRATE JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:

16        UNITED STATES ATTORNEY'S OFFICE
          BY:  NICHOLAS D. DICKINSON, AUSA
17        501 Las Vegas Boulevard South, Suite 1100
          Las Vegas, NV 89101
18        (702) 388-6336

19   (Appearances continued on Page 2)

20   DIGITALLY RECORDED:          Liberty Court Recorder (LCR)
                                  3:34:31 p.m.
21
     RECORDED BY:                 J. Miller
22
     TRANSCRIBED BY:              Heather K. Newman
23                                (702) 471-0002

24

25   Proceedings recorded by electronic sound recording; transcript
     produced by machine shorthand and computer-aided transcription.

—TRANSCRIBED FROM DIGITAL RECORDING—

1    APPEARANCES CONTINUED:

2    For the Defendant:

3         FEDERAL PUBLIC DEFENDER'S OFFICE
          BY:  BRIAN D. PUGH, AFPD (Telephonic)
4         411 East Bonneville Avenue, Suite 250
          Las Vegas, NV 89101
5         (702) 388-6577

6         *** DEFENDANT APPEARING VIA VTC ***

7    Also present:

8         Mariah Bassler-Wide
          Sandra Bustos
9         United States Pretrial Services

10                           *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─TRANSCRIBED FROM DIGITAL RECORDING─

1          LAS VEGAS, NEVADA; FRIDAY, MARCH 27, 2020; 3:34:31 P.M.

2                               --oOo--

3                        P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Your Honor, we are now

5     calling United States of America vs. Louis Damato.  The case

6     number is 2:20-mj-221-DJA.

7               Beginning with government counsel, counsel please

8     state your names for the record.

9               MR. DICKINSON:  Good afternoon, Your Honor,

10    Nicholas Dickinson for the United States.

11              THE COURT:  Good afternoon, Mr. Dickinson.

12              MR. PUGH:  Brian Pugh on behalf of Mr. Damato.

13              THE COURT:  Good afternoon, Mr. Pugh.

14         Good afternoon, Mr. Damato.  Can you hear us okay?

15              THE DEFENDANT:  I can, Your Honor.  Good afternoon.

16              THE COURT:  Good afternoon.

17         Can you hear your attorney, Mr. Pugh, okay?

18              THE DEFENDANT:  I can, Your Honor.  Thank you.

19              THE COURT:  All right.  So, some housekeeping matters

20    before we get into the actual hearing.  Due to COVID-19, we are

21    conducting Initial Appearances/Arraignments & Plea and

22    Detention Hearings by way of video conference.  Rules 5 and 10

23    of the federal -- federal criminal rules of procedure allow for

24    hearings to take place by way of video conference if the

25    defendant consents.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          Mr. Pugh, does Mr. Damato consent to appearing by way
2     of video conference?
3          MR. PUGH:  Yes, Your Honor.
4          THE COURT:  Mr. Damato; is that correct?
5          THE DEFENDANT:  That is correct, Your Honor.
6          THE COURT:  Mr. Damato, during the hearing, if you
7     need to speak with your attorney, just let me know.  There is a
8     procedure that we have in place whereby I will need to make
9     sure your side of the video conference is muted and you can
10    have a conversation with Mr. Pugh without the rest of us
11    hearing in.  So if at any point in time you need to speak with
12    him, just signal to me and I'll make sure that we put that into
13    place.  Okay?
14         THE DEFENDANT:  Wonderful.  That's understood,
15    Your Honor.  Thank you.
16         All right.  Very well.
17         THE DEFENDANT:  Can you hear me okay?
18         THE COURT:  I can hear you fine.
19         THE DEFENDANT:  Are you able to hear me okay?
20    Wonderful.  Thank you.
21         THE COURT:  Can you hear me okay?
22         THE DEFENDANT:  Wonderfully.
23         THE COURT:  All right.  So, Mr. Damato, is that your
24    true name, Luis -- Louis Damato?
25         THE DEFENDANT:  Louis Anthony Damato, that is correct,

—TRANSCRIBED FROM DIGITAL RECORDING—

1   Your Honor.

2           THE COURT:  How old are you, sir?

3           THE DEFENDANT:  47 years old.

4           THE COURT:  And how far have you gone in school?

5           THE DEFENDANT:  One semester of college.

6           THE COURT:  A Complaint has been filed charging you

7   with the following violations of law:

8           Count One, Threat Against a United States Official,

9   which is a violation of Title 18, United States Code §

10  115(a)(1)(B), and Count Two, Interstate Threats, which is a

11  violation of Title 18, United States Code § 875(2).

12          Did you receive a copy of the Complaint prior to

13  court?

14          THE DEFENDANT:  Yes, ma'am.  I'm reading it right now

15  in front of me as you're [sic] speak.

16          THE COURT:  And did you have a chance to read it prior

17  to this hearing?

18          THE DEFENDANT:  I did, and it was also read to me by

19  my attorney as well.

20          THE COURT:  All right.  Do you have any questions

21  about the Complaint?

22          THE DEFENDANT:  No, Your Honor.

23          THE COURT:  You're not required to make any statement

24  about the charges, either during this hearing or to any law

25  enforcement officer.  Anything you do say can be used against

TRANSCRIBED FROM DIGITAL RECORDING

1  you.

