```
                 —TRANSCRIBED FROM DIGITAL RECORDING—


1                   UNITED STATES DISTRICT COURT

2                       DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,    )  Case No. 2:20-mj-221-DJA
                                 )
5          Plaintiff,            )  Las Vegas, Nevada
                                 )  Friday, April 24, 2020
6          vs.                   )  Courtroom 6B
                                 )
7   LOUIS DAMATO,                )  REVOCATION OF PRETRIAL
                                 )  RELEASE HEARING
8          Defendant.            )
    _____)  C E R T I F I E D   C O P Y
9

10

11                   TRANSCRIPT OF PROCEEDINGS

12          BEFORE THE HONORABLE BRENDA N. WEKSLER,
                 UNITED STATES MAGISTRATE JUDGE
13

14   APPEARANCES:

15   For the Plaintiff:

16          UNITED STATES ATTORNEY'S OFFICE
            BY:  NICHOLAS D. DICKINSON, AUSA (Telephonic)
17          501 Las Vegas Boulevard South, Suite 1100
            Las Vegas, NV 89101
18          (702) 388-6336

19   (Appearances continued on Page 2)

20   DIGITALLY RECORDED:          Liberty Court Recorder (LCR)
                                  2:08:20 p.m.
21
     RECORDED BY:                 J. Miller
22
     TRANSCRIBED BY:              Heather K. Newman
23                                (702) 471-0002

24

25   Proceedings recorded by electronic sound recording; transcript
     produced by machine shorthand and computer-aided transcription.
```

─TRANSCRIBED FROM DIGITAL RECORDING─

1   APPEARANCES CONTINUED:

2   For the Defendant:

3          FEDERAL PUBLIC DEFENDER'S OFFICE
           BY:  REBECCA A. LEVY, AFPD (Telephonic)
4          411 East Bonneville Avenue, Suite 250
           Las Vegas, NV 89101
5          (702) 388-6577

6          *** DEFENDANT APPEARING VIA VTC ***

7   Also present:

8          Sandra Bustos (Telephonic)
           Mariah Bassler-Wide (Telephonic)
9          United States Pretrial Services

10         Steven Carpenter (Telephonic)
           United States Marshal Service
11
           Brandon Delaney, Chief Security Officer (Telephonic)
12         Rebecca Smith, Clinical Supervisor (Telephonic)
           Bonnie Holly, Health Services Administrator (Telephonic)
13         Southern Nevada Detention Center

14                            * * * * *

15

16

17                          I N D E X

18  WITNESSES:                                              Page

19  REBECCA SMITH

20         Examination by Ms. Levy                           6

21

22

23

24

25

```
                  ─TRANSCRIBED FROM DIGITAL RECORDING─
```

1          LAS VEGAS, NEVADA; FRIDAY, APRIL 24, 2020; 2:08:20 P.M.

2                                 --oOo--

3                        P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Ladies and gentlemen,

5    Judge Weksler has joined us in the courtroom.

6      (Court takes bench).

7          COURTROOM ADMINISTRATOR:  Good afternoon, Your Honor.

8    We are now calling the continued revocation of pretrial release

9    proceedings in the matter of United States of America vs.

10   Louis Damato.  The case number is 2:20-mj-0221-DJA.

11         Beginning with government counsel, counsel, please

12   state your names for the record.

13         MR. DICKINSON:  Good afternoon, Your Honor,

14   Nicholas Dickinson for the United States.

15         THE COURT:  Good afternoon.

16         MS. LEVY:  Rebecca Levy for Mr. Damato.

17         THE COURT:  Good afternoon.

18         MS. LEVY:  He is present via video conferencing.  He's

19   in custody, Your Honor.

20         THE COURT:  Good afternoon to you.

21         Good afternoon to you, Mr. Damato.

22         I also see that we have Ms. Bustos on the line as well

23   as Ms. -- is it Ms. Bassler-Wide?

24         PRETRIAL OFFICER BASSLER-WIDE:  Correct, Your Honor.

25         THE COURT:  And I understand that Mr. Carpenter, from

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

1    the Marshal's Office, is appearing telephonically.

2            Mr. Carpenter, are you on?

3            MARSHAL CARPENTER:  Yes, Your Honor.

4            THE COURT:  And I also understand that the security

5    chief, Brandon Delaney; the clinical supervisor, Rebecca Smith;

6    and the health services administrator, Bonnie Holly, all from

7    the detention facility in Pahrump, are present telephonically;

8    is that correct?

9            CHIEF DELANEY:  Yes, Your Honor.

10           THE COURT:  All right.  So we're here on the continued

11   Pretrial Revocation Hearing.  Mr. Damato, let me ask you the

12   same series of questions that I did last time.

13           You are entitled to have this proceeding by appearing

14   in person.  Due to a pandemic that's going on, we are taking

15   care of these matters by way of video conference but that

16   requires that you consent to the proceeding in this matter.

17           Do you consent?

18           THE DEFENDANT:  I do, Your Honor.  Thank you.

19           THE COURT:  All right.  And Ms. Levy, have you

20   consulted with your client prior to his consenting?

21           MS. LEVY:  I have, Your Honor, and I agree,

22   Your Honor.

23           THE COURT:  All right.  Very well.

24           So, I've been thinking about this case quite a bit

25   since yesterday.  I thought at one point that I was going to

—TRANSCRIBED FROM DIGITAL RECORDING—

1   need additional information from Mr. Delaney.  I really don't.

2   I just need some additional information from either Ms. Smith

3   or Ms. Bonnie Holly, and the only remaining question that I

4   have is whether Mr. Damato has been taking medications.  If so,

5   which ones those are and for how long he's been taking them.

6          MS. SMITH:  Your Honor, I believe he's currently on

7   five medications.  Would you like the name of those medications

8   or just what they are for?

9          THE COURT:  The names, please, and then if you know

10  what they're for, I would like to know what they're for as

11  well.

12         MS. SMITH:  Okay.  The first one is Descovy,

13  D-e-s-c-o-v-y, an HIV medication.  The next one is Duloxetine,

14  D-u-l-o-x-e-t-i-n-e.  That is for (indiscernible) nerve pain.

15  Next one is ibuprofen.  That one is as well for pain.  The next

16  one is lamotrigine, l-a-m-o-t-r-i-g-i-n-e.  That is a mental

17  health medication.  And the last one is Tivicay, T-i-v-i-c-a-y,

18  and that is also an HIV medication.

19         THE COURT:  Okay.  And the mental health medication,

20  what is it for?

21         MS. SMITH:  The. . .  For depression.

22         THE COURT:  And you had mentioned that when he first

23  went in, he was held at a medical facility mostly because of

24  mental health conditions.  Was he evaluated?

25         MS. SMITH:  Yes, he was.

─TRANSCRIBED FROM DIGITAL RECORDING─

1          THE COURT:  And what were the -- what was the result

2   of the evaluation?

3          MS. SMITH:  He was seen by mental health daily from

4   March 31st (indiscernible) to August [sic] 5th, and -- I'm

5   sorry, April 5th.  Sorry.  At that time, he was -- they added

6   the medication, the lamotrigine medication.  They were

7   monitoring him for a few days, make sure that that was

8   therapeutic before they released him to general population.

9          THE COURT:  All right.

10          All right.  Does either Ms. Levy or Mr. Dickinson have

11   any questions based on the questions that I have asked?

12          MR. DICKINSON:  Your Honor --

13      (Simultaneous crosstalk).

14          MS. LEVY:  I do, Your Honor, I was just waiting --

15      (Simultaneous crosstalk).

16          THE COURT:  Okay.  Mr. Dickinson, do you have any

17   questions?

18          MR. DICKINSON:  No, Your Honor.

19          THE COURT:  All right.  Ms. Levy, do you have some

20   questions?

