TRANSCRIBED FROM DIGITAL RECORDING

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

UNITED STATES OF AMERICA, Plaintiff, vs. LOUIS DAMATO, Defendant.

Case No. 2:20-mj-00221-DJA-1

Las Vegas, Nevada
April 23, 2020
Courtroom 6B

Recording method:
Liberty/CRD
10:07 a.m. - 11:41 a.m.
REVOCATION OF PRETRIAL RELEASE, MORNING SESSION

***CERTIFIED COPY***

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRENDA N. WEKSLER
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the Government (Via Videoconference):

***NICHOLAS DICKINSON, AUSA***
*UNITED STATES ATTORNEY'S OFFICE*
*501 Las Vegas Boulevard South, Suite 1100*
*Las Vegas, Nevada 89101*
*(702) 388-6336*

(Appearances continued on page 2.)

Recorded by: Jeff Miller

Transcribed by: Amber M. McClane, RPR, CRR, CCR #914
United States District Court
333 Las Vegas Boulevard South, Room 1334
Las Vegas, Nevada 89101
(702) 384-0429 or AM@nvd.uscourts.gov

Proceedings recorded by electronic sound recording. Transcript produced by mechanical stenography and computer.

APPEARANCES CONTINUED:

For the Defendant (Via Videoconference):

***REBECCA A. LEVY, AFPD***
*FEDERAL PUBLIC DEFENDER'S OFFICE*
*411 East Bonneville Avenue, Suite 250*
*Las Vegas, Nevada 89101*
*(702) 388-6577*

Also Present (Via Videoconference):

*Mariah Bassler-Wide, Pretrial Services*

*Alicia Coughlin, Pretrial Services*

*Sandra Bustos, Pretrial Services*

*Chief Security Officer Brandon Delaney*

*Clinical Supervisor Rebecca Smith*

*Medical Services Administrator Bonnie Holly*

Also present (In Person):

*Steven Carpenter, U.S. Marshal*

* * * * *

***I N D E X***

| Witnesses: | Page |
|---|---|
| **SEARA JONES** | |
| *Direct Examination by Mr. Dickinson* | 7 |
| *Cross-Examination by Ms. Levy* | 21 |
| **STEVEN CARPENTER** | |
| *Examination by the Court* | 54 |
| *Examination by Ms. Levy* | 59 |

***E X H I B I T S***

| EXHIBIT NO.: | OFFERED | RECEIVED | WITHDRAWN |
|---|---|---|---|
| **GOVERNMENT** | | | |
| 1 (sealed) | 15 | 15 | |
| 2 (sealed) | 13 | 13 | |
| 3 | 9 | 10 | |

* * * * *

LAS VEGAS, NEVADA; THURSDAY, APRIL 23, 2020; 10:07 A.M.

--o0o--

P R O C E E D I N G S

**COURTROOM ADMINISTRATOR:** Good morning, Your Honor. We are now calling the revocation of pretrial release proceedings in the matter of United States of America versus Louis Damato. The case number is 2:20-mj-0221-DJA.

Beginning with Government counsel, Counsel, please state your names for the record.

**MR. DICKINSON:** Good morning, Your Honor. Nicholas Dickinson for the United States.

**THE COURT:** Good morning.

**COURTROOM ADMINISTRATOR:** And defense counsel?

**MS. LEVY:** Rebecca Levy for Mr. Damato.

**THE COURT:** Good morning.

**MS. LEVY:** Good morning, Your Honor.

**THE COURT:** I see Pretrial Services is present as well. I see Ms. Bustos.

**PRETRIAL SERVICES OFFICER:** Sandra Bustos, Your Honor, from Pretrial Services. Good morning.

**THE COURT:** And who else do we have from Pretrial Services?

**PRETRIAL SERVICES OFFICER:** Mariah Bassier-Wide with Pretrial.

**THE COURT:** Good morning.

**PRETRIAL SERVICES OFFICER:** Alicia Coughlin from Pretrial Services.

**THE COURT:** Good morning. And is this Agent Jones?

**SPECIAL AGENT JONES:** Yes, Your Honor, with the FBI.

**THE COURT:** Good morning. And I --

**SPECIAL AGENT JONES:** Good morning.

**THE COURT:** -- can't quite see Mr. Damato. Mr. Damato, can you hear us okay?

**THE DEFENDANT:** Yes, I can, Your Honor.

**THE COURT:** All right. Good morning to you as well.

All right. So --

**THE DEFENDANT:** Good morning.

**THE COURT:** So that everybody knows, we have the marshals here present in court as well. I've asked Mr. Carpenter to make himself available. We have a lot of people present. Most of you obviously are appearing by way of videoconference. So to make sure the record is clear, I will call on each of you when I need you to respond to certain questions so that we're not talking over each other.

Let's see. So, Mr. Damato, the Court -- we are here on Document Number 9 which is a petition to revoke pretrial release. You are entitled to be appearing in person for this hearing; however, based on COVID-19, we have implemented different procedures which require that you consent to appearing by way of videoconference. Do you consent to

appearing in this fashion?

**THE DEFENDANT:** I do, Your Honor.

**THE COURT:** And Ms. Levy, is this after having spoken to you and with your advice?

**MS. LEVY:** Yes, Your Honor.

**THE COURT:** All right. Very well.

Okay. So as I said, we're here on a petition from Pretrial Services. The allegation in question is whether Mr. Damato failed to return to the Las Vegas Community Corrections Center on March 29th after having been discharged from Sunrise Hospital.

So with that in mind, Mr. Nickens [sic] -- Mr. Dickinson, this is your hearing.

**MR. DICKINSON:** Yes, Your Honor. My understanding is that the defendant is not going to admit. So [indiscernible] the Government would call FBI Special Agent Seara Jones.

**THE COURT:** Very well.

Agent Jones, let me place you under oath.

Do you swear or attest that all of the information you're about to provide is the truth and nothing but the truth?

**SPECIAL AGENT JONES:** Yes, Your Honor.

**THE COURT:** Very well. Mr. Dickinson, go ahead.

**DIRECT EXAMINATION**

**BY MR. DICKINSON:**

Q. Special Agent Jones, just for the record, where do you work?

**A.** The FBI.

Q. And how long have you worked with the FBI?

**A.** I've been with the FBI for four years.

Q. And what unit are you currently assigned to?

**A.** The Las Vegas Joint Terrorism Task Force.

Q. And are you the case agent on the case of the United States versus Louis Damato?

**A.** Yeah, I am.

Q. And I want to direct your attention to the evening of Sunday, March 29th, 2020. Did you come to learn that a petition had been filed alleging that Mr. Damato had failed to return to the halfway house?

**A.** Yes.

Q. And did you also learn that a warrant had been issued by Magistrate Judge Nancy Koppe for his arrest?

**A.** Yes.

Q. [Indiscernible] case agent did you begin to essentially look for Mr. Damato?

**A.** Yes, I did.

Q. And taking your attention to the next day, Monday, March 30th, did you and other law enforcement effectuate an

arrest of Mr. Damato?

**A.** Yes, we did.

Q. And approximately what time on Monday, March 30th did you arrest Mr. Damato?

**A.** It was approximately 6:30 p.m.

Q. And where did you arrest him?

**A.** It was at the animal shelter, 655 Mojave, and the intersection is -- I forget the intersection there. Bonanza and Mojave.