2          You have the right to a Preliminary Hearing at which

3  time the government will be required to provide evidence that

4  there is probable cause to believe you committed the crimes

5  alleged in the Complaint.  In the event an Indictment is filed

6  against you regarding the charges in the Complaint, the

7  Preliminary Hearing in this matter will be vacated and you will

8  instead appear in court for an arraignment and plea to the

9  Indictment.

10          You have the right to the assistance of counsel at all

11  stages of these proceedings.  If you cannot afford a lawyer,

12  one will be appointed to you at the public's expense.

13          Do you understand these rights?

14          THE DEFENDANT:  I do, Your Honor.  Thank you.

15          THE COURT:  Can you afford to hire an attorney at this

16  time?

17          THE DEFENDANT:  Not at this time, Your Honor.

18          THE COURT:  All right.  I see that there's been a

19  Financial Affidavit filled out.  Mr. Damato, what I'm going to

20  do at this point is place you under oath.

21          Do you swear or attest that all of the information

22  that you've provided to your attorney, Mr. Pugh, with regards

23  to your finances is true and correct?

24          THE DEFENDANT:  I do, Your Honor.

25          THE COURT:  And do you understand that when you

—TRANSCRIBED FROM DIGITAL RECORDING—

1  provided that information, that information was being provided

2  under penalty of perjury?

3          THE DEFENDANT:  I do, Your Honor, a felony.

4          THE COURT:  All right.  And Mr. Pugh, does the

5  Financial Affidavit that has been submitted to the Court

6  contain all of the information that Mr. Damato has provided to

7  you?

8          MR. PUGH:  Yes, Your Honor.

9          THE COURT:  I have reviewed the Financial Affidavit.

10  I do find that Mr. Damato qualifies for the appointment of

11  counsel, and the Court will appoint the office of the Federal

12  Public Defender to assist Mr. Damato in his defense.

13          Mr. Pugh, do you have any reason to question the

14  competence of your client to understand the charges against him

15  and to assist in his defense?

16          MR. PUGH:  Not at this time, Your Honor.

17          THE COURT:  Do you waive the reading of the Complaint?

18          MR. PUGH:  We do.

19          THE COURT:  Very well.

20          As to pretrial release, what is the government's

21  position?

22          MR. DICKINSON:  Your Honor, in short, the government

23  is not going to be seeking detention.  If I might just make a

24  brief record?

25          THE COURT:  You might.

—TRANSCRIBED FROM DIGITAL RECORDING—

1        MR. DICKINSON:  The government takes the charges in

2   the Information extremely seriously.  As noted in the Pretrial

3   Services report, there's also an underlying state case.   In

4   short, it appears Mr. Damato's actions relate to an eviction

5   procedure.  Essentially started dealing with his property

6   management company resulting in many, many, many calls that

7   ultimately result -- escalated to threats to life.  Before that

8   occurred, they made a complaint, Metro went out to try to tone

9   down the situation, again, calling the Metro detective.  That

10  all came to a head on the date of March 16th.  In addition to

11  the alleged threats in the criminal Complaint, that same

12  morning he called the Metro detective and threatened to blow

13  the head off each of his family members, et cetera.  So that

14  generated an enormous law enforcement response which ended up

15  with the defendant's arrest.  And I've been coordinating with

16  the state.  As of now, the state is keeping the charges related

17  to the others and the federal government has, obviously, the

18  threat to Congresswoman Titus.

19        That being said, as the Court has referenced and

20  everyone knows with what is going on with the coronavirus, the

21  Court -- did the Court get a copy of the patient profile that

22  was attached to the Complaint that came over with the warrant?

23        THE COURT:  I did not.

24        MR. DICKINSON:  May I approach?

25        THE COURT:  Sure.

—TRANSCRIBED FROM DIGITAL RECORDING—

1   Has Mr. Pugh received a copy of this?

2   MR. DICKINSON:  Yes, Your Honor.

3   MR. PUGH:  I do have a copy, Your Honor.

4   MR. DICKINSON:  I'll give the Court a second to look

5 at that.

6  (Brief pause in proceedings).

7   THE COURT:  All right.  Very well.

8   MR. DICKINSON:  And the government had it based on

9 some of the defendant's statements, so. . .  Among other --

10 among many medical conditions, the defendant appears to be

11 HIP -- V positive.  The government has worked with -- and I

12 want to thank Pretrial and Mr. Pugh.  We've had -- I've had

13 probably five conversations with Mr. Pugh today, as well as

14 discussing it with Pretrial, as well as discussing it with the

15 capitol police.  They've sort of been the conduit under the

16 Crime Victims' Rights Act with the Congresswoman's office and

17 they understand what the government's position is.  Obviously,

18 in a perfect world, they would want the defendant detained.

19 That being said, based on what is the defendant's medical

20 condition and looking at the least restrictive conditions --

21   THE COURT:  Hold on one second.

22   Can everybody still hear?  Mr. --

23   THE DEFENDANT:  Yes, I can hear.

24   THE COURT:  Okay.  Very well.

25   MR. DICKINSON:  The government is going to concur with

—TRANSCRIBED FROM DIGITAL RECORDING—

1    the conditions that Pretrial is stating, the most important of

2    which is placing him in a halfway house -- my understanding is

3    there is one bed -- and that would be on lockdown except for

4    medical, court appearances, et cetera, so, I'll let Pretrial

5    state those conditions.