21          MS. LEVY:  I do.

22

23               EXAMINATION OF REBECCA SMITH

24   BY MS. LEVY:

25   Q.  You indicated that you reviewed Mr. Damato's record from

—TRANSCRIBED FROM DIGITAL RECORDING—

1   March 31st to April 5th; is that correct?

2   A.   Correct.

3   Q.   And my understanding, after we left yesterday's court

4   appearance was you were going to review his record from what he

5   was initially detained in Pahrump; correct?

6   A.   Are you -- are you speaking of when he was at our facility

7   from March 26th to March 27th?

8   Q.   Yes, ma'am.

9   A.   Yes.  I have that information in front of me as well.

10  Q.   Thank you so much.  And I have some questions about that if

11  you could keep that information handy in front of you.

12  A.   Sure.

13  Q.   On March 26th and March 27th was he also prescribed the

14  medication for depression?

15  A.   Let me review that.

16  Q.   Thank you.

17  A.   (Witness complies).

18         He was on a different medication for depression.  At

19  that time, he was on sertraline, or Zoloft.

20  Q.   And how many doses did he receive between March 26th and

21  March 27th?

22  A.   That one I'm going to have to. . . get together that

23  information.  Give me just a moment.

24  Q.   No problem.

25         (Brief pause in proceedings).

—TRANSCRIBED FROM DIGITAL RECORDING—

1          THE WITNESS:  Okay.  So it looks like on March 27th,

2     at 10:00 a.m., he did receive a dose of that medication.

3     BY MS. LEVY:

4     Q.   And not on the 26th?

5     A.   No.

6     Q.   Now, you indicated that when he came back to the facility

7     on March 31st, he was prescribed a different type of mental

8     health medication?

9     A.   Correct.

10          CHIEF DELANEY:  Our --

11       (Simultaneous crosstalk).

12     BY MS. LEVY:

13     Q.   What day was he first prescribed --

14          CHIEF DELANEY:  Our records show that he came in --

15          THE COURT:  Wait a minute.  Please identify yourself

16     so that the record is clear because we're recording everything

17     and it's not going to be clear who is speaking.

18          Is this Mr. Delaney?

19          CHIEF DELANEY:  Yes, Chief Delaney.

20          THE COURT:  Go ahead.

21          CHIEF DELANEY:  Our -- our records show that he came

22     in on intake on the 26th at 18- -- 1856 hours and was

23     discharged on the 27th at 1228 hours.

24          MS. LEVY:  If I could just have one moment.

25       (Brief pause in proceedings).

---TRANSCRIBED FROM DIGITAL RECORDING---

1      MS. LEVY:  I'm sorry, I'm just a little confused.

2  What time did you indicate, Chief Delaney, that Mr. Damato was

3  released on the 27th?

4      CHIEF DELANEY:  Yes, ma'am.  I show that he was

5  released out of -- out of our system in Pahrump on the

6  27th. . .  Oh, excuse me.  17- -- 1753 hours.  1753 hours.

7      MS. LEVY:  Okay.  So --

8      CHIEF DELANEY:  (Indiscernible).

9   (Simultaneous crosstalk).

10      MS. LEVY:  -- that's what I was confused about.

11      Yeah, we usually don't have initial appearances that

12  early, so thank you for the clarification.

13      CHIEF DELANEY:  Yes.  I was -- I was off

14  (indiscernible) to another time he was moved to intake versus

15  the time he was actually put in the system.

16      MS. LEVY:  Chief Delaney, if you don't mind, and I

17  don't know if the Court wants me just to reserve questioning

18  for one witness versus another, but I do have another question

19  for Chief Delaney if that's acceptable to the Court.

20      THE COURT:  Is it one question?

21      MS. LEVY:  I -- I just have a follow-up on what he

22  just said.

23      THE COURT:  Okay.  Go ahead.

24      MS. LEVY:  Chief Delaney, you indicated that

25  Mr. Damato arrived in the facility on March 26th in the evening

TRANSCRIBED FROM DIGITAL RECORDING

1  and then was moved to intake in the morning of the 27th; right?

2          CHIEF DELANEY:  He was -- he was moved to -- he came

3  into intake at -- we have him in the system at 1856 hours and

4  he was then placed into CA at 1954 hours.

5          MS. LEVY:  And went to intake in the morning, the next

6  morning?

7          CHIEF DELANEY:  And the following day, on the 27th,

8  while he was in CA, he moved -- he was placed in CA.  He did go

9  back to medical on the 26th -- 27th and was housed there. . .

10 that morning to midafternoon till 1225.  Was placed back in the

11 CA, and looks like he was moved from cell 106 at 1228 hours.

12 He was placed into cell 105 at 1228 hours and that's where I

13 mis- -- misled you on the first time because he was released

14 out of TA [sic] to intake at 1753 hours where he was released

15 from the facility.

16         MS. LEVY:  All right.  Thank you, Chief.  Appreciate

17 it.

18         CHIEF DELANEY:  You're welcome.

19         MS. LEVY:  If we can go back, and ma'am, I can't

20 recall your last name but I know your first name is Rebecca.

21 Can you give me your last name one more time?

22         THE WITNESS:  Smith, S-m-i-t-h.

23         MS. LEVY:  Okay.

24 ///

25 ///

—TRANSCRIBED FROM DIGITAL RECORDING—

1                    FURTHER EXAMINATION OF REBECCA SMITH

2  BY MS. LEVY:

3  Q.  So, Ms. Smith, let's talk about that first incarceration

4  Mr. Damato had.  He arrives into the facility on March 26th in

5  the evening; correct?

6  A.  Correct.

7  Q.  And what time is he seen by the nurse or doctor?

8  A.  Um. . . let me -- bear with me just one moment.

9       (Brief pause in proceedings).

10            THE WITNESS:  Can you look on the computer, Bonnie?

11       (Brief pause in proceedings).

12            THE WITNESS:  1747.

13  BY MS. LEVY:

14  Q.  On the 26th?

15            THE WITNESS:  Bonnie, is that on the 26th?

16            UNIDENTIFIED SPEAKER:  (Indiscernible).

17            THE WITNESS:  Bear with me just one moment.

18  BY MS. LEVY:

19  Q.  Okay.  I'm assuming it has to be because he's prescribed

20  medication the next day, so, and then he's released, but I just

21  want to make sure I'm accurate on that.

22       (Brief pause in proceedings).

23            THE WITNESS:  My documentation actually says on the

24  27th at 5:47 and. . .

25  ///

—TRANSCRIBED FROM DIGITAL RECORDING—

1    BY MS. LEVY:

2    Q.   Okay.  Do you have any indication that Mr. Damato met with

3    a nurse or a doctor on the 26th at all?

4        (Brief pause in proceedings).

5            THE WITNESS:  Detainees are seen by medical while

6    they're still in intake prior to being moved to any pod.  I'm

7    just sifting through his chart to try and find that initial

8    intake visit by the nurse.

9        (Brief pause in proceedings).

10           THE DEFENDANT:  Would I be able to consult with my

11   lawyer in the meantime?

12           THE COURT:  Sure, so let's go ahead and mute Ms. Levy

13   and Mr. Damato.

14           THE DEFENDANT:  Thanks.

15           COURTROOM ADMINISTRATOR:  Your Honor, those parties

16   were muted.

17           THE COURT:  Let's test it.

18        Ms. Levy, could you say something?

19      (No sound heard).

20           THE COURT:  And could you -- would you say something,

21   Mr. Damato?

22        (No sound heard).

23           THE COURT:  All right.  You're both muted.

24        (Attorney-client discussion).

25           THE COURT:  All right.  We can go ahead and unmute.

─TRANSCRIBED FROM DIGITAL RECORDING─

1          All right.  Ms. Levy, can you hear us?

2          MS. LEVY:  I can.

3          THE COURT:  Mr. Damato, can you hear us?

4          THE DEFENDANT:  I can, Your Honor.

5          THE COURT:  All right.  Ms. Levy, did you have any

6    other questions?