Q. And how did you locate Mr. Damato at the animal shelter?

**A.** It was through a joint effort with the shelter. They made us aware that he was coming to pick up his dogs.

Q. And did you see how Mr. Damato arrived at the shelter?

**A.** Yes, I did.

Q. And how did he arrive?

**A.** In a taxicab. It was a MedMen taxicab.

Q. What is a MedMen taxicab?

**A.** From my understanding, MedMen is a cannabis company here in Las Vegas, and they have a taxi service.

Q. And after Mr. Damato was arrested, was him and his property searched incident to arrest?

**A.** Yes.

Q. And I'll --

**THE COURT:** I'm sorry, Mr. Dickinson. I did not --

*(Simultaneous crosstalk.)*

**BY MR. DICKINSON:**

Q. -- direct your --

**THE COURT:** -- hear -- Mr. Dickinson, can you just repeat your last question?

**MR. DICKINSON:** Yes, Judge. I'll speak up.

**BY MR. DICKINSON:**

Q. After Mr. Damato was arrested, was his -- was he and his property searched incident to arrest?

**A.** Yes.

Q. And in front of you there should be a document -- a two-page document marked as Exhibit 3?

**A.** Yes.

Q. And do you recognize that?

**A.** Yes. It is a confirmation printout for the Embassy Suites.

Q. And when's the first time you saw that, this document?

**A.** I first saw it when we placed him in custody.

Q. Placed who in custody?

**A.** Placed Louis Damato in custody.

Q. Was this on Mr. Damato's person?

**A.** Yes. It was in a backpack.

**MR. DICKINSON:** Your Honor, I'd move to admit Government Exhibit 3.

*(Government Exhibit No. 3, offered.)*

**THE COURT:** Any objections, Ms. Levy?

**MS. LEVY:** None, Your Honor. Thank you.

**THE COURT:** Exhibit 3 will be admitted.

*(Government Exhibit No. 3, received.)*

*[Indiscernible background noise]*

**BY MR. DICKINSON:**

Q. And for the record can you go through -- do you see Mr. Damato's name [indiscernible]?

**A.** Yes. It's under room information, guest name.

*[Indiscernible background noise]*

**BY MR. DICKINSON:**

Q. And what days were this reservation made for?

**A.** The dates on the reservation was from March 30th to April 6th of 2020.

Q. And Mr. Damato's name's on page 1 as guest name?

**A.** Yes.

Q. And if you go to page 2, Mr. Damato's name is there a couple places?

**A.** Yes.

Q. And the address for this Embassy Suite where the reservation is made?

**A.** Yes. 3600 Paradise Road.

Q. And at the top of the second page on the third line, it shows a date, Sunday?

**A.** Yes.

Q. Can you just read that date and time [indiscernible]?

**A.** The date is Sunday, March 29th, 2020, at 2:09 p.m.

Q. After Mr. Damato was arrested, did he make any statements regarding why he was at the animal shelter?

**A.** Yes. He said that the judge told him that he only had -- had to stay in the facility for 24 hours and that he should be able to pick up his dogs.

Q. And was that -- was that -- was Mr. Damato's statement in response to formal questioning or was he just talking?

**A.** He was just talking.

Q. And was he talking a lot while your transportation of him to the facility?

**A.** Yes, he --

*(Simultaneous crosstalk.)*

**MS. LEVY:** I'm going to object. Leading.

**THE COURT:** Overruled.

**BY MR. DICKINSON:**

Q. Can you just answer the question again? Was he talking a lot throughout his transportation?

**A.** Yes, he was talking a lot.

Q. Now, during the -- did you come to learn in your investigation that Mr. Damato had been [indiscernible] the hospital prior to his arrest?

**A.** Yes. He had been at obviously Sunrise Hospital, and also I learned later that he had visited a Southern Hills Hospital facility as well.

Q. And did you obtain the medical records from both those facilities regarding Mr. Damato's stay at the hospital?

**A.** Yes, I did.

Q. If I can have you first look at Exhibit 2, which is in front of you, and that's --

**A.** Yes.

Q. -- in the bottom right corner, Bates-numbered 13 through [indiscernible].

**A.** Yes. Can you repeat that, Nick? I'm sorry.

Q. Bates numbers 13 through 47 [indiscernible] 37.

**A.** Yes.

Q. And --

**THE COURT:** One moment. I'm sorry. So Exhibit 2, Bates 13 through 37?

**MR. DICKINSON:** No, Your Honor. I made a mistake [indiscernible] 28.

**THE COURT:** Okay.

**BY MR. DICKINSON:**

Q. And what is Exhibit 2, Special Agent Jones?

**A.** That's a medical record from Sunrise Hospital.

Q. And for who?

**A.** It's for Louis Damato.

Q. And for what day?

**A.** It's for March 29th, 2020.

**MR. DICKINSON:** Your Honor, I'd move to admit

Government Exhibit 2.

*(Government Exhibit No. 2, offered.)*

**THE COURT:** Any objections?

**MS. LEVY:** Your Honor, these are medical records. They're gonna have to be admitted under seal.

**THE COURT:** Any objections to these being admitted under seal, Mr. Dickinson?

**MR. DICKINSON:** No, Your Honor. Ms. Levy beat me to it.

**THE COURT:** All right. Very well. These will be admitted and will be maintained under seal.

*(Government Exhibit No. 2, received.)*

**BY MR. DICKINSON:**

Q. So I just wanted you to [indiscernible] does it show the admitting time and the discharge time on the -- on page 1?

**A.** [Indiscernible] --

**MS. LEVY:** Your Honor, I'm going to --

**THE COURT:** Go ahead, Ms. Levy.

**MS. LEVY:** These are documents that are in evidence. They speak for themselves. Unless this agent is speaking from personal knowledge, she should not be testifying about these documents.

**THE COURT:** They do speak for themselves, but I think if they want to call my attention to certain information in these exhibits and since they're very lengthy and we only have

so much time to do the hearing, I will allow Mr. Dickinson to ask the questions.

*[Indiscernible background noise]*

**THE COURT:** So the objection's overruled.

**BY MR. DICKINSON:**

Q. Does it --

**THE COURT:** Go ahead, Mr. Dickinson.

*[Indiscernible background noise]*

**BY MR. DICKINSON:**

Q. Agent Jones, does it show the admitting date and the admitting time at the top center of page 1?

**A.** Yes, it does.

Q. And what is that?

**A.** The admit date is March 29th, 2020, and the admit time is 1:27 p.m.

Q. And --

*[Indiscernible background noise]*

**THE COURT:** Let me just pause for a second. Mr. Damato, would you knock on the door for a second so that I can call -- I can speak to the guards outside?

*(Pause in proceedings.)*

**THE COURT:** Go ahead, Mr. Dickinson.

**BY MR. DICKINSON:**

Q. Agent Jones, let's flip to the first page of Exhibit 2, Bates stamp 13. On the bottom right does it show the

discharge date and time?

**A.** Yes, it does.

Q. And what is that?

**A.** Discharge date is March 29th, 2020, and the time is 4:15 p.m.

Q. All right. And finally I want you -- if you could look at Exhibit 1.

**A.** Yes.

Q. And what is Exhibit 1?

**A.** Exhibit 1 is Southern Hills Hospital medical reports for Louis Damato.

**MR. DICKINSON:** And, Your Honor, I'd [indiscernible] Government Exhibit 1.

*(Government Exhibit No. 1, offered.)*

**THE COURT:** Any objections, Ms. Levy?

**MR. DICKINSON:** Under seal.

**THE COURT:** Under seal. Ms. Levy, any objections to --

**MR. DICKINSON:** Yes.

**THE COURT:** -- Exhibit 1 under seal?

**MS. LEVY:** No, Your Honor.

**THE COURT:** That will be admitted under seal.

*(Government Exhibit No. 1, received.)*

**BY MR. DICKINSON:**

Q. Agent Jones, you said -- you stated it was for Southern

Hills Hospital and Medical Center?

**A.** Yes.

Q. Is that the facility that Mr. Damato is at?

**A.** No. The actual facility is ER at The Lakes. Is at the intersection of Fort Apache and Desert Inn.

Q. And does Exhibit 1 --

*(Simultaneous crosstalk.)*

**THE DEFENDANT:** [Indiscernible].

**BY MR. DICKINSON:**

Q. Does Exhibit 1 -- oh.

**THE COURT:** Mr. Dickinson --

*(Simultaneous crosstalk.)*

**MR. DICKINSON:** I hear Mr. Damato --

**THE COURT:** Yeah. Let me just interrupt you a moment.

Mr. Damato, I'm going to remind you that you do not have to say anything at all. We can hear everything that you say. So if you do need to speak to your attorney at any point in time, just make sure that you let me know and we'll pause the proceedings.

Do you need to speak to Ms. Levy?

**THE DEFENDANT:** I -- I would like to speak with Ms. Levy, please. This -- this is --

**THE COURT:** That's fine.

**THE DEFENDANT:** I have never --

*(Simultaneous crosstalk.)*

**THE COURT:** No other --

**THE DEFENDANT:** -- ER at The Lakes.

**THE COURT:** Mr. Damato, we went through this before. Just let me know whether you need to speak to Ms. Levy, and I'll make sure that that happens. But I don't want you making any other statements because everything's on the record. Okay? This is to protect your rights. Okay?

**THE DEFENDANT:** Okay. I --

**THE COURT:** All right.

**THE DEFENDANT:** -- apologize, Your Honor.

**THE COURT:** So go ahead and knock on the door one more time so that we can get the guards to mute the videoconferencing.

*(Pause in proceedings.)*

**COURTROOM ADMINISTRATOR:** Your Honor, I can mute the audio from Mr. Damato's cell from here.

**THE COURT:** Okay. Well, we're also going to need to mute Ms. Levy as well.

**COURTROOM ADMINISTRATOR:** Yes, Your Honor.

**THE COURT:** All right. So why don't you go ahead. Let me know when that's ready, Mr. Miller, and we'll test it.

**COURTROOM ADMINISTRATOR:** Ms. Levy, can you say something?

**THE COURT:** Okay.

**COURTROOM ADMINISTRATOR:** Your Honor, Ms. Levy is likewise muted at this time.

**THE COURT:** Okay. And Mr. Damato, go ahead and say something. Okay. We can't hear either Ms. Levy or Mr. Damato. If you want to block your screen, Ms. Levy, you're welcome to do that, and we'll resume whenever you're ready.