6              PRETRIAL OFFICER BASSLER-WIDE:  Hello, Your Honor.

7              THE COURT:  And please, speak closer to the mic and

8    identify yourself.

9              PRETRIAL OFFICER BASSLER-WIDE:  Yep.  Officer

10   Bassler-Wide from Pretrial.

11             We would recommend that the defendant report to

12   Pretrial Services for supervision.

13             The defendant shall abide by all conditions of release

14   of any current term of parole, probation, or supervised

15   release.  By that, we mean his state release.

16             The defendant shall abide by the following

17   restrictions on personal association, place of abode, or

18   travel:

19             Travel is restricted to Clark County, Nevada.

20             The defendant shall maintain residence at a halfway

21   house or community corrections center as Pretrial Services or

22   the supervising officer considers necessary.  The defendant is

23   only permitted to leave for religious services, medical

24   treatment services, attorney visits, court appearances,

25   court-ordered obligations, or other activity pre-approved by

—TRANSCRIBED FROM DIGITAL RECORDING—

1  Pretrial Services.

2          On that note, prior to court, we did speak to the

3  U.S. Marshal Service.  They let us know that if Mr. Damato is

4  the only defendant being released from Pahrump today that they

5  would be able to take him directly to the halfway house.  We

6  would ask that if that is possible to be the case that they do

7  that.

8          The defendant shall avoid all contact, directly or

9  indirectly, with any persons who is or may become a victim or

10  personal witness in the investigation or prosecution, including

11  but not limited to Dina Titus and all other victims in his

12  state cases.

13          The defendant shall refrain from possessing a firearm,

14  destructive device, or other dangerous weapon.

15          The defendant shall refrain from use or unlawful

16  possession of a narcotic drug or other controlled substances as

17  defined in 21 U.S.C. § 802 unless prescribed by a licensed

18  medical practitioner -- practitioner.  This includes marijuana

19  or any other item containing THC.

20          The defendant shall submit to any testing required by

21  Pretrial Services or the supervising officer to determine

22  whether the defendant is using a prohibited substance.  Any

23  testing may be used with random frequency and may include urine

24  test, a remote alcohol testing system and/or any other form of

25  prohibited substance screening or testing.

─TRANSCRIBED FROM DIGITAL RECORDING─

1      The defendant shall refrain from obstructing or

2  attempting to obstruct or tamper in any fashion with the

3  efficiency or accuracy of any prohibited substance screening or

4  monitoring which is required as a condition of release.

5      The defendant shall pay all or part of the cost of the

6  testing program based upon his ability to pay as Pretrial

7  Services or the supervising officer determines.

8      The defendant shall not be in the presence of anyone

9  using or possessing a narcotic drug or other controlled

10  substance.

11      The defendant shall submit to a mental health

12  evaluation as directed by Pretrial Services or the supervising

13  officer.

14      The defendant shall participate in mental health

15  treatment as directed by Pretrial Services or the supervising

16  officer.

17      The defendant shall pay all or part of the cost of the

18  medical or psychiatric treatment or evaluation based upon his

19  ability to pay as determined by Pretrial Services or the

20  supervising officer.

21      And I did forget one condition in regards to the

22  halfway house, that he pay all or part of the cost to reside at

23  the halfway house.

24      PRETRIAL OFFICER BUSTOS:  Your Honor. . .

25      THE COURT:  Yes, Ms. Bustos.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          PRETRIAL OFFICER BUSTOS:  If I may make a

2    clarification.  Pretrial Services recommended detention.  If

3    the Court's inclined to release the defendant, these are the

4    recommended conditions of release, Your Honor.

5          THE COURT:  Okay.  That was my -- that was -- I was

6    going to ask that because I do see that the Pretrial Services

7    report does recommend detention.  However, those are the

8    conditions that Pretrial Services would recommend should I find

9    that conditions could be fashioned.

10          PRETRIAL OFFICER BUSTOS:  Yes, Your Honor.  And -- and

11    one more -- and in addition to the halfway house, we listed

12    activities that he may be approved to leave the facility for.

13    However, the halfway house continuously modifies what any

14    resident may leave for due to the COVID-19, so even though

15    we're stating that, the halfway house may have something

16    different tomorrow, Your Honor.

17          THE COURT:  Understood.

18          All right.  So before we take the next step, I guess I

19    just wanted to ask certain questions.  The first question that

20    I have is really directed more to Mr. Pugh.  My -- I'm very

21    concerned with the facts alleged in this case, and I was

22    looking at the Pretrial Services report where it appears that

23    Mr. Damato really has not had any kind of contact with law

24    enforcement up until. . . 2015, and that case was due to I

25    believe a traffic violation --

1          THE DEFENDANT:  Your Honor --

2          THE COURT:  Mr. Damato --

3          MR. PUGH:  Well, the question's for me, Mr. Damato.

4          THE COURT:  Mr. Damato, first Mr. Pugh will address

5     the Court and then if there's anything else that you would like

6     to say, I'll make sure that you and Mr. Pugh have a

7     conversation.  He wants to make sure that you don't say

8     anything that could later on be used against you.  Okay?

9          THE DEFENDANT:  Understood, Your Honor.  Thank you.

10          THE COURT:  All right.  So, Mr. Pugh, I see that he

11     has really had no issues with law enforcement up until March of

12     this year.  I also saw that he was seeing a psychiatrist.  I

13     guess the question that I have for you is whether he is

14     currently on any kind of medication, if so, what that is,

15     whether it's being made available to him -- oh, excuse me,

16     whether he gets (indiscernible) that medication on a regular

17     basis.