7          MS. LEVY:  I think we're waiting on Ms. Smith.  She

8    was going to give me an answer about --

9          THE COURT:  That's right.

10         MS. LEVY:  -- (indiscernible).

11     (Simultaneous crosstalk).

12         THE WITNESS:  Well, I can as well.  This is -- this is

13   Ms. Smith.

14         Mr. Damato was seen by the nurse on 3-26-20 at 2107.

15   BY MS. LEVY:

16   Q.  And was he at that time given his HIV medication?

17   A.  He was not because he didn't come with the medication.

18   Q.  And then was he given the HIV medication on the 27th of

19   March?

20   A.  No, because he didn't come to our facility with any of his

21   medications and we only have certain medications that are --

22   we're allowed to have in stock, and those medications are not

23   one of those.  So when they're ordered, it does take 48 hours

24   for us to receive the medication from pharmacy when the

25   detainee does not come with them.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.   Was there any indication that he was dehydrated on either

2   March 26th or March 27th?

3   A.   No, we do not have any documentation of any signs or

4   symptoms of him being dehydrated on the 26th or 27th.

5   Q.   And just to clarify.  He got one dose of. . . basically

6   Zoloft, it's a different name, but basically Zoloft, and that

7   would have been on the morning of the 27th of March; right?

8   A.   Correct.

9   Q.   All right.  If I could now draw your attention to the time

10  frame when he comes back, that's March 31st.

11  A.   Okay.

12  Q.   And let me know when you're ready.

13       (Brief pause in proceedings).

14          THE WITNESS:  Okay.  We've got his information up from

15  that date.

16  BY MS. LEVY:

17  Q.   Thank you.

18          Did you receive any information, either from the FBI

19  or from any other agency, that Mr. Damato had been hospitalized

20  prior to coming back March 31st?

21  A.   No, we don't have any documentation on that.  He did

22  mention to the nurse at intake that he had been in the

23  hospital, but we have no official documentation of it, just his

24  verbal.

25  Q.   All right.  The FBI didn't give you the hospital records?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.   No.

2    Q.   And then on March 31st, I assume he sees a nurse that day?

3    A.   Yes, correct, at intake.

4    Q.   And then can you tell me what day he starts his HIV

5    medication?

6    A.   Yeah, let me pull that up.

7    Q.   Thank you.

8         (Brief pause in proceedings).

9            THE WITNESS:   Both of those medications were started

10   on April 15th.

11   BY MS. LEVY:

12   Q.   April 15, 1-5?

13   A.   1-5, correct.

14   Q.   Are those medications daily medications?

15   A.   They are.

16   Q.   Okay.  And I'm just trying to clarify.  And, so, there's a

17   2-week lag from when Mr. Damato gets into your facility until

18   he's prescribed his HIV medication?

19   A.   There was because we did not have his previous medical

20   history on what medications he was to be taking, so there was

21   discovery period for us to find what medication he was on to

22   get it ordered.

23   Q.   If I could just sort of flip back, sorry, to the first time

24   that Mr. Damato's in custody on March 26th, don't -- did you

25   guys do an intake with him on March 26th, and in that intake do

————TRANSCRIBED FROM DIGITAL RECORDING————

1  you discuss medications?

2       (Brief pause in proceedings).

3            THE WITNESS:  So, in reviewing his information, the

4  medical information that he came with did not mention HIV, it

5  just had report for tumors in his intestine, and he came with

6  no medication.

7  BY MS. LEVY:

8  Q.  Okay.  Are you telling me that on the March 26th intake

9  there is no indication that Mr. Damato had HIV?

10  A.  Correct.  We did not have that information on March 26th.

11  Q.  Did you have that information on March 27th?

12  A.  One moment.

13       (Brief pause in proceedings).

14            THE WITNESS:  Okay.  So in reviewing his information

15  on his paperwork, the 129, it did report HIV, but on his intake

16  and interview with the nurse was self-reported, it says,

17  "Medication:  Descovy."

18  BY MS. LEVY:

19  Q.  And can I clarify the date on that?

20  A.  That was on the 27th, March 27th.

21  Q.  When was Mr. Damato's -- you indicated that it takes

22  48 hours to order the medication.  At what time was

23  Mr. Damato's HIV medication ordered the first time he was

24  incarcerated, that would be March 26th/March 27th?

25  A.  Um. . . let me review.

————TRANSCRIBED FROM DIGITAL RECORDING————

1        (Brief pause in proceedings).

2            THE WITNESS:  In reviewing his chart, I do not have it

3    ordered March 27th, and this is likely because it was a

4    self-reported medication so we would have to wait until we got

5    clarification on dosages before we could order it.

6    BY MS. LEVY:

7    Q.  And did he indicate to you on that first incarceration time

8    period which HIV medication he was taking?

9    A.  We have self-reported that he was taking Descovy,

10   D-e-s-c-o-v-y.

11           Oh.  No.  Correct.  Sorry.  Correction.  That was

12   his -- that was the one we have him on now.  It was Bik- --

13   Biktarvy.

14   Q.  And that is also HIV medication that's supposed to be given

15   every day; correct?

16   A.  Correct.  It's also medication --

17        (Simultaneous crosstalk).

18   BY MS. LEVY:

19   Q.  Did you know that his viral load -- did you know what his

20   viral load was when he was first taken in on the 26th or the

21   27th of March?

22   A.  No.  He didn't come with labs.

23   Q.  When Mr. Damato -- now I'm jumping back -- I'm sorry to

24   jump around, but I'm jumping back to this March 31st date when

25   he comes back, he meets with a nurse on, what, the 31st you

─TRANSCRIBED FROM DIGITAL RECORDING─

1   said; right?

2   A.   Yes, that's correct.

3   Q.   Again, does he self-report HIV?

4   A.   Yes.

5   Q.   Okay.  Same as he had previously; correct?

6   A.   Correct.

7   Q.   He, again, indicates the same exact medications that he had

8   been on; correct?

9   A.   Yes, that's correct.

10  Q.   What is the first day that he meets with a doctor?

11  A.   Let me review that.  One moment.

12       (Brief pause in proceedings).

13           THE WITNESS:  On April 13th he was seen by Dr. Rivas.

14  BY MS. LEVY:

15  Q.   In person?

16  A.   Yes.

17  Q.   And at that time did Dr. Rivas order Mr. Damato's HIV

18  medication?

19  A.   At that time, he referred him to Dr. Saavedra who handles

20  all of our chronic care HIV detainees, and the medication was

21  ordered on April 15th.

22  Q.   My understanding is Dr. Rivas is the -- he's the medical

23  director; right?

24  A.   Yes.

25  Q.   He can't prescribe medication for an HIV detainee?

────TRANSCRIBED FROM DIGITAL RECORDING────

1   A.   He does.  We just have another provider here that

2   specializes with all our HIV, so he referred him to --

3   Q.   Dr. Saavedra?

4   A.   Yeah, Dr. Saavedra.

5   Q.   Is he an infectious disease doctor?  Because when I looked

6   him up previously, he was a family doctor.

7   A.   He's not an infectious disease doctor.

8           THE COURT:  I just have one question, clarification.

9   You mentioned that the medication was ordered on 4-15, but you

10  also stated that he started taking it on 4-15.  Did I get that

11  correctly?

12          THE WITNESS:  Sorry.  Repeat that.

13          THE COURT:  You mentioned that the medications were

14  ordered on April 15th and previously you had mentioned that he

15  started taking them on April 15th.

16          THE WITNESS:  Let me review.  One moment.

17     (Brief pause in proceedings).

18          THE DEFENDANT:  Your Honor, could I just have one

19  quick chat with my attorney?

20          THE COURT:  Sure.  Let's go ahead and mute --

21          THE DEFENDANT:  Just to clarify.

22          THE COURT:  Let's go ahead and mute Ms. Levy and

23  Mr. Damato.

24          COURTROOM ADMINISTRATOR:  Your Honor, the parties are

25  muted.