*(Pause in proceedings.)*

**THE COURT:** And Ms. Levy, I think that you -- are you able to call him at this time? Okay.

*(Pause in proceedings.)*

**COURTROOM ADMINISTRATOR:** Your Honor, I'm getting a -- the signal from Ms. Levy to unmute the parties.

**THE COURT:** All right.

**COURTROOM ADMINISTRATOR:** I'm going to do so now.

**THE COURT:** Very well.

**COURTROOM ADMINISTRATOR:** Mr. Damato, can you hear us okay?

**THE DEFENDANT:** Yes, I can.

**COURTROOM ADMINISTRATOR:** Ms. Levy, can you hear us? Ms. Levy, can you speak so we know that you're unmuted on this side?

**MS. LEVY:** Yes.

**COURTROOM ADMINISTRATOR:** Excellent. We're good to go, Your Honor.

**THE COURT:** Mr. Dickinson, go ahead.

**MR. DICKINSON:** Yes.

**BY MR. DICKINSON:**

Q. Again, Agent Jones, looking at Exhibit 1, does this show the admission date and time?

**A.** Yes, it does.

Q. On page 1, top [indiscernible]?

**A.** Yes.

Q. And what was that?

**A.** It's for March 30th, 2020, and the time was for 2:55 a.m.

Q. And does it show the discharge date and time in the bottom right?

**A.** Yes, it does.

Q. And what was that?

**A.** For March 30th, 2020, at 4:38 a.m.

Q. And then if you could go to page -- the second page, which is Bates 107.

**A.** Yes.

Q. At the bottom [indiscernible] the paragraph [indiscernible] notes?

**A.** Yes.

Q. If you go to the third line to the right [indiscernible] patient report?

**A.** Yes.

Q. Could you just read the rest of that paragraph from that?

**A.** Yes. [As read:] "Patient report. Seizure was unwitnessed. He was sitting outside with his neighbor smoking. Report says neighbor -- neighbor went inside at approximately 1:00 a.m. Patient states he then woke up on a bench where he was sitting and called 911. Patient reports dehydration, denies pain, incontinence, tongue biting, or other associated medical com -- complaints."

*[Indiscernible background noise]*

**BY MR. DICKINSON:**

Q. And just one -- one more question, Agent Jones. For the record, do you see Mr. Damato, the person you arrested on March 30th here on this -- at this hearing?

**A.** Yes, I do.

Q. And --

*[Indiscernible background noise]*

**THE COURT:** Okay. Mr. Damato, go ahead and knock on the door again, please.

*(Pause in proceedings.)*

**THE COURT:** Go ahead, Mr. Dickinson.

**MR. DICKINSON:** I don't have any further questions, Your Honor.

**THE COURT:** All right. Ms. Levy, do you have any cross-examination?

**MS. LEVY:** I do. Thank you.

**THE COURT:** Go ahead.

**CROSS-EXAMINATION**

**BY MS. LEVY:**

Q. I'm going to first direct your -- I'm going to first direct your attention to the Embassy Suites reservation.

**A.** Yes.

**THE COURT:** And for the record, that's Exhibit 3.

**BY MS. LEVY:**

Q. Yes. Do you have that in front of you?

**A.** Yes, I do.

Q. I was not at the initial appearance that Mr. Damato made. Were you there, Agent?

**A.** I was not.

Q. Okay. So you are unaware of what the judge told Mr. Damato regarding finding alternative housing; is that correct?

**A.** That is correct.

Q. Okay. I'm going to now turn your attention to the conditions of Mr. Damato's release. Were you given information about what his conditions were?

**A.** I was not.

Q. Do you know what his conditions of release are?

**A.** I do not.

Q. Have you spoken with Pretrial Services regarding Mr. Damato's conditions?

**A.** I have not.

Q. Did you personally review the conditions with Mr. Damato?
**A.** I did not.
Q. I'm gonna move your attention to Mr. Damato's medical records. You indicated that you reviewed them; is that correct?
**A.** That is correct.
Q. Do you have any personalized training in medicine?
**A.** I do not.
Q. Are you aware of Mr. Damato's medical conditions?
**A.** Just his status of HIV. That's pretty much it.
Q. What education and training do you have about [indiscernible] medical condition who has HIV?
**A.** I don't have any, ma'am.
Q. Do you know when he first was diagnosed with HIV?
**A.** I --

*(Simultaneous crosstalk.)*

**MR. DICKINSON:** Your Honor, I'm going to object as to beyond the scope. I didn't ask Agent any questions about the medical records except the discharge date and admitted date.

**THE COURT:** Ms. Levy, would you like to answer?

**MS. LEVY:** I would, Your Honor. He did, in fact, ask questions. He had this agent read a paragraph from the medical reports. I made an objection; it was overruled. So now I'm free to cross-examine this agent about what her knowledge is regarding my client's medical condition that is

in part contained in the records that she was used to admit.

**THE COURT:** How is that relevant to the finding that I need to make which is whether he returned to the halfway house or not?

**MS. LEVY:** Yes, Your Honor. And -- and I do understand the Court's point, which is more of a relevance objection. And to the Court's inquiry, the concern that we have is we have three separate medical reports that indicate that Mr. Damato was suffering from dehydration, which is a result of his status as having HIV and have -- having it for a long time.

The concern is that the dehydration can cause some levels of confusion, misunderstanding, and memory lost.

**THE COURT:** All right. So --

*(Simultaneous crosstalk.)*

**MS. LEVY:** The doctors --

**THE COURT:** Go ahead, Ms. Levy.

**MS. LEVY:** Thank you, Your Honor.

**THE COURT:** So the objection is overruled. Go ahead, Ms. Levy.

**BY MS. LEVY:**

Q. To be clear, Agent, you are unaware of his medical condition other than the fact that he is HIV positive?

**A.** That is correct.

Q. You reviewed the medical reports, though; correct?

**A.** That's correct.
Q. And you read from them, did you not?
**A.** I did.
Q. And when you reviewed them, it did indicate that he's suffering from dehydration; is that right?
**A.** That's correct.
Q. And, in fact, the hospital treated him for dehydration, they didn't turn him away; is that right?
**A.** That is correct.
Q. Do you know what time he initially appeared at the halfway house?
**A.** I do not.
Q. Do you know how he was released to the halfway house?
**A.** I do not.
Q. The cab that you indicate that Mr. Damato was in, do you know how Mr. Damato got the cab, meaning was the phone number provided to him from either the hospital or somebody else?
**A.** I do not.
Q. When Mr. Damato was arrested, he had items on his person; correct?
**A.** That is correct.
Q. He had a face mask?
**A.** That's correct.
Q. All right. He had the reservation for Embassy Suites; correct?

**A.** Yes.

Q. He did have Camel cigarettes; correct?

**A.** Yes.

Q. Did he have any marijuana?

**A.** No, he did not.

Q. Do you know whether Mr. Damato was provided medication while he was at the halfway house?

**A.** I do not.

Q. Do you know what medication he takes?

**A.** I do not.

Q. Do you know [indiscernible] Mr. Damato received from the halfway house?

**THE COURT:** Could you repeat the question --

**SPECIAL AGENT JONES:** When you say halfway --

**THE COURT:** -- Ms. Levy? I'm sorry. I couldn't hear the question. Could you repeat it one more time?

**BY MS. LEVY:**

Q. Do you know if Mr. Damato was given any pass to leave the facility at the halfway house?

**A.** Besides the ambulance, the emergency that he departed in, I don't have any knowledge outside of that. That was the only pass I know of.

Q. Which -- which date are you discussing?

**A.** That would be for the 29th.

Q. Mr. Damato went twice to the emergency room from the

halfway house; is that correct?

**A.** I only believe he went one time from the halfway house. I'm not exactly sure where he came from the second -- when he arrived to Southern Hills Hospital.

Q. You don't know whether he had been at the halfway house?

**A.** I -- I know that he did not return to the halfway house based on my conversation with Mrs. Sandra Bustos.

Q. But you don't know where he [indiscernible] ambulance from?

**THE COURT:** One more time.

**SPECIAL AGENT JONES:** The initial --

**THE COURT:** Hold on.

Could you repeat the question, Ms. Levy?