18          MR. PUGH:  Well, Your Honor, he should be on

19     medication.  They have not all been available to him.

20     Mr. Damato informed me that approximately 14 days ago was the

21     last time he had his medication, so he's been off it for

22     14 days.  That's of -- a -- a concern to him.

23          I'd also like to talk about the allegations and the

24     conditions of release.  I recognize that making a threat

25     against anyone is serious, and particularly against a

—TRANSCRIBED FROM DIGITAL RECORDING—

1    congresswomen, and not -- not making any admissions as to what

2    the allegations are, I would just like to note that there's no

3    evidence that Mr. Damato possessed a gun; that he made any

4    plans to travel to Washington; or do any -- or took any steps

5    to fulfill any of the allegations that are represented in the

6    Complaint.

7              I'd also like to agree with Mr. Dickinson wherein he

8    says this all seems to have arisen out of an eviction.

9    Mr. Damato, up until then, other than a traffic incident, had

10   no -- I believe it was a traffic incident -- I -- I only got to

11   read the PSR -- I mean, the Pretrial Services report and I

12   don't have it in front of me, but whatever it was, was -- it

13   was minor and he seems to have gone off -- well, once again,

14   not admitting anything, it appears that on March 16th he kind

15   of went off the rails in relationship to this eviction.  And --

16   and not being on his medication, I believe that the -- his

17   situation is overblown.  I believe the state court has, to a

18   certain extent, recognized that in the fact that he was

19   released on his own recognizance.  He has never done anything

20   before.  His father says that he's not a danger to anyone, and

21   I believe that he could be trusted on release.

22             I would -- he also has indicated that he believes that

23   he can find a place to stay.  And, so, recognizing the

24   conditions that Pretrial Services is recommending, we would ask

25   that he be allowed to look for a place to stay, and I

───TRANSCRIBED FROM DIGITAL RECORDING───

1  understand that that can be done on the phone, but sometimes

2  permission might be needed to leave the halfway house and we

3  recognize that under the COVID-19 situation that that might be

4  limited, but nevertheless, we would ask that he be allowed to

5  find a place and if he can find a place and it's acceptable to

6  Pretrial Services, that he be allowed to leave.  He -- and if

7  he is allowed to leave, he's willing to go on an electronic

8  monitoring to monitor his location to assure the Court of the

9  safety of the community and his appearance in court.

10         So, I mean, we -- we generally, by and large, agree

11 with the government as to the release into the halfway house,

12 but we would ask -- we have that one distinction that we'd be

13 asking that he be allowed to find a place and that if he can

14 find a place and if it's suitable to Pretrial Services, that he

15 be allowed to live outside the halfway house.  Because --

16 because of the COVID-19 concerns and his condition of HIV, as

17 well as asthma, which is another indicator on the list of

18 things that are -- make you susceptible and at risk, or greater

19 risk, being in the halfway house, there are still other people

20 there.  So moving him from Pahrump to the halfway house is not

21 a complete fix for his vulnerabilities whereas getting him in a

22 place of his own would be a much better resolution as it

23 relates to his safety.  And for that reason, we would ask that

24 that other condition be added.

25         THE DEFENDANT:  Your Honor, may I speak with the

─TRANSCRIBED FROM DIGITAL RECORDING─

1   attorney for one quick moment?

2           THE COURT:  Sure.  So what we're going to do is this:

3   Mr. Damato, I'm going to need you to knock on the door to get

4   the attention of the guards.  Go ahead.

5           THE DEFENDANT:  Yes, ma'am.

6      (Brief pause in proceedings).

7           THE DEFENDANT:  Guard?  Hey, they want your -- the

8   judge wants to speak with you.

9           OFFICER GILES:  Hi, Your Honor, Officer Giles.

10          THE COURT:  Good afternoon.  Hi.  I was wondering if

11  you could go ahead and mute the video conference on

12  Mr. Damato's end so that he can have a conversation with his

13  attorney?

14          OFFICER GILES:  Okay.

15          MR. PUGH:  Your Honor, that will only mean that I

16  can't hear him.

17          THE COURT:  Oh.

18          OFFICER GILES:  So you want it muted on my end or

19  on -- on your -- you guys are muting it on your end?

20          THE COURT:  What are --

21          MR. PUGH:  Your Honor, I think -- I think the proc- --

22  I think the procedure is, is that I call a telephone number,

23  they have a phone, and I talk with Mr. Damato over the

24  telephone.  I think that's --

25      (Simultaneous crosstalk).