TRANSCRIBED FROM DIGITAL RECORDING

1          THE COURT:  All right.  Let's test it.

2          Ms. Levy, could you say something?

3     (No sound heard).

4          THE COURT:  Mr. Damato?

5     (No sound heard).

6          THE COURT:  Ms. Levy, could you say something?

7     (No sound heard).

8          THE COURT:  All right.  You're muted.

9     (Attorney-client discussion).

10          THE COURT:  All right.  Looks like we can unmute.

11          Ms. Levy, can you hear me?

12          MS. LEVY:  I can, thank you.

13          THE COURT:  Mr. Damato, can you hear me?

14          THE DEFENDANT:  Yes, I can, Your Honor.

15          THE COURT:  All right.  I think we were waiting on

16     Ms. Smith to answer or clarify the questions I had.

17     (Brief pause in proceedings).

18          THE COURT:  Ms. Smith?

19          THE WITNESS:  Okay.  I'm here.

20          THE COURT:  Do you remember my questions?

21          THE WITNESS:  Okay.  I've got additional information.

22     It looks like the medication was ordered on 4-13 and then

23     administered for the first time on 4-15.  Part of the lapse in

24     ordering the medication was due to waiting on lab results as

25     when a detainee has not been taking their antiviral medications

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1  prior to getting started on the medication again, we do need to

2  do labs.  Those resulted on 4-11.

3         THE COURT:  All right.  Ms. Levy, do you have any

4  other questions?

5         MS. LEVY:  I do, Your Honor.  Thank you.

6  BY MS. LEVY:

7  Q.  Do you take blood in the facility, meaning does Mr. Damato

8  have to leave the facility to get his blood drawn?

9  A.  No.  Yeah.  They're right here on site, and it is shipped

10  out to our lab.

11  Q.  And he was -- and when he was intaked on the 26th, was

12  blood taken, March 26th?

13  A.  No.

14  Q.  Was blood taken on March 27th?

15  A.  No.

16  Q.  And then -- well, March 31st, blood taken?

17  A.  No.  Blood was not ordered --

18  Q.  What day was the --

19  A.  -- until April 8th.  (Indiscernible).

20     (Simultaneous crosstalk).

21  BY MS. LEVY:

22  Q.  It was taken on April 8th?

23  A.  It was taken on April 8th and resulted on April 11th, so

24  let me just review when it was actually ordered.

25     (Brief pause in proceedings).

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1          THE WITNESS:  Okay.  Sorry for that wait.  The blood

2     was ordered on April 8th and drawn on April 8th.

3     BY MS. LEVY:

4     Q.  Why the delay?  Why wasn't it ordered either on the 26th,

5     27th, or the 31st of March?

6     A.  Well, the 26th and 27th he was here on site less than

7     24 hours, from what I can tell --

8          (Simultaneous crosstalk).

9     BY MS. LEVY:

10    Q.  If I may stop you.  If -- if I may stop you.  But he

11    self-reported that he had AIDS and you were unsure whether he

12    would remain in your facility or not.

13    A.  Correct, but we don't have providers, doctor here 24 hours

14    a day and unless a detainee is showing signs and symptoms of an

15    emergency, we don't contact our on-call provider for routine

16    lab work and orders.

17    Q.  You do not have either a nurse or a doctor available at

18    your facility at all times.  Is that what you're testifying to?

19    A.  No, that's not at all what I said.  I was meaning a medical

20    provider -- a doctor on site 24 hours.  We do have R- -- an RN

21    on site 24 hours a day here.

22    Q.  And an RN can draw blood; right?

23    A.  They can, but they cannot order it.

24    Q.  So they would not have the capability to be able to assist

25    Mr. Damato in getting blood [sic] if he needed to; they would

                    ─TRANSCRIBED FROM DIGITAL RECORDING─

1   have to call out to the doctor?

2   A.   Correct, which we do on a regular basis when a detainee is

3   showing signs and symptoms of an emergency, but like I said, we

4   do not contact the doctor in the middle of the night for

5   routine orders.

6   Q.   And that delay can be approximately a week to 2 weeks, is

7   that what it looks like, from March 31st until the 8th and then

8   results back on the 11th?

9   A.   I'm sorry, can you repeat that?

10  Q.   There can be upwards of a week to 2 weeks of a delay in

11  getting blood work ordered?

12       (Brief pause in proceedings).

13            THE WITNESS:  I guess there could be.

14  BY MS. LEVY:

15  Q.   Well, there was in this case.

16  A.   Yeah.  When a detainee comes to our facility, we typically

17  have 14 days prior to -- up to 14 days to have the detainee

18  seen by a provider.

19  Q.   But if I may, it's not just in an intake problem.  I mean,

20  if Mr. Damato said today, hey, I'm concerned about something

21  going on with my HIV status, I need my blood drawn, there could

22  be up to between a week and 2 weeks delay in terms of getting

23  the nurse to see him, getting it ordered, getting the results

24  back.  We could be talking upwards of a 2-week delay; correct?

25  A.   I -- I -- I would disagree with that.  If a detainee comes

———TRANSCRIBED FROM DIGITAL RECORDING———

1   up to any of our nurses in the facility reporting they have

2   concerns about their HIV, that nurse would go to the doctor

3   and/or contact me or Bonnie and -- and we would -- it's not

4   something we would call a provider in the middle of the night,

5   but the next working day -- we have providers here Monday

6   through Friday -- we would be working on getting labs drawn or

7   medication.

8           THE COURT:  Ms. Levy, let me just ask you, I think

9   that I've gotten the gist of your cross-examination.  I think I

10  understand where you're going and I don't think that I need any

11  additional information.  If you have a couple of follow-up

12  questions and then we can wrap up this portion of the hearing,

13  I'll let you go ahead and do that, but I really don't need much

14  more on this particular area.

15          MS. LEVY:  I think the Court understands my concerns.

16          THE COURT:  All right.  Mr. Dickinson, do you have any

17  questions?

18          MR. DICKINSON:  No, Your Honor.

19          THE COURT:  All right.  So, very well.  I just have

20  one more question for you, Ms. Smith.  You had given me a list

21  of five medications that he was on.  Has he been on those

22  medications since March 31st?

23          THE WITNESS:  Um. . . let me check.

24      (Brief pause in proceedings).

25          THE WITNESS:  Since March 31st?

—TRANSCRIBED FROM DIGITAL RECORDING—

1          THE COURT:  That's when I believe you told me that he

2    started taking these medications, but if I'm incorrect or

3    misunderstood, please let me know.

4          THE WITNESS:  Well, we discussed at length that he

5    started his Descovy and Tivicay on April 15th, so those, of

6    course, he was not on since March 31st.  They're just -- he's

7    just currently on those medications.

8          THE COURT:  As to the other ones?

9          THE WITNESS:  The Duloxetine was started on the 31st.

10   The ibuprofen was not started until April 22nd, and the

11   Lamictal or the lamotrigine was started also on March 31st.

12         THE COURT:  All right.  Very well.

13         Let's see. . . let me ask you --

14         MS. LEVY:  Your Honor, I have a follow-up.  I'm sorry.

15         THE COURT:  Let me just ask one more question, and

16   that is, when an individuals are released from your facility,

17   are they released with medications in any kind of circumstance?

18         THE WITNESS:  Our policy states that, yes, when

19   they're currently prescribed medication, they are released with

20   7 days' worth of that medication.

21         THE COURT:  All right.  Go ahead, Ms. Levy.

22

23              FURTHER EXAMINATION OF REBECCA SMITH

24   BY MS. LEVY:

25   Q.  If Mr. Damato was released today, you would be able to

```
─────────────────TRANSCRIBED FROM DIGITAL RECORDING─────────────────
```

1   provide 7 days' worth of medication?

2   A.   Yes, that's correct.

3   Q.   I just want to confirm that the medication he is on

4   currently, including his HIV medication, is the same medication

5   he self-reported that he takes?