**BY MS. LEVY:**

Q. Do you know whether Mr. Damato took an ambulance from the halfway house?

**A.** I do know he did take an ambulance from the halfway house on March 29th.

Q. Do you know about any other dates that Mr. Damato took an ambulance from the halfway house to an emergency room?

**A.** I do not, no.

Q. Was Mr. Damato given any bus passes from the halfway house?

**A.** I'm not sure.

Q. You testified that Mr. Damato had been at The Lakes?

**A.** Yes.

Q. That's a stand [indiscernible] ER affiliated with Southern Hills; correct?

**A.** That is, correct.

Q. Okay. Why is it that you believe he was at The Lakes and not Southern Hills?

**A.** That was based off of my information I received from Sunset Hospital [sic]. I actually drove over to ER at The Lakes, and I inquired about Louis Damato and they told me that he had, in fact, been there. But the actual record that I had to retrieve had to come from Southern Hills, and at that point I went to Southern Hills Hospital to retrieve the document.

Q. Let me clarify something with you. You indicated Sunset Hospital. Do you mean Sunrise?

**A.** Or Sunrise. Sorry.

Q. So the information you are getting is secondhand. You did not see Mr. Damato at the hospital; correct?

**A.** I did not see him there, no.

Q. Did Mr. Damato discuss with you his medical condition when he was with you?

**A.** He talked about him having HIV. Beyond that, no.

**MS. LEVY:** Nothing further, Your Honor.

**THE COURT:** Thank you.

Mr. Dickinson, do you have any redirect?

**MR. DICKINSON:** No, Your Honor.

**THE COURT:** Very well.

Mr. Dickinson, do you have any other witnesses?

**MR. DICKINSON:** No, Your Honor.

**THE COURT:** All right.

**THE DEFENDANT:** Can I --

**THE COURT:** Mr. Damato --

**THE DEFENDANT:** Can I speak with my attorney?

**THE COURT:** Absolutely. So let's go ahead and mute Mr. Damato and mute Ms. Levy.

Mr. Miller, let me know when that's ready.

**COURTROOM ADMINISTRATOR:** Your Honor, both the [indiscernible] at room six for Mr. Damato is and Ms. Levy's are both muted at this time.

**THE COURT:** All right. Go ahead and let's test it. Ms. Levy, could you say something? Okay. And Mr. Damato, would you say something? Okay. It doesn't look like they can hear you.

Okay. Go ahead.

*(Pause in proceedings.)*

**COURTROOM ADMINISTRATOR:** Ms. Levy, can you hear me?

**MS. LEVY:** I can.

**COURTROOM ADMINISTRATOR:** Mr. Damato, can you hear us?

**THE DEFENDANT:** I can.

**COURTROOM ADMINISTRATOR:** Thank you, sir.

Your Honor, we're ready to proceed.

**THE COURT:** All right. So I believe I had asked Mr. Damato if he had any other witnesses.

**MR. DICKINSON:** No, Your Honor.

**THE COURT:** All right. And Ms. Levy, do you have any witnesses?

**MS. LEVY:** No, Your Honor.

**THE COURT:** All right. Very well.

So, Mr. Dickinson, I will hear from you.

**MR. DICKINSON:** Your Honor, as to the first prong [indiscernible] 48(b)(1)(B), I think there's established [indiscernible] evidence that the defendant violated his condition of release Number 23; that he maintain residence at a halfway house. He was only permitted to leave for religious services, medical treatment, attorney visits, court appearances, et cetera.

The defendant [indiscernible] leave for the hospital. He was discharged at 4:15 p.m. on March 29th. He did not return to the halfway house. His lawyer [indiscernible] until approximately a little over ten hours later when he checked into the second hospital, and there he stated that he had been outside with a neighbor smoking at 1:00 a.m. He's discharged at 4:38 a.m. His whereabouts are unknown until he is arrested at 6:30 p.m. attempting to pick up his dogs at an animal shelter. He arrives at the shelter in a taxicab. He has the

hotel reservation on him which indicates he had zero intention to return to the halfway house.

The conditions were clear. I was at the hearing. I know Your Honor knows from her memory. It was crystal clear to Mr. Damato that that was a condition and he was not permitted to leave.

Mr. Pugh argued strenuously that he should be permitted to leave to look for a place to live. The Court denied that request and stated that Mr. Damato should look for a place to live using the computer or other means at the halfway house. And if he found a place, that he was to come to Court expeditiously and bring that before Your Honor. So I think it's -- it's -- the Government's established by the burden -- the requisite burden of proof that he violated the condition.

I'm not sure if you want me to address the -- the second part of...

**THE COURT:** Yeah. Go ahead.

**MR. DICKINSON:** Well, if the Court finds that he did, in fact, violate his condition, there are no combination of conditions that can assure the safety to the community or Mr. Damato -- or that Mr. Damato will appear for court appearances.

Furthermore, under 3142(f)(2)(D) there's a serious risk that the defendant will at the very least attempt to

threaten, injure, or intimidate the victim in this case. In our case it's obviously Representative Titus. While defendant was out on that Monday, March 30th, he took to Facebook and began posting about Senator Titus -- Representative Titus. That's Exhibit 4, Your Honor.

**THE COURT:** Which is not in evidence.

**MR. DICKINSON:** Well, I believe on the second part, Your Honor, if you do find he can, then I can proffer under --

*(Simultaneous crosstalk.)*

**THE COURT:** Yeah, go ahead --

*(Simultaneous crosstalk.)*

**MR. DICKINSON:** -- the [indiscernible] format.

**THE COURT:** -- and proffer. I'm just making a record that that's -- that's just not in the -- in evidence. So go ahead. You're free to make a proffer.

**MR. DICKINSON:** I'm happy [indiscernible] however the Court would like to go about it. But we were -- the agent was -- Agent Jones was notified in her quest to find Mr. Damato by one of his friends that he had started posting on Facebook [indiscernible] Titus. You had 36 years in office. There's some additional ones that the Court has [indiscernible]. This is obviously a grave concern considering the death threats to not only Representative Titus but the state -- defendant's state charges which are to [indiscernible] and to the Metro officer.

I can tell you since -- since the hearing -- since our original hearing that I appeared before you for the Government, Your Honor, I've obtained a copy of the audio he left with the detective. I don't make light of this that Mr. Damato is unhinged. He threatens the detective's life. He threatens the detective's family members to put bullets in their head. He uses derogatory racial slurs against African-Americans, the "N" word. It goes on for quite a bit of time. Threats to the victim [indiscernible] federal case combined with him escaping from the halfway house -- or absconding from the halfway house combined with the Facebook postings, law enforcement had to notify the victim which of course puts the victim in a precarious predicament as well as the victims in the other cases. It generated a significant law enforcement response to find Mr. Damato, which is, again, troubling in the times we're at where law enforcement is spending their time looking for Mr. Damato during the coronavirus.

The -- the defendant knew he could not pick up his dogs. That was brought up at the [indiscernible]. The Court made that quite clear. The Government realizes that Mr. Damato has health conditions. That's why the Government spent a considerable amount of time that first day he was arrested working with Mr. Pugh and working with Pretrial Services to try and fashion the most strenuous conditions to

not put Mr. Damato in custody.

Mr. Damato broke the trust of the Court, and the chance he was given, he's obviously still not taking this seriously. But more so, there's clearly mental health issues that were discussed at the original detention hearing. The Court questioned Mr. Damato. He had -- he stated he was on some medication but didn't exactly say what. Based on his reported medication in the medical record, he's on antianxiety -- or he claims to have taken antianxiety, antidepressants, et cetera. Those need to be administered by a medical professional, which he was ordered to do as well.

You know, Mr. Damato's behavior has escalated from the beginning of February when it started with his property manager, and there's just a serious risk that he is going to reoffend. He places the victims in fear of danger when he absconds, and he's obsessed, unfortunately, with the victim in this case, Representative Titus. He incessantly talks about her as can be seen by the Facebook messages. So I think [indiscernible] beyond a serious risk that he will intimidate or attempt to threaten, injure, or intimidate the victim in this case.

So for those -- oh. One final thing, Your Honor. And I was unaware of this. The State filed a new charge against him, a misdemeanor stalking charge, including the 15th and 16th. I have been in touch with the DA but not since

then. So I apologize. I do not know the exact underlying facts, but based on the stay-away order in the docket which is from the property management, I have an educated guess that that's for the second property manager because the first pending charge is for one of the property managers. But he has a $3,000 bond on that one and arrest warrants issued. So he would roll into state custody, and I -- and once again an educated guess that he would not be released from state custody if he was released in our case, so --

**THE COURT:** Okay. Let me make sure I understand. Mr. Dickinson, let me ask you. You said that there's a new misdemeanor charge, and you believe that it arises out of what precisely?

**MR. DICKINSON:** He made -- Mr. Damato is currently [indiscernible] original charge -- he has charges pending that I know about --

*(Simultaneous crosstalk.)*

**THE COURT:** Mr. Dickinson? Mr. Dickinson, is there any way that we can put your phone somewhere where it's stable? Because I'm getting a little dizzy.