TRANSCRIBED FROM DIGITAL RECORDING

1          OFFICER GILES:  That works.  Do you need the
2    extension?
3          MR. PUGH:  I believe it's 4561?
4          OFFICER GILES:  Yep.  14561.
5          MR. PUGH:  Okay.  I've got that.  Yeah.
6          THE COURT:  (Indiscernible) is the phone in the room
7    where Mr. Damato is at?
8          MR. PUGH:  It's --
9          OFFICER GILES:  Yes, it is.
10          MR. PUGH:  I believe it's going (indiscernible).
11          THE COURT:  Okay.  So let's go ahead and --
12          MR. PUGH:  It's --
13          THE COURT:  -- do it.  I'm going to need the video
14    conference to be muted on that side so that he can have a
15    conversation with Mr. Pugh and nobody else will be able to
16    hear.
17          OFFICER GILES:  Okay.
18          THE DEFENDANT:  Thank you, Your Honor.
19          THE COURT:  You're welcome.
20          We're going to need to be muted, though.
21          OFFICER GILES:  Give me one sec.  I'm trying to find
22    it on here.
23       (Brief pause in proceedings).
24          THE COURT:  All right.  So for the record, we can't
25    hear anything.  So they can have a conversation and we'll

—TRANSCRIBED FROM DIGITAL RECORDING—

1  resume briefly, so if we could just have maybe like a 5-minute

2  recess and then we'll see where they're at.

3         COURTROOM ADMINISTRATOR:  All rise.

4     (Recess was taken from 3:53:07 till 3:56:47 p.m.)

5         COURTROOM ADMINISTRATOR:  We're back on record,

6  Your Honor.

7         THE COURT:  All right.  Mr. Damato, can you hear me?

8  Can you hear me?

9         THE DEFENDANT:  I can hear you, Your Honor.

10        THE COURT:  Okay.  Perfect.

11        THE DEFENDANT:  Can you hear me?

12        THE COURT:  I can.

13        Were you able to have a conversation with your

14  attorney?

15        THE DEFENDANT:  Oh, yeah.  It was just one quick

16  simple question.  Thank you for allowing me the time.

17        THE COURT:  Of course.

18        All right.

19        MR. PUGH:  Your Honor -- Your Honor, there's one --

20  there's one additional argument that Mr. Damato wanted me to

21  make regarding getting a place of his own.

22        THE COURT:  Okay.

23        MR. PUGH:  In addition to the list of items on his --

24  on his patient profile, is epilepsy.  He has service dogs that

25  are able to recognize an epileptic seizure before it comes on.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          He's trying to show you that he's got that in his
2     pocket there at the facility.
3          THE COURT:  Um-hmm.  I see it.
4          MR. PUGH:  So, in addition to the reasons that I've
5     already stated, if he had a place of his own, his dogs could be
6     there to help him, you know, to recognize when a seizure is
7     coming on.  So, I just wanted to add that one last reason.
8          THE COURT:  All right.  And is he -- where is the dog
9     at right now?
10          MR. PUGH:  The dogs --
11          THE DEFENDANT:  They're in the shelter.
12          MR. PUGH:  They're in a shelter.
13          THE COURT:  Okay.  All right.
14          THE DEFENDANT:  Available for rent as of yesterday.
15          THE COURT:  Okay.
16          THE DEFENDANT:  Or purchase.
17          THE COURT:  All right, Mr. Damato.
18          Mr. Damato, I'm going to ask you to take this
19     seriously because this is a really serious proceeding --
20          MR. PUGH:  He was crying, Your Honor.
21          THE DEFENDANT:  Your Honor, I'm crying.  I'm sorry,
22     I'm crying.  I'm not laughing.
23          THE COURT:  Oh, okay.  I thought you were laughing.
24     I'm sorry.
25          THE DEFENDANT:  No.  No.  No.  I'm crying over my

———TRANSCRIBED FROM DIGITAL RECORDING———

1  dogs.  I just want to see my -- my -- my three babies, Greggy,

2  Chancy, and Tyler are their names.

3          THE COURT:  Okay.

4          THE DEFENDANT:  They're rescued from a kill shelter in

5  Hawaii.  I bought a --

6      (Simultaneous crosstalk).

7          MR. PUGH:  Okay.  Mr. Damato --

8          THE DEFENDANT:  -- first class to bring them here.

9          THE COURT:  All right.

10         MR. PUGH:  Mr. Damato --

11         THE COURT:  All right.  All right.  I just wanted to

12  make sure that you were taking this seriously, Mr. Damato.

13  That's all.

14         THE DEFENDANT:  Oh, very seriously, Your Honor.

15         THE COURT:  All right.  Okay.  So, let me just recap

16  here for a second.

17         I understand that the government is not moving for

18  detention.  I have heard the conditions that Pretrial Services

19  would like to have in place.

20     (Announcement over the PA system).

21         THE COURT:  Can everybody hear me?

22         MR. PUGH:  I can still hear you, Your Honor.

23         THE COURT:  Okay.

24         MR. PUGH:  I can still hear you.

25         THE DEFENDANT:  I can hear you.  It said -- the

—TRANSCRIBED FROM DIGITAL RECORDING—

1  recording is saying the conference is now lost here, but I can

2  hear all of you.

3          THE COURT:  Okay.  So, the government is not moving

4  for detention.  Pretrial Services is requesting detention.

5  However, they have mentioned some conditions that they would

6  ask to be put in place should I decide to release Mr. Damato.

7          In addition, Mr. Pugh has asked me to consider

8  modifying some of the conditions that Pretrial would ask for.

9          So, here is my finding:

10         Taking into consideration the nature and circumstances

11 of the offense, the weight of the evidence, the history and

12 characteristics of the defendant, whether at the time of the

13 offense he was subject to any conditions of release, the nature

14 and seriousness of the danger to any person or the community, I

15 find that conditions can be fashioned in this case to

16 reasonably assure the appearance of Mr. Damato and that he will

17 not pose a danger to the community.