6   A.   He self-reported originally that he was on Biktarvy.   The

7   two medications that he is currently on, the Descovy and the

8   Tivicay is the same medication but it's in two pills.   Biktarvy

9   is that medication and a combo med.

10  Q.   And how about the mental health medication?

11  A.   What's your question?

12  Q.   Is the mental health medication he's still on the same as

13  he self-reported?  Because you initially put him on Zoloft and

14  now he's on a different one.

15  A.   Well, let me double-check.  One moment.

16       (Brief pause in proceedings).

17            THE DEFENDANT:  Can I have a word with my attorney

18  really quickly, Your Honor?

19            THE COURT:  Let's go ahead and mute --

20            THE DEFENDANT:  Please.  Thank you.

21            THE COURT:  -- Mr. Damato and Ms. Levy.

22            COURTROOM ADMINISTRATOR:  The parties are muted,

23  Your Honor.

24            THE COURT:  All right.  Let's test it.

25            Ms. Levy, could you say something?

———TRANSCRIBED FROM DIGITAL RECORDING———

1      (No sound heard).

2          THE COURT:  Mr. Damato, could you say something?

3      (No sound heard).

4          THE COURT:  All right.  You're muted.

5      (Attorney-client discussion).

6          THE COURT:  All right.  We can go ahead and unmute.

7          COURTROOM ADMINISTRATOR:  Your Honor, the parties are

8  unmuted.

9          THE COURT:  All right, Ms. Levy, can you hear us?

10         MS. LEVY:  I can.  Thank you, Your Honor.

11         THE COURT:  And Mr. Damato, can you hear us?

12         THE DEFENDANT:  I can, Your Honor.  Thank you.

13         THE COURT:  All right.  Okay.  I don't have any other

14  questions for Ms. Smith.  I just want to make sure that

15  Ms. Levy and Mr. Dickinson do not have any other questions.

16         MS. LEVY:  I have one more, Your Honor, which is, when

17  Mr. Damato was released on March 27th, was he given a week's

18  worth of Zoloft?  And I think we're just waiting on the answer

19  whether the drugs he's on, the mental health medication is the

20  same as it was self-reported.  And then that's it for me,

21  Your Honor.

22      (Brief pause in proceedings).

23         THE COURT:  Ms. Smith, did you hear the question?

24         THE WITNESS:  I did.  One moment.

25      (Brief pause in proceedings).

─TRANSCRIBED FROM DIGITAL RECORDING─

1        THE WITNESS:  Okay.  So, in answer to your first

2   question as far as he's taking the same medications he

3   self-reported, he self-reported he was on Seroquel, Valium, and

4   the Zoloft and only got the Zoloft on the 27th.

5        And then when he left on the 27th, per policy, he

6   would have gone with 7 days' worth, but I do not have that

7   documented.

8   BY MS. LEVY:

9   Q.  So if he -- if he wasn't given the 7 days' worth of Zoloft

10  when he left on the 27th, that would have been against policy?

11  A.  Correct.

12        MS. LEVY:  I don't have anything further, Your Honor.

13        THE COURT:  All right.  Very well.  Thank you so much,

14  Ms. Smith.

15        I'm going to excuse Mr. Delaney, Ms. Smith, and

16  Ms. Holly.  Thank you so much for appearing telephonically

17  today and yesterday.

18        MS. SMITH:  Thank you, Your Honor.

19        CHIEF DELANEY:  Thank you, Your Honor.

20     (Witnesses excused.)

21        THE COURT:  I'm inclined to also release Mr. Carpenter

22  unless the parties have any other questions that need to be

23  asked of him.

24        MS. LEVY:  No, Your Honor.

25        MR. DICKINSON:  No, Your Honor.

─TRANSCRIBED FROM DIGITAL RECORDING─

1          THE COURT:  All right.  Mr. Carpenter, thank you so
2     much for the information that you provided yesterday and for
3     appearing today.
4          MARSHAL CARPENTER:  Thank you, Your Honor.
5       (Witness excused.)
6          THE COURT:  All right.  So, Ms. Bustos, I do have a
7     couple questions for you, and one has to do with some
8     clarification that I needed regarding your petition for
9     revocation.  It mentions that Mr. Damato went to the hospital
10    on March 27th.  I just wanted to understand whether that is a
11    third hospitalization or whether that is the same -- one of the
12    same hospitalizations that we've been talking about during the
13    last couple of days.
14         PRETRIAL OFFICER BUSTOS:  So, the hospitalization on
15    March 27th was the first hospitalization that occurred when he
16    was released.
17         So he arrived at the halfway house at 7:40 in the
18    evening and soon after requested that he be taken to the
19    hospital for issues he was experiencing.  So that was the first
20    hospitalization, Your Honor.
21         THE COURT:  All right.  So follow -- if I'm
22    understanding correctly, there was a total of three different
23    instances in which he went to the hospital or the ER between
24    3-27 and 3-31?
25         PRETRIAL OFFICER BUSTOS:  Well, Your Honor, that -- I

─TRANSCRIBED FROM DIGITAL RECORDING─

1  was only aware of two hospitalizations, the one that occurred

2  on the 27th and the one that occurred on the 29th.  The third

3  one that you are referencing occurred after we had requested

4  the warrant be issued and we were not privy to that information

5  until the Revocation Hearing.

6          THE COURT:  Ah.  All right.  Thank you.

7          I don't have any questions.  I don't know if Ms. Levy

8  or Mr. Dickinson have any questions of Ms. Bustos.

9          MR. DICKINSON:  Not at this time, Your Honor.

10         THE COURT:  Ms. Levy?

11         MS. LEVY:  I'm just wondering if Ms. Bustos knows that

12 Mr. Damato arrived at the halfway house without medication,

13 whether she knows whether he did or not.

14         PRETRIAL OFFICER BUSTOS:  He arrived without

15 medication.  He had no medication and reported that he had no

16 medication when he arrived at the halfway house.

17         THE COURT:  All right.  Any other questions, Ms. Levy?

18         MS. LEVY:  No.  Thank you, Your Honor.

19         THE COURT:  All right.  So, I'm going to tell you, I

20 have been thinking about this case for a very long time.  I've

21 gone back and listened to the hearings that we've had, and it's

22 a close case, but ultimately I have decided I will not revoke

23 pretrial release and I will order Mr. Damato released once

24 certain conditions are satisfied.

25         I went ahead and put together a very brief order that

─TRANSCRIBED FROM DIGITAL RECORDING─

1   I'm going to read into the record and I'm going to follow this

2   up in writing, so just bear along with me.

3           As to 3148(b)(1), which is the section that I need to

4   be looking at, I find clear and convincing evidence that

5   Mr. Damato violated the conditions of release.

6           He failed to return to the halfway house on

7   March 29th, and the basis for this information is the FBI agent

8   testified that she had learned from Ms. Bustos that the

9   defendant had not returned to the halfway house prior to the

10  hospitalization at Southern Hills Hospital, which she later

11  clarified was the stand-alone ER affiliated with Southern

12  Hills.  So, I do find clear and convincing evidence as to that

13  portion of the statute.

14          The next step is for me to undertake a review of

15  3148(b)(2).

16          The statute does not state the type of burden of proof

17  the government is required to meet.  I have looked into case

18  law and have found nothing in the Ninth Circuit addressing this

19  specific issue.  I have looked at other circuits and I am

20  persuaded by a Second Circuit case, which is *United States vs.*

21  *Gotty*, G-o-t-t-y, 794 F.2d 773, it's a 1986 case which holds

22  that the government's burden of proof as to § 3148(b)(2) is

23  preponderance of the evidence.

24          With this burden of proof in mind, I turn to

25  3148(b)(2)(A) and (B) where the question is whether the

TRANSCRIBED FROM DIGITAL RECORDING

1   government has proved by a preponderance of the evidence there

2   is no condition or combination of conditions that will assure

3   that the person will not flee or pose a danger to the safety or

4   any other person or the community.