**MR. DICKINSON:** Okay. Sorry.

**THE COURT:** That's okay.

**MR. DICKINSON:** I couldn't get the computer up this morning, Your Honor.

**THE COURT:** It's all right.

**MR. DICKINSON:** The -- he -- I know for a fact he has pending charges related to threatening one of the property managers as well as the Metro detective. In the police reports there is a second property manager that was threatened. So my educated guess -- but I do not know for sure -- is this new charge relates to that.

**THE COURT:** Got it.

**MR. DICKINSON:** I base that on the fact that the stay-away order mentions the property management company.

**THE COURT:** All right.

**MR. DICKINSON:** But the fact remains that there's a new misdemeanor charge with a 3,000-dollar bond attached to it that's been filed. And to refresh the Court's recollection, we did not writ Mr. Damato over. I believe since we filed the federal charges on the Titus threat, that the State dropped that charge and decided to request the release despite the fact that he had a 40,000-dollar bond but to request his release from the state court so he would roll over into federal custody to address the federal charge.

So bottom line, Your Honor, the Government believes it showed by clear and convincing evidence the defendant's violated the condition of release, and then that there are no conditions that can guarantee the safety of the community, that the defendant will appear, or the defendant will not attempt to threaten, injure, or intimidate any of the victims

in this case.

**THE COURT:** All right. Ms. Levy?

**MS. LEVY:** Thank you, Your Honor.

Your Honor, first of all, I'm going to give somewhat of a timeline based upon the testimony that we have about what has occurred, Your Honor, which is that my client was released and sent to the halfway house. We don't know what time he got there based upon the testimony.

We also don't know who, if anybody, went over the conditions of release when he got to the halfway house, Your Honor. We know that the Court gave him conditions, but we don't know whether the normal procedure was done. Not through any fault of Pretrial Services, but this unique circumstance with coronavirus means that, unlike in the normal course where a Pretrial officer would have the opportunity to speak with Mr. Damato, Mr. Damato goes right to the halfway house skipping that step. Again, no fault of anybody there.

We [indiscernible] that he is dehydrated during this time period. It's crystal clear that my client has significant medical problems. The agent testified that he's HIV positive, but -- but we do know and we can extrapolate from the medical records is that the doctors agreed that my client was dehydrated. And as this Court may or may not be well aware, dehydration can cause a variety of problems; significantly confusion, disorientation, those type of things,

which can be magnified with somebody who suffers from HIV and is taking medication.

That leads me to my next point, which is that the agent is unaware of what medication he was given or he was taken -- taking. I'm sorry, Your Honor. That's important because he was supposed to be taking these essential medications while he was at the halfway house. We don't have information at this point whether he was given that medication, and obviously that's critical if he's leaving the facility in order to get his medication. That would be part of the allowed reasons to leave if you extrapolate that from the Court's PR bond indicating medical appointments if my client is going to get prescription medication, which, Your Honor, I believe that he was, in fact, seeking the medication which he was not given at the halfway house unfortunately. That would have been allowed by this Court's order.

Now, if he's waiting for that medication at a friend's house and then ends up having what appears to be -- it's not a seizure. They don't think it's a seizure. They think it's something like a seizure, an episode where basically you lose consciousness, that, again, not a violation of this Court's order. And it's our understanding -- and maybe not quite clear about exactly what happened when he left the halfway house, but there's no testimony that him going to

the hospital was in any way a violation of him -- of his pretrial conditions.

Your Honor, I'm going to talk about that Embassy Suites e-mail. I wasn't at the initial appearance, as I previously indicated and the Court is aware, but I was able to review it. And in the reviewing it, the Court does indicate that Mr. Damato is free to find alternative housing via the Internet. What Mr. Damato apparently did was find alternative housing, [indiscernible] so of course if he cannot go to this [indiscernible] it's refundable. And then from there, that's [indiscernible] find this reservation. And it's a future reservation.

The Court had indicated that it would expeditiously hear any request for a modification. Now, I can tell this Court, when I have clients seeking alternative housing on Pretrial or even on any type of post-prison supervision, I tell them you need an actual address. So he can't just [indiscernible] say you're going to be at a hotel or you're going to be at a weekly. You need to actually have confirmation that I can provide to Pretrial Services about where specifically you're going to go and for how long. So that is a -- that's basically a [indiscernible] had that because in reviewing the pretrial appearance, it appears that that would be well within his ability to look for alternative housing, make that reservation, and then pass that information

along so that a hearing could be put on calendar.

Your Honor --

**THE COURT:** So, Ms. Levy, I guess my question comes down to this. So he is suffering from dehydration which causes confusion, et cetera. He's discharged from Sunrise Hospital on 3/29 at 4:15 p.m., and your argument is that he's been disoriented, that he has had these side effects of being dehydrated, yet he is lucid enough to make these reservations but not to contact pretrial release services or the halfway house to explain his whereabouts. That's sort of my concern here.

**MS. LEVY:** Well, Your Honor, I would argue that that is not information that we have. I asked the agent whether she had been in touch with Pretrial Services or the halfway house regarding his passes, and she did not indicate that she had information about that. So we don't -- we do not know whether Mr. Damato had been in touch with Pretrial or with the halfway house. It is my understanding, Your Honor, that the halfway house had indicated that Pretrial Services would come and speak with him the next day, and then [indiscernible] e-mail address for what appeared to be his case manager at the halfway house, not a Pretrial Services officer. He then e-mailed this particular case manager believing it to be his Pretrial officer trying to get in touch with this -- what he believed to be a Pretrial officer in desperation. This was

while he was still at the halfway house after have -- having come back from the hospital the first time.

So, Your Honor, we do not have testimony that Mr. Damato [indiscernible] contacted Pretrial Services, contacted the halfway house, or that they indicated to him he needed to come back. We also don't have testimony that he was given a pass and told to come back at a certain time. I would argue, Your Honor, that if he was [indiscernible] pass and he was seeking medication -- prescribed medication, which was not provided to him at the halfway house, this would not have been a violation and certainly not clear and convincing that this is a violation of his pretrial conditions.

Your Honor, I would also note that HIV can -- particularly in individuals who have long-term diagnosis can actually go into the brain, and it's a phenomenon that then can cause symptoms that appear to be dementia like. So in -- the Court has concerns how he can be lucid during some parts and then not lucid during others, but experience with dementia would show you that that is exactly how it appears in individuals and it's actually a very common -- it's a common side effect, I would say, of HIV.

The Government argued about conditions, and I'm gonna -- if the Court is okay with that, I'm -- I'm gonna parlay into my argument of conditions for Mr. Damato. We would argue that there hasn't been a showing by the Government

that Mr. Damato violated his pretrial release by clear and convincing standards simply by going to the hospital to seek appropriate treatment. But if the Court did find that, Your Honor, there -- there are conditions that can be fashioned to continue Mr. Damato on release.

This is the concern that -- that we have, is that we don't know what condition Mr. Damato was at when he is first released to the halfway house. Because we know at that point he hadn't been receiving the medications needed when he [indiscernible] to the halfway house. He's off -- basically off that mental health medication. But in addition to that, he takes antiretroviral drugs for HIV, which are critical; not only critical to somebody who has HIV but critical to somebody who has HIV during coronavirus. Without those antiretroviral drugs, the CDC says that he's at great risk because he is immunocompromised. But when he gets to the halfway house, he's not receiving his medication. He basically immediately has to go to the hospital. The doctors find that he is dehydrated. They -- that he requires treatment. He's released, and they give him a bus pass the first time except the bus isn't running back at that time. So he has to walk back from the hospital all the way to the halfway house, which he does, in fact, do.

Saturday morning he then e-mails what he believed to be his Pretrial officer that is really an internal case

manager. Now, Mr. Damato doesn't notice. He has basically no experience with the criminal justice system --

**THE COURT:** I'm sorry. Let me --

**MS. LEVY:** -- unlike --

*(Simultaneous crosstalk.)*

**THE COURT:** Let me -- let me stop you one second. I'm sorry. You said that on Saturday he e-mailed somebody he believed to be his Pretrial officer. Who was it instead that he e-mailed?

**MS. LEVY:** Who was the person he e-mailed?

**THE COURT:** Correct.

**MS. LEVY:** Okay. Give me one second, Your Honor. I'm going to check my documents. I just have to go to a new page.

*(Pause in proceedings.)*

**THE DEFENDANT:** Your Honor, would I be able to speak with Ms. Levy again really quickly?

**THE COURT:** Yes. Of course. Mr. Miller, if we could mute Ms. Levy --

**THE DEFENDANT:** Thank you.

**THE COURT:** -- and Mr. Damato?

**MS. LEVY:** Your Honor, before I go, I -- I have the e-mail so that way I can just leave the Court with that information before I go.