18         Specifically, I note that he has lived in Las Vegas

19 since October of 2016 at the same address, which is 2641

20 Keating Circle.  He was recently evicted from that place and

21 was arrested at the Red Rock hotel and casino as he was trying

22 to live there for a little while.  He has not traveled since

23 2005.  His passport is expired.

24         On the other hand, his families are -- his family ties

25 are not particularly strong.  He has one -- father and a

─TRANSCRIBED FROM DIGITAL RECORDING─

1   brother living in Florida.  His father was not really sure of

2   where exactly Mr. Damato lived, other than the fact that he

3   lived in Las Vegas.  And Mr. Damato characterized his

4   relationship with them as fair.

5          With regards to his mom, Mr. Damato's mother lives in

6   New York, and his relationship with her is poor, according to

7   him, as he has minimal contacts with her.

8          Mr. Damato's not married and does not have any kids.

9          Regarding danger to the community, as I've stated

10  previously, I am really concerned with the allegations in this

11  case.  I am really concerned with the other behavior that led

12  to the second state case that appears in the Pretrial Services

13  report.  Specifically, I am concerned that there have been

14  threatening messages to law enforcement officers and their

15  families.  However, I do also take a look at his criminal

16  history, which is basically non-existing in this case until

17  March of this year.

18          I also note that both Judge Zimmerman in state court

19  and Judge Tobias in the state court have allowed him to be

20  released on a (indiscernible) recognizance bond.

21          I do take into account the fact that the government's

22  position, while taking this case very seriously, is that

23  conditions could be fashioned.  I also appreciate the fact that

24  the government is taking into account, Mr. Damato, what your

25  health conditions are, specifically, asthma, the fact that you

—TRANSCRIBED FROM DIGITAL RECORDING—

1   are HIV positive, and now we learn also that you may have

2   epilepsy as well.  So, given the COVID-19 crisis and balancing

3   all of the different interests, the government is suggesting

4   that conditions could be fashioned in this case and is not

5   requesting your detention at this time.  So I will go ahead and

6   release you pursuant to conditions, and we're going to talk

7   about that in a moment.  However, before we do that, I want to

8   make sure of two things, Mr. Damato, that I need you to make

9   sure that you're listening to me very carefully:

10          If you are supposed to be taking psychiatric

11  medication, you --

12          MR. PUGH:  Your Honor -- Your Honor, could you get

13  closer to the microphone, please?  It's --

14      (Simultaneous crosstalk).

15          THE DEFENDANT:  I can't hear, yeah.

16          MR. PUGH:  (Indiscernible).

17          I'm sorry, Your Honor.  Thanks.

18          THE COURT:  Can you hear me now?

19          THE DEFENDANT:  I can hear you, yes, Your Honor.

20          THE COURT:  Is this better?

21          THE DEFENDANT:  Much better.

22          THE COURT:  Okay.

23          THE DEFENDANT:  I'm leaning forward.  I apologize.

24          THE COURT:  No, that's okay.  I just want to make sure

25  that you hear me very carefully.  I said that I will go ahead

—TRANSCRIBED FROM DIGITAL RECORDING—

1   and enter an order of release subject to conditions and we're

2   going to talk about those conditions in a moment.  However, my

3   main concern is the following here:

4            One, if you are supposed to be taking psychiatric

5   medications, you have to take them.

6            Do we understand each other?

7            THE DEFENDANT:  Your Honor, can you do me a favor?

8   Can you allow me -- if the 5-day eviction notice that's under

9   the law --

10           MR. PUGH:  Mr. Damato --

11           THE DEFENDANT:  -- that was revised in --

12           THE COURT:  Okay.  So Mr. Damato, let me just stop you

13   right there.  This Court does not have any jurisdiction over

14   your eviction case.  This Court only has --

15           THE DEFENDANT:  Okay.

16           THE COURT:  -- jurisdiction over the Complaint that

17   has been brought me.

18           THE DEFENDANT:  I'll -- I'll meet with the

19   psychiatrist this week and I will get all the prescriptions

20   re-prescribed and I will pay for them myself if I have to if

21   the -- if my Medicare won't renew them at this time --

22           THE COURT:  Okay.  And I'm going to need you to --

23           THE DEFENDANT:  -- as they're in the home.

24           THE COURT:  And I'm going to need you to take the

25   extra step in taking them as well.  Okay?

—TRANSCRIBED FROM DIGITAL RECORDING—

1      THE DEFENDANT:  Oh, I take them every day.  Since

2   1996, I've been taking my HIV meds.

3      THE COURT:  Okay.  And I'm not talking just about your

4   HIV --

5      THE DEFENDANT:  I -- I -- I promise you, you have my

6   word that I will take them and you can -- we can even check up

7   on it.  I'll -- I'll -- I'll -- I'll keep a log.

8      THE COURT:  Okay.  So, in addition to the conditions

9   that we're going to be talking about in a moment, one of the

10  conditions that this Court is going to have is that you have to

11  take all of your medications, including the psychiatric

12  medications.  Okay.  And if you are not --

13      THE DEFENDANT:  With pleasure.

14      THE COURT:  If you are not taking those medications,

15  that could be grounds to bring you back before this Court so

16  that this Court can entertain another detention (indiscernible)

17  at that time.