5          Addressing the danger prong of 3148(b)(2)(A), I think

6   it is important to compare the information this Court was

7   presented on March 27th and see what additional information has

8   been presented since then that allows the government to meet

9   this burden.

10          The government did not move for detention when

11  Mr. Damato made his initial appearance back on March 27th.  The

12  government stated that while ordinarily they would seek

13  detention in a case like this, due to the COVID-19 crises and

14  the underlying health conditions affecting Mr. Damato, they

15  would not do so.

16          The government emphasized the seriousness of this

17  case, but also provided some context giving rise to the

18  charges.  Specifically, it appeared that the government -- it

19  appeared to the government that during the time in question

20  Mr. Damato was being evicted from his residence and grew

21  increasingly upset with the property manager.  His behavior

22  during this period of time gave rise to state charges.  The

23  state charges are based on allegations that Mr. Damato's

24  behavior escalated from calling the property manager several

25  times to eventually threatening him to kill him.  As a result

TRANSCRIBED FROM DIGITAL RECORDING

1   of these interactions, Metro got involved and it is alleged

2   that Mr. Damato also threatened to kill the detective's family.

3          The government made note of the fact that Mr. Damato

4   was HIV positive and suffered from other underlying conditions.

5          The government explained that they had spoken to

6   several stakeholders, including the capitol police who was

7   acting as a conduit for Congresswomen Titus' office.  They

8   understood the government would not be seeking detention.

9          The government mentioned that the capitol police

10  understood the government's position and "obviously, in a

11  perfect world, they would want the defendant detained.  That

12  being said, based on the defendant's medical condition, as well

13  as looking at the least restrictive conditions," they requested

14  release under certain conditions.

15         At bottom, it appears to this Court that when weighing

16  all of the factors at play, the government made a determination

17  that detention was not merited.

18         I heard arguments from defense counsel as well back on

19  March 27th.  They noted that there was no evidence that

20  Mr. Damato possessed -- possesses a gun or that he took any

21  steps to materialize any of the threats that he had allegedly

22  made.  In short, the defense explained that Mr. Damato "went

23  off the rails" after what appeared to be a combination of not

24  taking his medications and the eviction procedure.

25         The defense noted that the two state court judges who

                  ─TRANSCRIBED FROM DIGITAL RECORDING─

1    had reviewed the other threats alleged as a result of that

2    behavior had released him as well.

3         I was persuaded by these arguments and released

4    Mr. Damato and made mention of the fact that Mr. Damato had no

5    criminal history prior to the eviction procedure other than a

6    traffic-related citation.

7         Since then, the only additional information that

8    applies to this prong of the statute is that Mr. Damato appears

9    to have posted some posts on Facebook calling

10   Congresswomen Titus a tumbleweed and made other disparaging

11   comments.  While those are or could be seen as inappropriate,

12   none appear to be threats.

13        The information we have is that there are new charges

14   as well.  These charges appear to stem out of the same conduct

15   going back to the eviction procedure.

16        The government represented that that new misdemeanor

17   charge seems to have arisen --

18        MR. DICKINSON:  Excuse -- I apologize for

19   interrupting, Your Honor.  I could do it now or after, but I

20   have some additional information on that.

21        THE COURT:  Okay.  Let's do it after.

22     (Brief pause in proceedings).

23        THE COURT:  Well, rather than do it after, to the

24   extent that it may affect my decision, maybe we should stop

25   this and you can make --

─TRANSCRIBED FROM DIGITAL RECORDING─

1          MR. DICKINSON:  I don't believe it will, Your Honor.

2    I -- (indiscernible) it's difficult to get information with the

3    COVID and the D.A.'s office but last night I did and the D.A.

4    assigned to the case was almost not -- aware of -- almost

5    99 percent sure that it was just a crossing of paths and that

6    it doesn't -- it would not be an additional charge and was

7    working to take care of that today.

8          THE COURT:  Thank you for clarifying that,

9    Mr. Dickinson.

10         So, it appears that there is no pending misdemeanor

11   charge in this case.

12         There has been no evidence that he made any other

13   calls or threats or took any steps to materialize the threats

14   he allegedly made in the middle of March.  The government did

15   not seek detention on March 27th and argued that conditions

16   could be fashioned for Mr. Damato's release.  This new

17   information, that being the Facebook post, does not tip the

18   scales.

19         Based on all of this, the Court finds that the

20   government has not shown by a preponderance of the evidence

21   that there are no conditions of release that will assure

22   Mr. Damato will not pose a danger to the community.

23         Moving on to the flight prong of 3148(b)(2)(A), I

24   think it is key to remember that the question here differs from

25   the question under § 3148(b)(1)(B).  In that context, the

TRANSCRIBED FROM DIGITAL RECORDING

1   question is whether the defendant violated conditions of

2   release.  I found that he did.  The question under

3   § 3148(b)(2)(A) is whether the government can prove by a

4   preponderance of the evidence that there are no conditions that

5   will assure the person will not flee.

6          While I found by clear and convincing evidence that

7   Mr. Damato violated conditions of release by not returning to

8   the halfway house on March 29th, I do not find that the

9   government has shown by a preponderance of the evidence that

10  there are no conditions that will assure he will not appear in

11  court as instructed.

12         All we have is information for the dates between

13  March 27th and March 30th.  The Pretrial Services petition

14  states that he went to the hospital on March 27th and that he

15  returned to the halfway house, albeit an hour late.

16         March 28th offers no information in this regard.

17         As to March 29th and March 30th, there is evidence

18  that Mr. Damato was hospitalized twice.

19         There is inconsistent information from those exhibits,

20  but the following information is consistent throughout:

21         He had been falling.  There was information to suggest

22  syncopal episodes and was dehydrated.

23         The defense argues that he was confused.

24         I find that the fact that he had the wherewithal to

25  pick up his dogs seems to cut against that argument, so I am

TRANSCRIBED FROM DIGITAL RECORDING

1    conflicted on that account.

2              I also want to touch base on the reservation from --

3    for the Embassy Suites starting on March 30th through

4    April 6th.

5              First, I know that there is evidence that the

6    confirmation from the hotel was sent on March 29th at 2:09 p.m.

7    That's not the reservation, but the confirmation.  This would

8    suggest that Mr. Damato made the reservations either while

9    hospitalized on March 29th or before that.  Ultimately, what I

10   come back to is the fact that if his intent on March 29th was

11   to abscond, then he would have made the reservation for

12   March 29th or earlier, not for March 30th.  Importantly,

13   March 30th was a Monday.  I did state on the record that I

14   would review any proposals for moving out of the halfway house

15   on an expedited basis.

16             Given this, the fact that he showed back up to the

17   halfway house on March 27th, the fact that he did not make a

18   reservation to start his stay at Embassy Suites until Monday --

19   until Monday, March 30th, I found that the government has not

20   proved by a preponderance of the evidence that no conditions

21   can be fashioned to assure the defendant will appear in court.

22             Lastly, as to § 3148(b)(2)(B), the question is whether

23   the government has shown by a preponderance of the evidence the

24   defendant is unlikely to abide by any condition or combination

25   of conditions of release.

TRANSCRIBED FROM DIGITAL RECORDING

1          My analysis centers around much of what I previously

2     discussed.  We only have behavior spanning from March 27th to

3     March 30th.  He was in compliance on March 27th and March 28th.

4     March 29th and March 30th involve hospitalizations and

5     contradictory information.

6          As stated before, there is clear and convincing

7     evidence that defendant violated a condition of release, but I

8     have conflicting information regarding his mental and physical

9     health based on the hospitalizations during those days and how

10    that may have played a role in failing to return to the halfway

11    house on March 29th.

12         In short, I know he violated a condition in the past,

13    but there is insufficient evidence for the government to meet

14    by a preponderance of the evidence that he will not do so in

15    the future.

16         This is just a brief summary of what my order will

17    say.  I will add other information after I listen to all of the

18    evidence that's been presented again and I will reduce all of

19    that to writing.