**THE COURT:** Okay.

**MS. LEVY:** So the -- the e-mail is -- the e-mail is to a Ms. Castro who he believed [indiscernible] officer --

**THE COURT:** Who is who?

**MS. LEVY:** He tells the...

**THE COURT:** I'm sorry, who's Ms. Castro?

**MS. LEVY:** I'm -- I'm sorry, what?

**THE COURT:** You said something about Ms. Castro that I did not understand.

**MS. LEVY:** Yes, Your Honor. He e-mails an individual named Ms. Castro. Mr. Damato is [indiscernible] from the halfway house that Miss [indiscernible] is his Pretrial officer or at least that's what he understands. And that night he -- just another indication how confused Mr. Damato is.

**THE COURT:** So let me make sure that --

**MS. LEVY:** He sends Miss --

**THE COURT:** -- I understand. Mr. Damato believed that Ms. Castro was his Pretrial Services officer, and he e-mailed Ms. Castro. Is Ms. Castro somebody at the halfway house?

**MS. LEVY:** That's correct. It appears that she's probably his case manager because the e-mail is from GEO Group. Mr. Damato doesn't know the difference [indiscernible] that the e-mail should be a Pretrial e-mail address. He sends her an e-mail stating that he's -- he wants to obtain his own

place ASAP, begging for them to come and meet with -- telling the Pretrial officer, the person he believes to be his Pretrial officer, that his dog needs to be picked up by 6:30 and basically indicating he had been hospitalized and seeking help he says ASAP. He then leaves his name and phone number. Of course he does not hear back because Ms. Castro is not a Pretrial officer unfortunately. That was a miscommunication on the half -- on behalf of -- of the halfway house.

So Mr. Damato is reaching out to Pretrial. My understanding -- and, again, I'm not casting any aspersions. This is a very difficult time for everybody. But my understanding is that Pretrial had never met with Mr. Damato while he was at the halfway house.

**THE COURT:** All right. Thank you.

Should we go ahead and mute at this point, Ms. Levy?

**MS. LEVY:** Thank you, Your Honor.

**THE COURT:** All right.

**MS. LEVY:** Thank you.

**THE COURT:** All right. Let's test it. Ms. Levy, could you say something? Let's test it. Ms. Levy, can you hear us? Okay. Perfect.

Mr. Damato, can you hear me? All right. Perfect. Go ahead.

*(Pause in proceedings.)*

**COURTROOM ADMINISTRATOR:** Your Honor, both Mr. Damato and Ms. Levy have been unmuted.

**THE COURT:** All right. Ms. Levy, go ahead.

**MS. LEVY:** So, Your Honor, in terms of the conditions that can be fashioned, there are conditions that can be fashioned. This is the concern that we have, and -- and perhaps if we did not have coronavirus things might be a little bit different. But given Mr. Damato's unique circumstances, his medical circumstances, being HIV positive in jail is a very, very dangerous situation. My client indicates he's still in a bunk. My client indicates that he's basically eating in his bunk, which is -- is very concerning to me because obviously, at that point, you could -- you could really infect somebody or -- or be infected. My client is indicating to me that -- that not everybody is using masks and gloves. He does have access to one mask, but of course, as we know, they have to disinfect that mask.

So the concerns that we have are that if he's being housed so closely with other individuals in custody, that in all frankness, if he gets coronavirus, it is basically a death sentence. And I don't say that to be dramatic. I actually consulted with an individual who is a specialist dealing with HIV patients. He indicates that somebody who is as immunocompromised as Mr. Damato -- and he has had HIV for such a long time, which can be [indiscernible], Your Honor, HIV in

its form initially in the 80s and 90s was much different than HIV today. It's actually -- it's a different strain. So Mr. Damato is at great risk if he contracts the virus, and we know that individuals in custody have contracted the virus.

Aside from just concerns about coronavirus, I'm gonna go back to what was argued initially, which is that Mr. Damato really basically has absolutely no criminal history. The latest misdemeanor complaint appears to relate back to sort of the [indiscernible] of these -- all these charges. So even though there are multiple charges, it's really basically one event or series of events. My client was released in state court. Bail was given to my client, and then a PR bond was given to my client. So there's no indication that if he -- he was sent to CCDC on a misdemeanor, that they would hold him. And if bail was [indiscernible], my understanding's that he might be able to get family support to assist him with that. And -- and that -- that's something that's [indiscernible] his family. I know there's financial strains, but that is always a possibility there. And I know they're not keeping people in custody over in state court as much because of coronavirus as well.

So, Your Honor, there are conditions that can be fashioned. When my client was initially released to the halfway house, he was not sat down and given these conditions and reviewed with him. So what he's basically asked to do

was -- was to base it off of his memory from the initial appearance, which normally, Your Honor, would be understandable, and the Court would say, Well, you heard me say particular conditions, except we don't know what medical condition he was in at the time of his initial appearance because right when [indiscernible] house, he basically is sent to the emergency room, to UMC for treatment.

And so while in a normal circumstance the Court may say, you know, regardless of whether you reviewed these conditions with Pretrial Services, you heard me say it. Mr. Damato was in a very unique circumstance that we just don't know exactly what he was able to retain from that initial court appearance and continue [indiscernible].

Furthermore, we really don't know what he -- what was going on during this time period because the Government simply hasn't provided us enough information to be able to state clear and convincing -- by the clear and convincing standard that he was in violation of the -- the PR bond which allowed release [indiscernible] certain circumstances which includes medical release and then other -- other circumstances. He had begged this individual, Ms. Castro, Please come see me, I have to get my dog out, which he discussed at his initial appearance, and I'm having some medical issues here. So he was trying to get in touch with Pretrial Services, and -- and that was while he was still at the halfway house.

Also, Your Honor, my understanding is -- just to update the Court on the Embassy Suites, that was done at the halfway house using the halfway house computer, which would not be a violation of his pretrial and would not, as the agent indicated, show any type of indication he wasn't gonna come back because he actually remained at the halfway house that day.

**THE COURT:** So I guess, Ms. Levy, what I've not heard you talk about is what -- where would he go? Right? I mean, assuming that I were to find conditions, what -- how does your client account for where he would go?

**MS. LEVY:** So, Your Honor, we would suggest that the Court [indiscernible] there has been no violation that --

**THE COURT:** I'm sorry --

*(Simultaneous crosstalk.)*

**MS. LEVY:** -- that would prohibit going back to the --

**THE COURT:** So your suggestion is for him to go back to the halfway house?

**MS. LEVY:** Yes, Your Honor. Unlike a client who had some type of altercation at the halfway house or didn't follow internal rules at the halfway house. That's not the circumstance that we have here. I mean, frankly, the violation has nothing to do with rules at the halfway house. It's Mr. Damato's understanding of his requirements to stay at

the halfway house regardless of his medical condition.

So we would suggest that he go back to the halfway house, but as this Court is well aware, the halfway house also has people close to each other. It's better -- it is much better -- Mr. Damato says that that facility had much better spacing, which obviously is critical. But Mr. Damato has the ability as we [indiscernible] Embassy Suites reservation to get alternative housing [indiscernible] disability. So he can get his own place which would then provide him isolation to be able to continue throughout this process.

Your Honor, as the Court knows, his pre -- preliminary hearing was set out until June, and then after that, you know, we simply don't know what's going to happen [indiscernible]. So Mr. Damato could be in custody for quite a -- a while pending this case. And so the greater amount of time that he would have in custody, the greater concern we have that Mr. Damato's life is at risk in the jail. So while it -- it may be a very unusual situation and not something that this Court is going to deal for other clients, with Mr. Damato, he really does need to be given consideration for release to the halfway house and then allowed to do what he was able to do, make a reservation for a -- a -- a -- at either an apartment or a weekly, a Siegel Suites, where he could remain solo without any other individuals there that could possibly infect him.

There are people in who have coronavirus and obviously Mr. Damato simply cannot be, you know, anywhere near somebody who has that -- who has coronavirus.

**THE COURT:** All right. So I thought I had read in one of the documents that had been filed on the docket that the halfway house would not allow Mr. Damato to go back. Ms. Bustos, could you address that point for me?

**PRETRIAL SERVICES OFFICER:** That's correct, Your Honor. When Mr. Damato made his initial appearance on the revocation hearing, we spoke with the halfway house, and they advised that they're not equipped to handle [indiscernible] concerns and at that time [indiscernible].

During his brief residency at the halfway house [indiscernible] advised us that he would be openly telling the residents at the -- at the facility about his medical conditions and telling everyone he has HIV, and it caused great concern amongst the residents.

Additionally, Your Honor, just to address Ms. Levy's request for him to return to the halfway house, we do not have beds available at this time.