18      Do you understand me?

19      THE DEFENDANT:  I understand.  I probably wouldn't be

20  in this position if I had access to my medication --

21      THE COURT:  Okay.  I don't need to --

22      THE DEFENDANT:  -- so thank you for the clarity.

23      THE COURT:  Yeah.  Okay.  And just make sure that you

24  understand, please --

25      MR. PUGH:  Yes or no.

TRANSCRIBED FROM DIGITAL RECORDING

1          THE COURT:  -- refrain from making any statements.

2    Okay?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  All right.  So, as to the conditions, I

5    agree with all of the conditions that have been suggested by

6    Pretrial Services.

7          With regards to Mr. Damato's ability to seek a place,

8    so this is where I stand on that position.  I understand that

9    the halfway house is not a perfect fit.  I understand that some

10   of the same concerns that exist at a detention facility would

11   still exist at the halfway house.  However, I'm also concerned

12   that if Mr. Damato is out looking for different places to

13   reside at, he is also coming into contact with different

14   people.  So, we have exposure no matter what.

15         Mr. Damato is free to make whatever kind of calls he

16   wants from the halfway house to try and see whether he can find

17   a place.  If there is a place that he has found, then I would

18   ask Mr. Pugh to bring the matter before the Court so that we

19   can entertain that.  I'm happy to do that on an expedited

20   basis, but I'm not going to allow Mr. Damato to be moving in

21   and out of the halfway house for several reasons, one of which

22   is not only is he going to be exposed, but his exposure may

23   bring the virus into the halfway house as well.  So, the

24   conditions will require for him to stay at the halfway house,

25   and movement is restricted as specified by Pretrial Services,

————TRANSCRIBED FROM DIGITAL RECORDING————

1    understanding that this may change on a day-to-day basis and

2    his ability to move from the halfway house may become more

3    restrictive depending upon what happens in the community with

4    the COVID-19 crisis.

5            Do we understand that?

6            MR. PUGH:  Yes, Your Honor.

7            THE COURT:  Mr. Damato?

8            THE DEFENDANT:  Yes, Your Honor.  I do, Your Honor,

9    and thank you very much.

10            THE COURT:  All right.  As to. . .  Was there another

11    condition, Mr. Pugh, that you were asking me to reconsider?

12            MR. PUGH:  No, Your Honor, that was the only one.

13            THE COURT:  All right.  Okay.  So, for the record, so

14    that we're all on the same page, I'm going to ask Pretrial

15    Services to set the conditions of Pretrial Services -- of

16    pretrial release one more time on the record.  Mr. Pugh and

17    Mr. Damato, if you can't hear or if you have any questions,

18    please let me know.

19            PRETRIAL OFFICER BASSLER-WIDE:  The defendant shall

20    report to --

21            MR. PUGH:  Yes, Your Honor.

22            PRETRIAL OFFICER BASSLER-WIDE:  -- Pretrial Services

23    for supervision.

24            The defendant shall abide by all conditions of release

25    of any current term of parole, probation, or supervised

─TRANSCRIBED FROM DIGITAL RECORDING─

1   release.

2          The defendant shall abide by the following

3   restrictions on personal association, place of abode, or

4   travel:

5          Travel is restricted to the following areas:

6          Clark County, Nevada.

7          The defendant shall maintain residence at a halfway

8   house or correction -- community correction center as Pretrial

9   Services or the supervising officer considers necessary.

10          The defendant is only permitted to leave for religious

11   services, medical treatment services, attorney visits, court

12   appearances, court-ordered obligations, or other activities

13   pre-approved by Pretrial Services.

14          The defendant shall pay all or part of the cost for

15   residing at the halfway house or community corrections center

16   based upon his ability to pay as Pretrial Services or the

17   supervising officer determines.

18          The defendant shall avoid all contact, directly or

19   indirectly, with any person who is or may become a victim or

20   potential witness in the investigation or prosecution,

21   including but not limited to Dina Titus and all other victims

22   in the defendant's state cases.

23          The defendant shall refrain from possessing a firearm,

24   destructive device, or other dangerous weapons.

25          The defendant shall refrain from the use or unlawful

———TRANSCRIBED FROM DIGITAL RECORDING———

1   possession of a narcotic drug or other controlled substances

2   defined in 21 U.S.C. 802 unless prescribed by a licensed

3   medical practitioner.  This includes marijuana and/or any item

4   containing THC.

5           The defendant shall submit to any testing required by

6   Pretrial Services or the supervising officer to determine

7   whether the defendant is using a prohibited substance.  Any

8   testing may be used with random frequency and may include urine

9   testing, a remote alcohol testing system and/or any form of

10  prohibited substance screening or testing.

11          The defendant shall refrain from obstructing or

12  attempting to obstruct or tamper in any fashion with the

13  efficiency and accuracy of any prohibited substance, testing,

14  or monitoring which is required as a condition of release.

15          The defendant shall pay all or part of the costs of

16  the testing program based upon his ability to pay as Pretrial

17  Services or the supervising officer determines.

18          The defendant shall not be in the presence of anyone

19  using or possessing a narcotic drug or other controlled

20  substance.

21          The defendant shall submit to a mental health

22  evaluation as directed by Pretrial Services or the supervising

23  officer.

24          The defendant shall participate in mental health

25  treatment as directed by Pretrial Services or the supervising

—TRANSCRIBED FROM DIGITAL RECORDING—

1  officer.