20         Mr. Damato will be released.  However, I do need to

21    make sure that certain conditions are in place.

22         One of the things that I wanted to know about is the

23    medications.  It appears that he will be released with 7 days

24    of medication.  One of the things that I want to make sure of,

25    Ms. Levy, is moving forward, I need to have a plan that

—TRANSCRIBED FROM DIGITAL RECORDING—

1 explains to the Court how he's going to get the medications.

2 So, I understand that will be taken care of for the first

3 7 days.  I want to know what happens afterwards and that

4 there's a plan in place.

5           The second thing that I need to make sure that is in

6 place is that we have. . . a suitable place for him to reside

7 at.  So, once that information is provided to the Court, I will

8 go ahead and review that.  If suitable, he will be on home

9 confinement and subject to electronic monitoring.

10           I will also request that there be no posting on social

11 media of any kind, and I will also want the facility in Pahrump

12 to take the normal steps that they take prior to releasing

13 somebody to ensure that he is not positive for COVID-19.

14           So, Ms. Levy, my inclination is to move this to Monday

15 to give you enough time to put a plan together for these two

16 things that need to be worked out, one, the medication issue,

17 and secondly, the. . . the residence.

18           MS. LEVY:  Your Honor, if I may respond.

19           THE COURT:  Sure.

20           MS. LEVY:  In terms of medication, my understanding,

21 the FBI arrested him this last time, he had pill prescriptions

22 with him in his property.  My hope is that FBI kept the

23 medication with his property.  I can't imagine they would do

24 anything else, and that when he gets out he will have

25 (indiscernible).

—TRANSCRIBED FROM DIGITAL RECORDING—

1          I can tell the Court it is also my understanding that
2    my client is on Medicare with supplement and that he is able to
3    fill prescriptions.  So if he's released, he can do that
4    after -- you know, when -- (indiscernible) so it should be
5    within that 7-day period, but he should, even after the 7 days,
6    have a 30-day (indiscernible) and I'll clarify that with my
7    client, but that's my understanding.
8          THE COURT:  All right.  Wonderful.  So,
9    Mr. Dickinson --
10          MR. DICKINSON:  Yeah.
11          THE COURT:  -- what I will ask you to do is -- yes --
12          MR. DICKINSON:  Well, I have --
13          THE COURT:  -- whatever information you have.
14          MR. DICKINSON:  Your Honor, his property, the FBI
15    turned that over to Lorraine Miller who, I believe, is his
16    sister, or cousin.
17          THE COURT:  Okay.  I see Mr. Damato shaking his head,
18    or nodding his head I should say.
19          So, let's go ahead and verify this information,
20    Ms. Levy.  I am on duty all of week next week.  I will schedule
21    this for Monday, and we'll get a time in a few minutes.
22          If we need to continue this for whatever reason, I'm
23    happy to do so as well.  I just wanted to set it for the first
24    available date and provide the defense sufficient time to get
25    information together for the Court.

———TRANSCRIBED FROM DIGITAL RECORDING———

1    So, let's ensure that he does have at least a 30-day

2  prescription so we know exactly where it is that he's going to

3  be filling that prescription and where it is that he plans on

4  residing.

5    PRETRIAL OFFICER BUSTOS:  Your Honor --

6    MS. LEVY:  And I would ask that -- I'm sorry,

7  Your Honor.  I would ask that he be released to the halfway

8  house in the meantime so that he can do what he did last time,

9  which is (indiscernible) to the halfway house and then make a

10  reservation for probably like a weekly or a monthly facility.

11  Obviously, as the Court knows, I can't do that for a client, I

12  can't (indiscernible) financial information for the client, so

13  he has to be released.  The halfway house has a computer that

14  allows them to do that so even if he's only at the halfway

15  house for day or two, he can actually get there, be on his

16  medication this time, be on both his mental health and physical

17  medication, which obviously makes a big difference at the

18  halfway house versus the last time, make the reservation.  We

19  will have him have the information to be able to communicate

20  with his pretrial officer, which he didn't have last time, and

21  then he can communicate with his pretrial officer what address

22  he has and they can confirm that that's a suitable address for

23  him (indiscernible).

24    THE COURT:  All right.  So if I understand -- and I'll

25  get to you in a second, Mr. Damato.  My understanding is that

——TRANSCRIBED FROM DIGITAL RECORDING——

1  there are no beds available at the halfway house and in any

2  event, they will not take Mr. Damato back, so that is not an

3  alternative in this case.

4          Mr. Damato, do you need to speak to your attorney?

5          THE DEFENDANT:  Um. . . yes, Your Honor --

6          THE COURT:  All right.  Let's go ahead and mute

7  Ms. Levy and --

8          THE DEFENDANT:  -- about the medications.

9          THE COURT:  -- and Mr. Damato.

10          COURTROOM ADMINISTRATOR:  The parties are muted,

11  Your Honor.

12          THE COURT:  All right.  Go ahead and test it.

13          Ms. Levy, can you say something?  Can you hear me?

14  Okay.

15      (No sound heard).

16          THE COURT:  Okay.  And Mr. Damato, can you say

17  something?

18      (No sound heard).

19          THE COURT:  All right.  You're muted.

20      (Attorney-client discussion).

21          COURTROOM ADMINISTRATOR:  Mr. Dickinson, those screen

22  adjustments are creating lots of noise in the courtroom.

23          PRETRIAL OFFICER BUSTOS:  Your -- Your Honor --

24          MR. DICKINSON:  I'm --

25      (Simultaneous crosstalk).

────────TRANSCRIBED FROM DIGITAL RECORDING────────

1          PRETRIAL OFFICER BUSTOS:  Your Honor, it's Sandra.

2          If I have a question regarding your home confinement

3   order, would you like me to ask it now or wait so they can hear

4   me?

5          THE COURT:  Let's wait until Ms. Levy and Mr. Damato

6   are all on record.  They are right now speaking to each other.

7       (Brief pause in proceedings).

8          THE COURT:  All right.  Looks like we can unmute.

9          COURTROOM ADMINISTRATOR:  The parties are unmuted,

10  Your Honor.

11         THE COURT:  All right.  Ms. Levy, can you hear me?

12         MS. LEVY:  I can.  I have some information,

13  Your Honor, and I just want to confirm that (indiscernible).

14         My client indicates that the medication's with his

15  property, which was booked in with him and not with another

16  third party, which makes sense because I don't think you'd give

17  that type of medication, including controlled substances to

18  somebody else, so I just want to make sure that Pahrump

19  releases that medication with him when he gets (indiscernible),

20  but my client indicates that he wants to take those medications

21  when he gets out because those are the medications that he is

22  more used to.  Pahrump, as we heard from testimony, gave him an

23  alternative type of medication that he's having some side

24  effects on, so he'd prefer to be on the medication he takes

25  while he's not in custody.  And I'm sure the Court would just

———TRANSCRIBED FROM DIGITAL RECORDING———

1   say, you know, or -- the order would just be medication as

2   prescribed as long as it's prescribed by any doctor, not just a

3   Pahrump doctor.

4           THE COURT:  That is correct.  So let me just make

5   sure --

6           MS. LEVY:  In terms of where he would --

7           THE COURT:  Let's just make sure that when you get

8   that information together on Monday that we know where it's at.

9   So I'm going to ask you to just coordinate with Mr. Dickinson,

10  Mr. Dickinson can call the FBI and follow up and then when we

11  all meet up on Monday, you can let me know what the situation

12  is.  And, I'm sorry, you were saying?

13          MS. LEVY:  Is the Court going to require a -- an

14  actual hotel room be on hold for him or a place be on hold for

15  him or can we give a prospective place?  That's just my only

16  concern.  Sometimes that arrangement can be difficult.  Again,

17  unfortunately, I can't do it.