**THE COURT:** All right. Very well. So your request, Ms. Levy, would be that he be allowed to go to the Embassy Suites?

**MS. LEVY:** That's correct, Your Honor. If -- if I may, I -- I have some concern about the halfway house

indicating that they do not -- that they can't have him because of his medical [indiscernible] one, and two, because he is disclosing his medical condition. Your Honor, it's exactly the type of advice that a doctor would give, which is you tell individuals that you cannot be near them and they cannot be near you because you are in a very delicate medical condition. So I understand that there's stigma attached to HIV, but that stigma should not be preventing our clients from going to the only [indiscernible] that Mr. Damato or any other federal detainee would have to go, and it frankly concerns me to hear that. And the fact that the halfway house doesn't have the medical ability is simply because they didn't provide him the medication that he needs. My understanding is that he had medication on him at the time of his arrest, enough for 30 [indiscernible] which would then allow him, when he's released and he gets his property, he would have 30 days regardless of whether the halfway house is able to provide him that medication or not, medication that's critical to him.

This is what I would ask the Court to do: To allow his attorney -- who's me for today but is ultimately not going to be me -- the opportunity to find a temporary housing for him, such as Embassy Suites or Siegel Suites, make a reservation, and then come back to the Court with that information so that Pretrial -- Pretrial would have that information, [indiscernible] that information, and then

supervise him from that facility.

So I guess I would ask that this be set over for -- until Monday so that we could make a reservation for Mr. Damato for alternative housing.

**THE COURT:** Ms. Bustos, let me ask you -- you cut off. You were suggesting that the halfway house was not willing to take him back for what specific reason?

**PRETRIAL SERVICES OFFICER:** One second, Your Honor. I'm just finding my notes on that.

**MS. LEVY:** Your Honor, if I may one -- add one thing while Ms. Bustos is looking for her notes?

**THE COURT:** Yes. Go ahead, Ms. Levy.

**MS. LEVY:** My understanding -- my understanding is Pretrial Services also has funding that they could provide Mr. Damato with temporary housing. If the Court didn't want to set this hearing over, we could ask that Pretrial Services provide Mr. Damato with two days' worth of a hotel. They will know where it's at because they'll provide it, and then Mr. Damato is to find alternative housing within those two days, and then we could set a status hearing for Monday.

**THE COURT:** Ms. Bustos, let me know when you're ready.

**PRETRIAL SERVICES OFFICER:** Your Honor, the halfway house advised that they're not equipped to handle his medical concerns and his constant unaccountability. Their other

concern was that he was telling residents about his medical conditions and telling them that he's HIV positive which caused concern amongst residents [indiscernible], Your Honor --

**THE DEFENDANT:** Your Honor, may I speak with -- may I speak with Ms. Levy privately?

**THE COURT:** You may. So let's go ahead and mute Mr. Damato and Ms. Levy.

**COURTROOM ADMINISTRATOR:** Your Honor, both parties are muted.

**THE COURT:** All right. Let's make sure it worked. Ms. Levy, can you say something? Mr. Damato, can you say something?

Okay. We're muted. Go ahead.

*(Pause in proceedings.)*

**THE COURT:** All right. It looks like we can go ahead and unmute.

Can you hear me, Ms. Levy?

**MS. LEVY:** Yes.

**THE COURT:** Mr. Damato, can you hear us?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** All right. So Ms. Levy, I think that you were speaking.

**MS. LEVY:** So, Your Honor, the only thing that I would add after speaking to my client is that while I -- I see

nothing wrong with disclosing medical status in -- in this -- in the world, he indicates to me he didn't disclose it but he [indiscernible]. So I don't know if maybe the staff felt uncomfortable because of, you know, there is stigma attached to HIV and -- and perhaps if they're unaware of how it's transmitted and how to protect yourself, perhaps some of that fear -- understandably but perhaps that is how it spread throughout the facility, but my client indicates that it was the staff that was told [indiscernible] told because what happened is they line up for medication. He would line up and they would not have any medication for him, and he would then have to say to the staff member, you know, "I have medication that I need." And they'd say, "What do you have?" [indiscernible] antiretroviral [indiscernible] nothing further after that, Your Honor.

**THE COURT:** All right. So I did ask Mr. Carpenter to be present in court today. I have certain questions for Mr. Carpenter. I advise both Mr. Dickinson and Ms. Levy to ask questions of him as well.

Let me start out, Mr. Carpenter, by asking you a specific question.

**EXAMINATION**

**BY THE COURT:**

Q. During the hearing today, we had guards from the facility at Pahrump come into the room without gloves, without a mask,

and they're dealing with an HIV positive individual. Could you please let me know what's going on?

**A.** The facility does allow the people to wear masks, but it's not -- it's not mandatory for them to wear gloves or masks at all times.

Q. Even when they're dealing with HIV detainees?

**A.** I have not talked to them about any specific procedures for the different level of individuals with their health conditions. I know Mr. -- Mr. Damato is not in the high-risk unit. He was a -- they asked him --

Q. He is not in the high --

**A.** He is not. I talked to the nurse before the hearing, Clinical Supervisor Smith. She talked to him directly. He refused to go into the high-risk unit because he did not want to be housed in a cell. So he wanted to be housed in the dorm unit. So he's currently in the D 4 dorm, which is the protective custody kind of unit. So it was --

Q. Let me stop you right there.

**A.** Yes.

Q. He refused to go into the high-risk unit for what reason?

**A.** He did not want to be housed in a cell. The high-risk unit is Unit BB, which is a cellblock, which two people in each cell. He told them that -- Nurse Smith informed me that he said he was -- they gave him anxiety or claustrophobic or something to that extent, and he didn't want to be housed in

that unit.

Q. All right. So let me just stop you right there. I thought when -- during the initial appearance -- and I'm going off of memory -- I thought that you were presented that there were certain dorms that allowed for I believe you said about 90 people to be housed there [indiscernible] individuals that were in high risk would be allowed to go to that specific dorm and that you had maybe nine or ten at the time so that you could ensure that social distancing was in place. I thought that that's where Mr. Damato was at, at least originally.

**A.** At that time it was in a dorm. Because there's still movements and needs to house people in certain units depending on the custody, they couldn't take a whole dorm for 20 people. So they did move them to the smaller unit, which is I think 60 beds, and they have him in that unit. So they moved the high-risk unit from the dorm into the cellblock in between his initial appearance and --

Q. Got it.

**A.** -- currently.

Q. And was the idea that he was going to be sharing a -- a -- a room in the cellblock with another individual?

**A.** They decide that. I couldn't speak if he was going to be in his own cell or if there was going to be two to a cell. I guess it would depend on how many people were in that category and how many spots they had. We leave that up to the facility

to decide exactly how people are housed.

Q. All right. So I'm sorry, I interrupted you. So you're saying that currently he's at the G 4 dorm and I think that you're giving information --

*(Simultaneous crosstalk.)*

**MARSHAL CARPENTER:** There's currently 59 detainees in that unit and total capacity is 96. So they could still implement some social distancing in that unit. All detainees were provided cotton masks. It's up to them if they want to wear them or not [indiscernible] wear the masks.

**BY THE COURT:**

Q. Are these being disinfected every so often?

**A.** Speaking to the facility, the idea was to eventually get them two masks so one can be washed in laundry and then one could be used. I have to verify that they do, when that's going to happen, or if -- how many masks were given out.

Q. Okay.

**A.** I didn't get that information.

As far as the disinfectant products, every detainee was given hand soap, shampoo, and toilet paper --

Q. Um-hum.

**A.** -- and the pod officer does have cleaning supplies and the hygiene supplies to reissue. I did take a tour of the facility the last -- couple weeks ago, and they do have a large amount of toilet paper, soap, shampoo, all that stuff,

cleaning solutions, and I was informed that every [indiscernible] is there around every hour to clean the pod in the high-risk areas that people touch and that that cleaning solution is available to the detainees. Is certain one is, a certain one's not depending on the chemical breakdown, but they do have access to cleaning -- cleaning products.

Q. All right. Could you give me some information, if you have any -- and I know that I did not put this in the minute order. But do you have any information as to whether Mr. Damato has been receiving medication while incarcerated?

**A.** I didn't ask about specifically that. I just talked to the nurse, and I know he has communications with them because she's the one that I asked about the unit. I could find that out, and Mr. Damato might be able to say if he's getting that --

*(Simultaneous crosstalk.)*

**BY THE COURT:**

Q. If you would, yes.

**A.** -- verify it.

Q. If you would find that out for me, that would be very helpful.

**THE COURT:** I will turn things over to Ms. Levy first, and then Mr. Dickinson, I will allow you an opportunity to [indiscernible] some questions as well.

Ms. Levy, go ahead.