2  The defendant shall pay all or part of the cost of the

3  medical or psychiatric treatment program or evaluation based

4  upon his ability to pay as determined by Pretrial Services or

5  the supervising officer.

6  And then the last condition that Your Honor ordered,

7  that the defendant must take prescribed medication, including

8  his psychiatric medication as directed.

9  THE COURT:  Very well.

10  Mr. Damato, any questions?

11  THE DEFENDANT:  No, Your Honor.

12  THE COURT:  Mr. Pugh, any questions at all or anything

13  further that you'd like the Court to consider?

14  MR. PUGH:  Um. . . well, as I was listening to the

15  conditions, I noticed that it included alcohol.  Mr. --

16  Mr. Damato doesn't drink, and that was confirmed by his father.

17  He said as far as he knows, his -- he doesn't even drink.  So,

18  I understand the controlled substance, but I don't understand

19  the alcohol.  I would ask that there be no alcohol testing

20  since he doesn't drink anyway.

21  THE COURT:  All right.  So my understanding at the

22  halfway house is that they do do those tests; is that correct?

23  PRETRIAL OFFICER BUSTOS:  That is correct, Your Honor.

24  That is --

25  THE COURT:  Okay.

———TRANSCRIBED FROM DIGITAL RECORDING———

1          PRETRIAL OFFICER BUSTOS:  -- that is mandatory.  They

2   are tested upon return.  However, the condition where it states

3   substance abuse/alcohol testing, that's just combined for the

4   both, it does not mean that we will do any other alcohol

5   testing outside what that -- what's done in the halfway house,

6   Your Honor.

7          THE COURT:  Okay.  Mr. Pugh, any other questions given

8   what Ms. Bustos just explained?

9          MR. PUGH:  No other questions, Your Honor.

10          THE COURT:  All right.  Very well.

11          Mr. Dickinson, do you have anything further?

12          MR. DICKINSON:  No, Your Honor.

13          THE COURT:  All right.  Well, thank you, everybody, so

14   much, and that concludes this hearing.

15          MR. DICKINSON:  Did we get a prelim date?

16          THE DEFENDANT:  Thank you, Your Honor.

17          MR. DICKINSON:  Your Honor, I don't believe --

18          THE DEFENDANT:  And thank you, everyone.

19          MR. DICKINSON:  I don't believe we got a prelim date.

20          THE COURT:  Oh, I'm sorry, give me one second.  I did

21   not give you a Preliminary Hearing date and I did not ask, is

22   the Complaint under seal at this point?

23          MR. DICKINSON:  No, Your Honor, it's under --

24          THE COURT:  It's not.

25          MR. DICKINSON:  It's been unsealed.

TRANSCRIBED FROM DIGITAL RECORDING

1          THE COURT:  All right.  So --

2          MR. DICKINSON:  It was not filed under seal.

3          THE COURT:  So if we could have a Preliminary Hearing

4  date, Mr. Miller.

5          COURTROOM ADMINISTRATOR:  Yes, Your Honor.  The

6  Preliminary Hearing date at this time has been scheduled for

7  Friday, April the 17th, 2020, at 4 o'clock p.m. in Courtroom 4B

8  or unless otherwise specified by the courtroom deputy.

9          THE COURT:  All right.  Very well.  Thank you,

10  everyone.

11          PRETRIAL OFFICER BASSLER-WIDE:  Your Honor --

12          THE COURT:  Oh, one more thing.

13          PRETRIAL OFFICER BASSLER-WIDE:  One more thing,

14  Your Honor.

15          PRETRIAL OFFICER BUSTOS:  One more thing, Your Honor.

16          PRETRIAL OFFICER BASSLER-WIDE:  We will be -- just for

17  the record, we will be e-mailing reporting instructions to the

18  defendant's defense attorney as well as to the halfway house so

19  the defendant has further instructions on how to proceed with

20  Pretrial Services, and in addition, is it possible to. . .

21          THE COURT:  Have him transported right away?

22          PRETRIAL OFFICER BASSLER-WIDE:  Yes.

23          PRETRIAL OFFICER BUSTOS:  Yes.  As Mr. Carpenter

24  stated.

25          THE COURT:  So I did forget that.  I knew there was

─TRANSCRIBED FROM DIGITAL RECORDING─

1    something else I was forgetting.

2              So, we do have the marshal deputy here today.  It's

3    Pretrial Services' understanding that Mr. Damato can be

4    transported today from the detention facility in Pahrump to the

5    halfway house.  I will ask that that, in fact, be the case.

6              I think that's it; right?

7              PRETRIAL OFFICER BASSLER-WIDE:  Yes.  That's all.

8    Thank you, Your Honor.

9              PRETRIAL OFFICER BUSTOS:  Thank you, Your Honor.

10             THE COURT:  All right.  Okay.  Thank you, everyone.

11             THE DEFENDANT:  Thank you, Your Honor.

12             THE COURT:  Thank you.

13             THE DEFENDANT:  Oh, God bless America, everyone.  Stay

14   safe.

15        (Proceedings adjourned at 4:12:48 p.m.)

16

17                    C E R T I F I C A T E

18

19        I, Heather K. Newman, court-approved transcriber, certify

20   that the foregoing is a correct transcript transcribed from the

21   official electronic sound recording of the proceedings in the

22   above-entitled matter.

23

24        /s/ Heather K. Newman              4-25-2020
            Heather K. Newman                  Date
25