18          THE COURT:  It needs to be a -- it needs to be a --

19          MS. LEVY:  His family's in New York.

20          THE COURT:  It needs to be a -- I need to have

21  confirmation of some type of suitable residence so that I can

22  get an idea of what this place is, whether it's a hotel or

23  somewhere else, so, yeah, I need some definite plans as to

24  that.

25          And perhaps Pretrial Services, Sandra, or Ms. Bustos I

1  should say, is there any help that Pretrial Services can aid

2  with in that respect?

3  　　　　　PRETRIAL OFFICER BUSTOS:  In regards to a residence,

4  Your Honor?

5  　　　　　THE COURT:  In re- -- if it were the case that

6  Mr. Damato wanted to make reservations at, say, the

7  Embassy Suites again, is -- would Pretrial Services be able to

8  do that reservation for him, get the. . .  He can't -- he

9  can't -- he doesn't -- does he have a credit card in his

10  possession at the Pahrump facility?  My guess is no.  He can't

11  go to the halfway house because they won't take him back and

12  because there is no room.  I need a suitable place for him to

13  live at, so I'm asking how we can get this done.

14  　　　　　PRETRIAL OFFICER BUSTOS:  I believe Mr. Damato has a

15  family member in town.  I recall hearing something about family

16  member resides in town.

17  　　　　　THE COURT:  All right.  So, Ms. Levy, perhaps you can

18  go ahead and contact his family and see whether the family's

19  able to help in that regard.

20  　　　　　MS. LEVY:  Your Honor, I have.  Unfortunately, she

21  has -- children live in her house so she's just not comfortable

22  having Pretrial Services, understandably, you know, come and

23  visit and all that.

24  　　　　　THE COURT:  No.  What I'm asking you to do is call --

25  　　　　　MS. LEVY:  I guess --

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1          THE COURT:  I'm asking you to see whether perhaps his

2   family can help in making whatever arrangements need to be

3   made.  So if the idea is for him to go to the Embassy Suites,

4   perhaps his family can make that reservation for him.

5          UNIDENTIFIED SPEAKER:  Perfect.

6          MS. LEVY:  And we've been trying, I can tell the Court

7   that, so I -- and we'll continue to try and I'm just -- I'm

8   concerned that that will be unsuccessful.

9          I'm wondering if Pretrial Services have that FIRST

10  STEP Act money that could allow him perhaps 2 nights at a hotel

11  and then he can make his own way after that so that we're not

12  spending too much money but it gives him a step so that he

13  could get out of custody and then make his own arrangements.

14         THE COURT:  Ms. Bustos?

15         PRETRIAL OFFICER BUSTOS:  Your Honor, we do not have

16  funds under the FIRST STEP Act.  That is a post-conviction.  It

17  isn't (indiscernible).  It's not Pretrial Services.

18         THE COURT:  Ms. Bustos, do you have funds to -- any

19  other kind of funds that would allow for Mr. Damato to have at

20  least one night at some hotel before we -- he's able to make

21  additional reservations?

22         PRETRIAL OFFICER BUSTOS:  Um . . . through our Second

23  Chance Act funding, again, it's a -- it's actually not a --

24  background, it's not an actual account that has money in it, we

25  have to pull it from other areas to create money for this

—TRANSCRIBED FROM DIGITAL RECORDING—

1  account, I might be able to see if we can accommodate one

2  evening.  I don't know if I'd be able to get that done today,

3  but if we could come back on Monday, I could have an answer for

4  the Court.

5          THE COURT:  Let's go ahead and do that, and to the

6  extent that that is a possibility, I'm going to ask you to go

7  ahead and book a night at a facility that you deem to be

8  suitable for him to stay at.  This will be one night, and

9  Ms. Levy, I just want to make sure that we understand, so all

10  of us are on the same page, we need to have a plan in place

11  that is sustainable for more than a week.  All right?

12          MS. LEVY:  I understand, Your --

13          THE COURT:  All right.  Okay.  I think that we've

14  covered everything.

15          Ms. Levy, do you have anything further?

16          MS. LEVY:  No.  Thank you, Your Honor.

17          THE COURT:  Mr. Dickinson?

18          PRETRIAL OFFICER BUSTOS:  Your Honor. . .

19  Your Honor. . .

20          THE COURT:  Yes, Ms. Bustos.

21          PRETRIAL OFFICER BUSTOS:  Just some clarification on

22  the home confinement condition.  When you said -- when it was

23  ordered location monitoring, what does the Court envision with

24  that condition?

25          THE COURT:  So I understand that there have been some

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1   changes as a result of the pandemic and I will ask you to tell

2   me what those changes are.  I know that it's -- what --

3   whatever Pretrial Services is using now is somewhat different

4   than what's been used in the past, so whatever it is that

5   Pretrial Services is using I would be comfortable with.

6           PRETRIAL OFFICER BUSTOS:  Okay, Your Honor.  So, the

7   Court's referencing the SmartLINK.  So, SmartLINK, in order for

8   that to occur, the defendant will have to have a cell phone and

9   would have to download an app on his cell phone.  With the

10  SmartLINK, he would be required to check in during certain

11  times.  It's a facial recognition program, and it collects GPS

12  points at the time that he's calling in.  It's not a continuous

13  monitor; it just gathers for us when he checks in and passes

14  the facial recognition.  So that is the SmartLINK, Your Honor.

15          THE COURT:  All right.  Ms. Levy, do you foresee any

16  problems with that technology?

17          MS. LEVY:  My understanding was, from the FBI agent,

18  that he had a phone when he was arrested.  I don't know if the

19  FBI kept it or not.

20          MR. DICKINSON:  The phone is in evidence, and there's

21  a federal search warrant on it.

22          MS. LEVY:  Well. . . so, yes, I anticipate a problem

23  with that, Your Honor.

24          THE COURT:  Mr. Dickinson, can you make a mirror image

25  of that phone?

```
───────────TRANSCRIBED FROM DIGITAL RECORDING───────────
```

1           MR. DICKINSON:  Um. . . I can see, after we get off

2   this call -- after we get off this call, Your Honor, I will

3   call the FBI and see where that is in the process.

4           THE COURT:  All right.  I'm going to ask you --

5           MR. DICKINSON:  Encourage -- encourage -- go ahead.

6           THE COURT:  No, go ahead.

7           MR. DICKINSON:  And, obviously, I will encourage that

8   to be done expeditiously.

9           THE COURT:  Yes.  Please do so.

10          Okay.  Well, I guess we need to have answers to all of

11  these questions and then we'll meet back up again on Monday.

12          Given this, I guess what I was going to suggest that

13  we meet back up at 1 o'clock.  What I would like to do instead

14  is to have move the hearing up to the morning, maybe 9:00 or

15  10 o'clock in the morning.  Let's do 11 o'clock just in case

16  there's some loose ends that the parties need some additional

17  time for.

18          Ms. Bustos, given this, let's not make any

19  reservations for a hotel stay on Monday.  I think that if we

20  have the hearing at 11 o'clock, there should be sufficient time

21  for you to make the reservation for that same day.

22          PRETRIAL OFFICER BUSTOS:  Yes, Your Honor.

23          THE COURT:  All right.  Anything further?

24          MS. LEVY:  No.  Thank you, Your Honor.

25          THE COURT:  Mr. Dickinson?

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. DICKINSON:  No, Your Honor.

2          THE COURT:  All right.  Thank you, everyone.

3          Thank you, Mr. Damato.

4          THE DEFENDANT:  Thank you, Your Honor.

5          Thank you, everyone.  I appreciate it.

6          MS. LEVY:  Call me, Mr. Damato.

7      (Proceedings adjourned at 3:35:22 p.m.)

8

9                   C E R T I F I C A T E

10

11      I, Heather K. Newman, court-approved transcriber, certify

12  that the foregoing is a correct transcript transcribed from the

13  official electronic sound recording of the proceedings in the

14  above-entitled matter.

15

16      /s/ Heather K. Newman            4-25-2020
        Heather K. Newman                Date
17

18

19

20

21

22

23

24

25