**EXAMINATION**

**BY MS. LEVY:**

Q. Mr. Carpenter, the first housing option that Mr. Damato was given, you indicated that was a single cell?

**A.** No. It's two people to a cell. I don't know if Mr. Damato would be in his own cell or if he'd be paired with somebody. But I could talk to them to see, if there's a single cell available, I could make sure that he's the one that has access to it due to his medical condition. As opposed to somebody with asthma that's in there, he'll be -- well priority to have his -- his own cell.

Q. And the question that I have was you indicated that he was first given an option for a -- a single cell; right? Or did I --

**A.** No, no. He -- I was informed he came in, I think he was housed in medical, and then to move him into the high risk for the COVID unit. He indicated he didn't want to be in that unit because he didn't want to be in the cell. It gave him anxiety, I believe, I was informed.

Q. Sorry. It's hard because I can't see your face, Mr. Carpenter, so I don't mean to interrupt.

When -- when you're talking about the high-risk unit, is that a single cell?

**A.** No. The high-risk unit is the BB cellblock, and there are two beds in each cell in that unit. So the facility

houses the individuals. So they could be housed by themselves, or they could be housed with another individual depending on how many beds are needed.
Q. And we're talking about the unit that Mr. Damato indicated he did not want to be in; right?
**A.** That is correct.
Q. Okay. So even if he was in the high-risk unit that he indicated he didn't want to be in, he would be potentially with someone else?
**A.** Correct.
Q. And are they on lockdown?
**A.** They are in the unit and with limited access by the staff. And I think they are for a certain amount of time. It's kind of a split tier. So the COVID-19 high-risk individuals come out at a certain time, and they have another group I think in the lower part of that unit that comes out at a different time. They don't intermingle, and everything is sanitized in between. But I believe part of the day they are on lockdown. They wouldn't be out the whole, like, 18 hours, whatever it is, during the day. They would be locked down part of the day.
Q. Do you know how much time they're allowed out of their cell in the high-risk unit?
**A.** I do not have that exact information right now.
Q. Okay. So it's possible that they might be in their cell

close to lockdown for almost the entire day?
**A.** I don't think that is a -- if they're out of their cell during the day, so 16 hours and eight hours of sleep, they'll probably be out, instead of the 16, half that time, so eight hours out, eight hours asleep, and then eight hours they'll be locked down during the day.
Q. When they're out of their cell, how close are they to other individuals?
**A.** They have a day area. So that would be up to them to decide how close they want to get to other individuals.
Q. When they're out of their cell, are other detainees required to wear masks?
**A.** I do not believe they're required. They have access to the masks, but it's up to them if they want to -- to wear them.
Q. Just for clarification, your understanding of the mask is that it -- the mask doesn't protect the individual wearing the mask. The mask protects the person near the other individual; right?
**A.** Um...
**THE COURT:** So if you don't have the answer to the question, that's fine, Mr. Carpenter. I mean --
**MARSHAL CARPENTER:** I mean, I believe it's protecting the individual wearing it, and if that person is sick, protecting that person from spreading the virus as much.

**BY MS. LEVY:**

Q. Meaning, Mr. Carpenter [indiscernible] there is a detainee in the high-risk unit who has coronavirus and they opt not to wear a mask, there's nothing that the staff there can do to force them to wear a mask; right?

**A.** They are -- to my understanding, they're not forcing people to wear masks. I mean, if the -- if it's known the person has the virus or symptoms, they get placed in isolation in the medical unit itself. So they would not be roaming free.

All the people in that unit do not have any symptoms or we have no reason to believe any of them have COVID at this time. Of course we don't know because they could be asymptomatic.

Q. I was just going to ask about that, Mr. Carpenter. Thank you.

Was Mr. Damato tested?

**A.** No. They only test individuals that shows symptoms believed to be COVID.

Q. And you know it can take up to 14 days to show symptoms?

**A.** Yes.

Q. And Mr. Damato's been out of custody; correct?

**A.** That's correct.

Q. In a hospital environment, are you aware of that?

**A.** Just in the hearing here, during the hearing.

Q. Are you aware whether he came into contact with anybody who had coronavirus in the hospital setting?

**THE COURT:** Well, Ms. Levy, I -- you can make those arguments to me. Mr. Carpenter is here just simply to answer questions regarding conditions of confinement, and then you can take those answers and make arguments to me. I don't want to put him on the spot of having to become part of the hearing otherwise. So his role here is very limited.

**MS. LEVY:** Yes, Your Honor.

**BY MS. LEVY:**

Q. If Mr. Damato was placed in the high-risk unit, how much contact would he have with staff members?

**A.** They still have staff members in that unit but only certain -- they have designated staff [indiscernible] are working that unit. So not everybody can go into that unit. But as far as the contact, it's -- it's more limited, but there's still contact with staff.

Q. Is the staff in the high-risk unit wearing masks and gloves at all times?

**A.** I don't know. I could find that out, but I don't know at this time.

**MS. LEVY:** Nothing further. Thank you.

**THE COURT:** Mr. Dickinson?

**MR. DICKINSON:** No, Your Honor, I don't have any questions.

**THE COURT:** All right. Ms. Bustos, is there anything else that you would like to offer?

**PRETRIAL SERVICES OFFICER:** Just one clarification, Your Honor. I just want to advise the Court that in communicating [indiscernible] just advised me that Mr. Damato did not report to the halfway house with any medication and never provided them any medication to dispense to him. So I just wanted to clarify that.

**THE COURT:** When he first arrived after I initially released him?

**PRETRIAL SERVICES OFFICER:** Yes, Your Honor.

**THE COURT:** All right. So --

**THE DEFENDANT:** May I speak with my attorney again?

**THE COURT:** You may. Actually, I'm gonna tell you --

**THE DEFENDANT:** Your Honor, can I speak with --

**THE COURT:** Mr. Damato, I'm going to tell you what. There's a lot of things that I need to consider here. I think that we still need specific answers from Mr. Carpenter. I got to tell you, I am very concerned about just simply what I've seen here today. And I'm not blaming you, Mr. Carpenter. I understand that you're is not in charge of the facility in Pahrump, but we're dealing with a detained person who is at a pretrial setting who is HIV positive and people are dealing with him without gloves, without masks, and I've seen this twice during the course of today's hearing.

I'm very concerned about the fact that it may be sort of optional for individuals in Pahrump to wear masks and gloves. And, again, I understand that you're not the one making those conditions and policies, but I want very specific answers to all of these questions. So I'm going to continue this hearing for -- I know that Judge Albregts has duty this afternoon. Could you give me some idea, Mr. Miller, as to when we can continue this hearing to? Or maybe you could tell me how many arrests there are. Because if I can continue this hearing for today, I would like to do so.

**COURTROOM ADMINISTRATOR:** Your Honor, I believe the Honorable Judge Albregts is seeing two arrests this afternoon, unless I'm mistaken. But I think that's the number.

**THE COURT:** All right. So we'll go ahead and do this. We will all resume this hearing at let's plan for 3:45. It may be the case that we start a little bit later. I'm trying to start this hearing as soon as possible.

Mr. Carpenter, I'm going to ask you to be available. I'm going to ask someone who can get specific answers regarding both the high-risk unit, which is the BB cell, and the G 4 dorm which is where Mr. Damato is currently at to be available at that hearing as well.

**MARSHAL CARPENTER:** Yes, Your Honor. I'll contact the facility and get one of the upper management to answer any questions about his facility.

**THE COURT:** Yes. And I would also like to have somebody answer questions regarding the policies and whether it is mandatory to wear masks and gloves.

**MARSHAL CARPENTER:** This person should have all that information, Your Honor.

**THE COURT:** All right. Wonderful.

So Ms. Levy, we will take this up again at 3:45. Mr. Dickinson, are you available?

**MR. DICKINSON:** [Indiscernible] for the Court, Your Honor.

**THE COURT:** Okay. Ms. Levy, are you available?

**MS. LEVY:** Yes. And, Your Honor, if I may just ask my client if he could call me at about 1:30. I have another court appearance that I'm actually late for. So I know Mr. Damato wants to speak. So Mr. Damato, if you could call me this afternoon before the hearing, please.

**THE DEFENDANT:** You got it. Sure. Thank you, everyone.

**THE COURT:** All right. Miss -- Ms. Bustos and everybody else from Pretrial, you are free to join back in, all three of you, but at least one of you should be present for the 3:45 hearing.

So, with that, we'll conclude this hearing, and we'll take this back up at 3:45. Thank you, everyone.

**COURTROOM ADMINISTRATOR:** All rise.

*(Proceedings adjourned at 11:41 a.m.)*

* * *

I, AMBER M. McCLANE, court-appointed transcriber, certify that the foregoing is a correct transcript transcribed from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Amber M. McClane 4/27/2020

AMBER MCCLANE, RPR, CRR, CCR #914 Date