TRANSCRIBED FROM DIGITAL RECORDING

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,       )
                                     ) Case No. 2:20-mj-00221-DJA-1
4              Plaintiff,            )
                                     ) Las Vegas, Nevada
5    vs.                             ) April 23, 2020
                                     ) Courtroom 6B
6    LOUIS DAMATO,                   )
                                     )
7                                    ) Recording method:
               Defendant.           ) Liberty/CRD
8    _____  ) 3:51 p.m. - 5:05 p.m.
                                       REVOCATION OF PRETRIAL RELEASE,
9                                      AFTERNOON SESSION

10                          *C E R T I F I E D   C O P Y*

11

12                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE BRENDA N. WEKSLER
13           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13

14   APPEARANCES:

15   For the Government (Via Videoconference):

16          **NICHOLAS DICKINSON, AUSA**
            *UNITED STATES ATTORNEY'S OFFICE*
17          *501 Las Vegas Boulevard South, Suite 1100*
            *Las Vegas, Nevada 89101*
18          *(702) 388-6336*

19   (Appearances continued on page 2.)

20   Recorded by:        Jeff Miller

21   Transcribed by:     Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.
25

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant (Via Videoconference):

 3        REBECCA A. LEVY, AFPD
          FEDERAL PUBLIC DEFENDER'S OFFICE
 4        411 East Bonneville Avenue, Suite 250
          Las Vegas, Nevada 89101
 5        (702) 388-6577

 6    Also Present (Via Videoconference):

 7        Mariah Bassler-Wide, Pretrial Services

 8        Alicia Coughlin, Pretrial Services

 9        Sandra Bustos, Pretrial Services

10        Chief Security Officer Brandon Delaney

11        Clinical Supervisor Rebecca Smith

12        Medical Services Administrator Bonnie Holly

13

14    Also present (In Person):

15        Steven Carpenter, U.S. Marshal

16                        * * * * *

17                        I N D E X
```

```
18    Witness:                                      Page

19    BRANDON DELANEY

20        Examination by Ms. Levy                      5

21        Examination by Mr. Dickinson                16

22        Examination by the Court                    16

23        Re-examination by Ms. Levy                  19
```

```
24

25                        * * * * *
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1         LAS VEGAS, NEVADA; THURSDAY, APRIL 23, 2020; 3:51 P.M.

2                              --o0o--

3                     P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Good afternoon, Your Honor.

5   We are back on record, and we are now recalling United States

6   of America versus Louis Damato.  The case number is

7   2:20-mj-0221-DJA.

8          Beginning with Government counsel, Counsel, please

9   state your names for the record.

10         MR. DICKINSON:  Good afternoon, Your Honor.  Nicholas

11  Dickinson for the United States.

12         THE COURT:  Good afternoon.

13         MS. LEVY:  Rebecca Levy for Mr. Damato.

14         THE COURT:  Good --

15         MS. LEVY:  He's present via videoconference, and he's

16  is in custody, Your Honor.

17         THE COURT:  All right.  Good afternoon.  And good

18  afternoon, Mr. Damato.  I know we went over this this morning,

19  but once again, you are entitled to have this hearing in

20  person.  But due to the pandemic that's in place, we're

21  conducting these by way of videoconference.  But I do need

22  your consent in order to proceed.  Do you consent to

23  proceeding in this manner?

24         THE DEFENDANT:  I do, Your Honor.

25         THE COURT:  And Ms. Levy, is this after having
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1    consulted this with you?
2              MS. LEVY:  Yes, Your Honor.
3              THE COURT:  Thank you.
4              All right.  So last time we left off, we had had
5    Mr. Carpenter from the Marshal's Office provide some
6    information that the Court requested and that Ms. Levy was
7    requesting as well.  I can't quite recall if we ever got to
8    Mr. Dickinson or not.  I don't think we did.
9              So I have requested that somebody be available from
10   the facility at Pahrump to address concern questions, and I
11   understand that Chief -- Chief Brandon Delaney is on the line;
12   is that correct?
13             MR. DELANEY:  Yes, that is correct.
14             THE COURT:  Good morning, sir.
15             And I also understand that there's a clinical
16   supervisor by the name of Rebecca Smith that's on the line; is
17   that correct?
18             MS. SMITH:  Yes, that's correct.
19             THE COURT:  All right.  So that the record's clear,
20   Mr. Carpenter is here today.  He's here in court, and we also
21   have Ms. Coughlin and Ms. Bustos from Pretrial Services.
22             Is there anybody else on the line that I did not
23   catch?  All right.
24             Okay.  So with that, I'll turn things over to you,
25   Ms. Levy.
```

Examination of Brandon Delaney

 1          **MS. LEVY:**  Your Honor, do you want me to start with
 2    the questioning?
 3          **THE COURT:**  So I think that's probably going to be
 4    best, if you could start with the questioning, and then we'll
 5    allow Mr. Dickinson to go on.
 6          **MS. LEVY:**  Thank you.  And this is for -- just for
 7    Officer Delaney; right?
 8          **THE COURT:**  Correct.  I have questions for Ms. Smith.
 9    You're welcome to ask Ms. Smith questions as well, but
10    predominantly I would imagine you're interested in
11    Mr. Delaney's testimony.
12                            **EXAMINATION**
13    **BY MS. LEVY:**
14    Q.   Mr. Delaney, I'm sorry, I don't know much about your
15    position.  Can you just give me a very brief, you know,
16    sentence explanation of what your position there is?
17    **A.**   Yes.  I'm currently the chief of security at Nevada
18    Southern Detention Center.
19    Q.   And you -- there's another gal there with you, Rebecca.
20    Can you give me a brief description of what her job is, if you
21    know it?
22    **A.**   She's present right now in the room with us, and she's
23    our clinical supervisor.
24    Q.   Thank you.
25          And as chief of security, you're in charge of

Examination of Brandon Delaney

1    handling the measures taken during coronavirus?

2    A.   That is one of my jobs, yes.

3    Q.   All right.  Well, let's -- let's dive right in.  First,

4    there is a -- a separate unit for individuals who are at

5    higher risk; is that accurate?

6    A.   That is correct.

7    Q.   That unit is optional for the inmate?

8    A.   Yes.  We are currently going off of the CDC's standards.

9    If the detainees meet the criteria, our medical department

10   will let us know.  The detainee then has the opportunity to go

11   into that unit unless they sign a waiver not to.

12   Q.   That unit consists of how many individuals?

13   A.   We currently have, now after [indiscernible] Mr. Damato

14   in there, we will have 31 detainees.

15   Q.   Are the detainees given individual cells, or do they have

16   a -- a bunkmate?

17   A.   We currently -- three-fourths of the pod have single

18   cells.  The detainees that are in there with bunkies have been

19   placed in there at their own request.

20   Q.   And how long are they in the cell, and how long are they

21   allowed out of their cell?

22   A.   We currently have what we call a tier program going on

23   with that particular pod.  The -- we have another unit that we

24   have as a COVID which we've had to put a tier time on there

25   because there's two separate groups in there; a general

Examination of Brandon Delaney

 1   population group, and then we have another group of detainees

 2   that are not -- cannot mix with general population.  So we're

 3   running two different groups, which means when one group is

 4   out in the dayroom, the other ones are celled up.  And they

 5   are -- they alternate -- they average about six and a half

 6   hours a day outside of their cell.

 7   Q.   Now, outside of their cell, what regulations are in place

 8   ensuring social distancing?

 9   **A.**   We currently have one counselor that works in that pod.

10   He is not allowed to go into any other pod inside the

11   facility.  We also have designated staff that can go in there.

12   Myself, including the warden, the assistant warden, the

13   contract monitor, and all other staff that are not on their

14   list do not walk into that pod.  We keep the traffic in there.

15   Medical goes down to the unit.  We do not pull the detainees

16   out of that pod or cross-mix with any other part of the

17   population.  Every hour we are using what we call an HTQ PROXI

18   40 that we spray down the door and common areas and are wiped

19   off.

20        We've issued every detainee and every staff a

21   protective mask at their option to wear, and they are --

22        *(Simultaneous crosstalk.)*

23   **BY MS. LEVY:**

24   Q.   [Indiscernible].

25   **A.**   What was that, ma'am?

Examination of Brandon Delaney

1    Q.   And I'm sorry, it's hard on this video, so I apologize if

2    I interrupt -- interrupt you.  So that's not my intent.

3         Are the detainees given gloves?

4    A.   No, we do not -- if they are cleaning, then, yes, they

5    are -- they are issued gloves, but they are not given gloves

6    on a regular basis.  They are issued soap and shampoo that

7    they can change or replace.  All they have to do is ask, and

8    we have ample amount of soap [indiscernible] for all detainees

9    in the institution.

10   Q.   Let's say the --

11        (Simultaneous crosstalk.)

12        **MR. DELANEY:**  [Indiscernible].

13   **BY MS. LEVY:**

14   Q.   -- detainee --

15        I'm so sorry.  Go ahead.

16   A.   I was also letting you know we have signs that are all

17   over the units that go through and allow and demonstrate

18   social distancing, how -- how long they have to wash their

19   hands for, and -- and we do town halls twice a week to get out

20   information on any [indiscernible].

21   Q.   Who's giving out the information in the town hall?  Is

22   that in person?

23   A.   In the regular units, they will be in person for the unit

24   staff.  In the high-risk pod, it will be written down, and

25   then it will be handed out to the detainees.

Examination of Brandon Delaney

```
 1   Q.   And the person handing out this material, are they
 2   wearing gloves?
 3   A.   When we -- when we put it out as in they're being handed
 4   out materials, it will we given, and the detainees will come
 5   up and they will read it or slide it through the door.  When
 6   they're actually issuing out a piece of paper, no, nine times
 7   out of ten the officer will not be wearing gloves.
 8   Q.   Do the officers wear masks?
 9   A.   The officers do have masks, yes.  It is not mandated at
10   this point for all staff or officers to wear masks in the
11   pods.  It is at their discretion.
12   Q.   So I'm going to give you an example.  Let's say
13   Mr. Damato is in that high-risk unit, and I need to have a --
14   an attorney visit with him.  He would then leave that unit;
15   correct?
16   A.   No.  We have visit -- video visiting that he's capable to
17   go through unless it is a contact visit with the attorney.
18   Q.   Okay.  So there is a unit inside of the high-risk unit
19   that would allow for attorney conferencing?
20   A.   It is -- it's our video visit.  So the -- typically the
21   attorneys that show up for -- for visitation with the
22   detainees would go through a monitor that is located here.
23   They do not have the capabilities on the pod to do like we're
24   doing right now with a court videoconference.
25   Q.   Okay.  So -- so follow me with -- with this hypothetical.
```

Examination of Brandon Delaney

1    Mr. Damato is in a high-risk unit.  I know it's a

2    hypothetical.  We have a court appearance for Mr. Damato.

3    Walk me through what happens for Mr. Damato's court

4    appearance, sir.

5    **A.**    So in -- in the particular case where he came down from G

6    4, he will be pat searched coming out of the unit.  The

7    officer will be wearing gloves.  Any time there's any type of

8    contact, gloves are -- are mandated.

9             He will walk down to the attorney visits.  The

10   attorney -- he will go in and meet with the attorney visit

11   officer, he will be placed in a room, and then he'll be

12   waiting for his hearing at which time he will be placed into

13   the room that he's currently located at right now.

14             **THE COURT:**  Okay.  Let me interrupt --

15             **MR. DELANEY:**  In that --

16        *(Simultaneous crosstalk.)*

17             **THE COURT:**  Let me interrupt.  Sir?

18             **MR. DELANEY:**  -- [indiscernible] G 4 --

19             **THE COURT:**  Hello?  Hello?

20             **MR. DELANEY:**  -- which is a -- hello?

21             **THE COURT:**  Let me interrupt you.  I -- I missed some

22   of it.  So you said someone is in the G 4 unit.  That's --

23   that's the hypothetical that you're following?

24             **MR. DELANEY:**  No, that is real time.  That's where

25   he's at, which is a controlled movement pod.

Examination of Brandon Delaney

1      **THE COURT:**  Okay.

2      **MR. DELANEY:**  If he was coming -- hypothetically

3   coming from BB, it would be the same process where the officer

4   in there would pat him down, and then he would be taken -- we

5   would do what we call a cease movement, which means we would

6   clear the hallways.  There would be no detainee contact with

7   him, and he would be taken right into the room that he's

8   currently in [indiscernible].

9      **THE COURT:**  I didn't mean to interrupt.  I just was

10  trying to make sure that I understood.

11  **BY MS. LEVY:**

12  Q.   In the room that Mr. Damato's in, was it cleaned before

13  Mr. Damato walked in there?

14  **A.**   Yes.  We did -- we did go through and I reviewed video

15  where there was a few times and the issue was addressed where

16  the officer did not clean after each use.  But that has been

17  addressed with the staff member.

18  Q.   Because right -- right before I saw Mr. Damato go in this

19  room, I saw an individual [indiscernible] into the room.  Was

20  that -- did you see that female in there?  Was that Rebecca,

21  or was that someone else?

22  **A.**   I will pull it up here in a second.

23  Q.   She was in scrubs, so it -- it might have been Rebecca.

24  **A.**   Give me one second and I'll pull it up.  Yes, there was a

25  female detainee that was coming out of the room.

Examination of Brandon Delaney

1   Q.   I did not see anybody go in and clean, but certainly I

2   might have missed that.  Did -- did I miss that, sir?

3   **A.**   I am reviewing it.  No, ma'am.  As soon as the detainee

4   left, they did bring another detainee right in there.  It was

5   not sanitized.

6   Q.   And it did not look like the officer was wearing gloves

7   or a mask.  Am I correct in seeing that?  It's kind of hard on

8   the video.

9   **A.**   The officer is not wearing gloves or a mask.

10   Q.   It doesn't [indiscernible] I'm sorry.  I'm so sorry, sir.

11   It's so hard to -- on video.  So, again, I apologize.

12          I also do not notice that Mr. Damato has gloves on

13   and is -- you know, he's in the room in close proximity to

14   things that --

15   **A.**   [Indiscernible].

16   Q.   -- he could [indiscernible].

17   **A.**   Well, so going back through there, the officer that is in

18   attorney visits is not wearing gloves, he's not wearing masks.

19   He also did not make contact with the detainee.  The detainee

20   is wearing a face mask, but we are not issuing out gloves to

21   the detainees.

22          **THE COURT:**  Okay.  I gotta tell you, Ms. Levy, I'm --

23   I'm really not tracking this.  I'm going to ask you to please

24   make sure that you get testimony as to each specific thing in

25   each category because we're going from one thing to the next.

Examination of Brandon Delaney

1   And I just want to make sure that I understand exactly what's

2   going on.  So --

3         **MS. LEVY:**  Yes, Your Honor.

4         **THE COURT:**  Okay.

5   **BY MS. LEVY:**

6   Q.   So I -- I assume that Mr. Damato would be patted down

7   prior to being placed into an attorney visitation room or a

8   court visitation room.  Is that accurate?

9   **A.**   Yes, he is patted down when he leaves his unit.

10  Q.   And does that person wear gloves?

11  **A.**   Yes.

12  Q.   And is that the person that's assigned just to that unit?

13  **A.**   Yes.

14  Q.   And then when he leaves -- for instance, Mr. Damato is in

15  a courtroom visitation room right now.  Would he -- would --

16  if he was in the high-risk detention area, would he wait to be

17  patted down until he got back?

18  **A.**   Yes.

19  Q.   So --

20        *(Simultaneous crosstalk.)*

21        **MR. DELANEY:**  [Indiscernible] patted down right

22  before he goes into the room.  If it was a contact visit, then

23  that's a different -- but being there's no contact with the

24  outside, he would be pat searched [indiscernible] the pod.

25  *///*

Examination of Brandon Delaney

1    **BY MS. LEVY:**

2    Q.   Was Mr. Damato patted down before he was placed in this

3    room today?

4    **A.**   I will review it.  It takes a second to pull it up.

5         All right.  Give me one second here.  Just trying to

6    find -- without knowing the exact time he left the pod, I have

7    to search for it.

8        *[Indiscernible background noise]*

9         **MR. DELANEY:**  Just give me a few more minutes, and

10   I'll locate him.

11        All right.  Yes, he was patted down.  The officer was

12   wearing gloves.

13   **BY MS. LEVY:**

14   Q.   And a mask?

15   **A.**   No.  Officers -- that is on their discretion at this

16   time.  Now, we did --

17   Q.   [Indiscernible] --

18       *(Simultaneous crosstalk.)*

19        **MR. DELANEY:**  -- the staff member comes in to the

20   institution, we have a series of questions that they have to

21   ask.  There is a temperature reading that, if they're above

22   100.4 degrees, they are not allowed inside the institution.

23   **BY MS. LEVY:**

24   Q.   How often are the inmates -- how often do they have their

25   temperature taken?

Examination of Brandon Delaney

1    **A.**    They -- in the -- in the general -- in the general
2    populated unit that's gonna be when they have doctor visits or
3    when they're seeing medical.  In our [indiscernible] units we
4    are going in there and doing it twice a day.
5    Q.    Are other inmates from other facilities coming into your
6    facility?
7    **A.**    We still -- we still have transports, but we are
8    currently -- the detainees that are coming in, they are being
9    placed on a lockdown period where they are isolated for up to
10   14 days.
11   Q.    Where are they housed in isolation?  Where's that?
12   **A.**    We currently have two areas that are set up for it -- a
13   unit called BA, and a unit called CA -- where they are in
14   lockdown and they come out only to shower.  They have their
15   temperatures checked twice a day.  Once they hit the 14 days,
16   show no signs, then they're released to general population.
17   Q.    Inmates you said are given masks?
18   **A.**    Yes.
19   Q.    They're cloth masks?
20   **A.**    They're cotton masks.
21   Q.    Is there any mechanism to clean them?
22   **A.**    We do have -- we do have some -- it's like a flat iron
23   that has been ordered.  We are waiting for them to come in.
24   They get about 400 degrees, and that's how we'll be sanitizing
25   them.  We're also in the process of getting additional masks

Examination of Brandon Delaney

1   in where -- wherever a detainee will [indiscernible] but they

2   only have one mask at this time.

3   Q.   So currently detainees have one mask and at this time no

4   mechanism to clean them?

5   **A.**   Correct, unless they send it through the laundry.

6            **MS. LEVY:**   Thank you, Your Honor.  I don't have any

7   other questions.

8            **THE COURT:**  Mr. Dickinson, do you have any questions?

9        **MR. DICKINSON:**  Just one.

10                           **EXAMINATION**

11  BY MR. DICKINSON:

12  Q.   Just to understand, if -- in the high-risk unit, as we

13  sit here today, specifically Mr. Damato, if he opted into the

14  high-risk unit, would he be able to have a single cell?

15  **A.**   He has opted into the high-risk unit.  They rolled up

16  his -- his property was placed down there.  He is placed in a

17  cell where he does not have a cellie.  He is in a single cell.

18  Q.   Thank you.

19           **MR. DICKINSON:**  That was my only question,

20  Your Honor.

21           **THE COURT:**  Thank you.  I do have some follow-up

22  questions, sir.

23                           **EXAMINATION**

24  BY THE COURT:

25  Q.   When did he opt into this single-cell situation?

Examination of Brandon Delaney

1    **A.**   [Indiscernible] around 1500 hours [indiscernible].

2    Q.   Okay.   There was --

3    **A.**   Now, he -- when he did come into Nevada Southern

4    Detention Center, he was screened by medical, and we offered

5    to place him in the high-risk pod at which time he

6    [indiscernible].

7    Q.   And I'm sorry, at that time what?

8    **A.**   He refused to go in there.

9    Q.   Based on what?

10   **A.**   It was off of his decision.   I was not present for the

11   interview, but my understanding it had to deal with he did not

12   want to be in a room.

13          I do have Ms. Smith that was present, and she could

14   go into a little bit more detail on that.

15   Q.   Okay.   We'll -- we'll reserve that portion of the

16   questions for Ms. Smith then.

17          So my understanding from having heard Mr. Carpenter

18   earlier is that he's currently in the G 4 unit; is that right?

19   **A.**   Yes.   He was moved down to BB [indiscernible].

20   Q.   All right.   And in the G 4 unit --

21   **A.**   -- the high-risk pod.

22   Q.   I'm sorry.   Go ahead.

23   **A.**   Which is the high-risk pod.

24   Q.   All right.   So in the G 4 unit I would imagine that the

25   same policy applies in terms of the optional wearing of masks?

Examination of Brandon Delaney

1   **A.**   Correct.

2   Q.   And could you describe for me what the sanitation process

3   is like in the G 4 dorm?

4   **A.**   It is going to be very similar to BB we do every hour.

5   We use the PROXI 40 HTQ.  We wipe down the tables, the common

6   areas.  We have soap readily available for all detainees.

7   They have to come up to the officer and ask, and they would

8   give them out soap.  They are also -- like I said, every

9   detainee in the institution was issued a cotton mask.  Any

10  detainee coming in or out of the pod, the officers pat search

11  them in and out.  We have signs for social distancing

12  [indiscernible].  We do the town hall to make sure that staff

13  understand any updates that are happening and -- and will be

14  required for social distancing, which is

15  obviously [indiscernible] G 4 currently has [indiscernible] 59

16  detainees.  I want to say 59 detainees currently in G 4, and

17  it holds a total of 94.  So it is not at full capacity.

18  Q.   All right.

19          **THE DEFENDANT:**  Your Honor, can I speak with my

20  attorney, please?

21          **THE COURT:**  You can.  Let's go ahead and mute

22  Ms. Levy and Mr. Damato.  All right.  So --

23          **COURTROOM ADMINISTRATOR:**  Your Honor, both parties

24  are muted.

25          **THE COURT:**  Let's go ahead and test it.  Ms. Levy,

 1    could you say something?  Could you say something, Mr. Damato?

 2    All right.  Both of you are muted.

 3         *(Pause in proceedings.)*

 4              **COURTROOM ADMINISTRATOR:**  Your Honor, we are ready to

 5    proceed.

 6              **THE COURT:**  All right.  Ms. Levy, do you have

 7    anything for the Court?

 8              **MS. LEVY:**  I have some follow-up questions when the

 9    Court is ready for them for Officer Delaney.

10              **THE COURT:**  All right.  I do not have any further

11    questions, but go ahead, Ms. Levy.

12              **MS. LEVY:**  Thank you, Your Honor.  Appreciate it.

13                          **RE-EXAMINATION**

14    **BY MS. LEVY:**

15    Q.   Officer Delaney, I want to talk to you a little bit about

16    the quarantine process when people come in from -- transfer

17    from another facility.

18    **A.**   Okay.

19    Q.   Were there new individuals that went to the G 4 unit

20    today?

21    **A.**   [Indiscernible] off of a trip -- trip today.  No, those

22    would have been individuals that were placed in T 8 that their

23    time has elapsed or [indiscernible] for the incoming trip

24    coming in.

25              **THE COURT:**  Okay.  Let me interrupt one second.  I

Examination of Brandon Delaney

1   originally thought we were talking about the G 4 unit.  Then I

2   heard you talk about the C 4 unit, and now I'm hearing D 4

3   unit.  Are the -- are we all referring to the same unit?

4           **MR. DELANEY:**  I apologize.  Like I mentioned earlier,

5   trips of detainees coming in, we started a process back where

6   all detainees being isolated [indiscernible] that they're not

7   showing any signs of COVID-19.  We did release detainees out

8   of that area today that have been placed in that unit that

9   are -- that are not symptomatic.  So we've monitored and

10  reviewed them.  So there was movement today into the unit, but

11  it was not any detainees that came in off the transport today.

12          **THE COURT:**  All right.  Go ahead, Ms. Levy.

13          **MS. LEVY:**  Thank you.

14  **BY MS. LEVY:**

15  Q.   When you're in the high-risk unit, you indicated that you

16  get your temperature taken periodically; is that correct?

17  **A.**   No.  Just -- just the [indiscernible] visits.  Not in

18  the -- not in the high risk.  The COVID units, they do.

19  Q.   And my apologies.  I should have been more specific.

20          So we're talking about the -- if you're in the high

21  risk -- and that's BB; correct?

22  **A.**   Yes, BB is a high risk, and they do not have their

23  temperatures checked daily.  They will have their temperatures

24  checked when they see the doctor or the nurse.

25  Q.   And how often are they seeing the doctor -- oh, I'm so

Examination of Brandon Delaney

1    sorry.  How often are they seeing the doctor or the nurse?

2    **A.**    That would be different for each detainee depending on

3    what their -- their medical needs are.  We do have medical

4    staff that go in there daily that can answer any questions,

5    concerns, or issues.

6    Q.    So if Mr. Damato is placed in the BB high-risk unit, he

7    is dependent upon other inmates self-reporting any

8    temperatures or -- or feelings of being sick; correct?

9    **A.**    We have a -- we have nurses that go in there twice a day

10   that do their -- their checks and calls.  The detainee does

11   have access to what we call a sick call to report it, or if

12   any notation is made via a phone, a concern form, verbal to

13   the officer or a medical staff, then it would be reported to

14   medical, and we would then have medical go address the

15   detainee immediately.

16   Q.    Okay.  So just hypothetically, if there's someone in the

17   unit with Mr. Damato who is not feeling good or is running a

18   fever but either doesn't mention it intentionally or -- or

19   unintentionally, there would be no way to monitor that this

20   individual's showing symptoms?

21   **A.**    As soon as we are notified of any type of symptoms, the

22   detainee then would be checked and isolated.  If they -- if

23   they were out on the same quadrant and they shows signs of

24   COVID, then we would isolate that group so it would not be

25   spreading.

Examination of Brandon Delaney

```
 1    Q.   Okay.  And that's done based on -- on self-reporting in
 2    part; right?
 3    A.   Yes.  And -- and visual from both the nurse and the
 4    officer.  If -- obviously if our nurse is in there and a
 5    detainee is showing signs of sickness, then they would address
 6    that concern with the detainee.
 7    Q.   Okay.  And the nurse goes around and meets with all the
 8    individuals, or am I confused?
 9    A.   They have face-to-face.  They'll go in there, they'll do
10    a --
11         (Simultaneous crosstalk.)
12    BY MS. LEVY:
13    Q.   And --
14    A.   -- half the -- half the pod or if it's on lockdown,
15    they'll go cell to cell.
16    Q.   How often is that happening?
17    A.   Twice a day.
18    Q.   Okay.  And that's in this BB unit?
19    A.   That's in -- that would be in all units, but yes.
20    Nurses --
21    Q.   Okay.
22         (Simultaneous crosstalk.)
23         MR. DELANEY:  -- in our medical facility twice a day
24    to ensure at a minimum.
25    ///
```

Examination of Brandon Delaney

1   **BY MS. LEVY:**

2   Q.   And take -- but just not take temperatures but they're

3   going in and meeting with every single detainee?

4   **A.**   Correct.   They're not -- we're not going in and -- and

5   having every detainee's temperatures checked.   The only unit

6   that is is the ones that we have on co-- COVID, which have

7   come through a facility where a detainee may or may not have

8   been infected, and they are not -- and they are not -- we have

9   a 14-day [indiscernible] so they will get checked to ensure

10  that there's no signs.   Once they've cleared that 14 days --

11       *(Simultaneous crosstalk.)*

12  **BY MS. LEVY:**

13  Q.   Well, how do you --

14  **A.**   Once they clear that 14-day period or have been deemed

15  not showing signs, then we release them out to general

16  population.

17  Q.   How many times has Mr. Damato interacted with the nurse

18  since his incarceration?

19  **A.**   I will get with Nurse Smith and have her pull that up.

20  Due to my position, I don't have access to that type of health

21  questionnaire.

22  Q.   Okay.   But you're indicating it would be approximately

23  twice a day?

24  **A.**   We have nurses that come down to the unit twice a day.

25  Q.   Okay.   And I'm so sorry.   Maybe I'm miss--

Examination of Brandon Delaney

1  misunderstanding.  The nurses that come down to the unit twice

2  a day, they interact with every single detainee; is that what

3  you're testifying to?

4  **A.**   In general population, they will come in to -- they'll

5  come into the unit.  It's usually during a field call, and

6  they will be up there, [indiscernible] will be announced.  If

7  detainees have questions, they can come up to the nurse at

8  that time.  The nurse is not going around to make contact with

9  every detainee in the institution.

10 Q.   Okay.  That's -- that's what I -- that was my

11 understanding.  I just wanted to clarify that.

12       So, again, in part we're relying on other individuals

13 self-reporting signs of COVID; right?

14 **A.**   Can you repeat?  I wasn't quite sure -- the process is if

15 a detainee shows any signs, we report it immediately to

16 medical.  As a security staff, we -- we do not [indiscernible]

17 determine whether it is a COVID sign or not.  So if an inmate

18 comes up and says he's not feeling well, that he has an upset

19 stomach or he has this, security staff [indiscernible] that's

20 not COVID, that's not.  We would defer to the medical

21 professionals.  They will come back down and interview.

22       So if a detainee says he's not feeling well, security

23 will report it to medical.  Medical will then come down or

24 send the inmate down to medical depending on the area and the

25 movement that's happening.

Examination of Brandon Delaney

1    Q.    Gotcha.

2    **A.**    [Indiscernible].

3    Q.    And if the detainee doesn't -- and if the detainee

4    doesn't self-report that, he may not interact with a -- a

5    nurse, and he's not gonna have his temperature taken if he's

6    in the BB unit or in general population?

7    **A.**    Theoretically.  It has the potential.  Typically -- and

8    I've been doing this for quite some time.  If there's anybody

9    that's showing any signs, there'll be numerous other detainees

10    that will be saying, Hey, this -- this guy's not feeling well,

11    he hasn't been up.  Officers are making rounds.  When an

12    officer goes in there and does -- we do -- we do twice an hour

13    minimum visual on every detainee.  So if a detainee is laying

14    in his bed all day long, it kind of falls under the unit

15    management concept.  We check up on them.  So the officers are

16    gonna be also checking up on [indiscernible] sitting in their

17    cell all day long and not coming out, not showing any signs.

18    We have counts where we have to have visual movement and check

19    on them.  At any point, if an officer makes a visual

20    determination or they come back and say, Hey, [indiscernible]

21    hasn't been out of his cell, so he's not feeling well or he

22    doesn't look well, medical will come down and check it as

23    well.

24             So it's not just the fact that a detainee has to self

25    admit it, but if there's any visual signs, the security staff

Examination of Brandon Delaney

1    has been trained and work on -- on communicating that.

2              THE DEFENDANT:  Can I speak with my --

3    BY MS. LEVY:

4    Q.   How many individuals in the --

5              THE DEFENDANT:  -- attorney, please?

6              THE COURT:  Hold on a second.

7              Mr. Damato, you need to speak to your attorney?

8              THE DEFENDANT:  Yes.

9              THE COURT:  All right.

10             THE DEFENDANT:  Is this under -- is he under oath as

11   well?

12             THE COURT:  Let's go ahead and mute both Ms. Levy and

13   Mr. Damato.

14             THE DEFENDANT:  Oh.

15             COURTROOM ADMINISTRATOR:  Your Honor, the parties are

16   muted.

17             THE COURT:  Let's test it.  Ms. Levy?  Could you say

18   something, Mr. Damato?

19             Okay.  You're muted.

20        (Pause in proceedings.)

21             THE COURT:  All right.  Mr. Damato, can you hear us

22   okay?

23             THE DEFENDANT:  Yeah.

24             THE COURT:  All right.  Ms. Levy, go ahead.

25   ///

Examination of Brandon Delaney

1    **BY MS. LEVY:**

2    Q.   Officer Delaney, I'm gonna switch gears just a tiny bit

3    because I just spoke with my client, and I have a couple

4    follow-up questions.  So my apologies for switching gears.

5         **MS. LEVY:**  And my apologies to the Court for

6    switching gears.

7    **BY MS. LEVY:**

8    Q.   But Mr. Damato was brought into your facility from

9    Henderson jail; right?

10   **A.**   I would have -- I would have to check the transport

11   orders.  I do know that he came in on or around the 27th of

12   March.  He came in... actually, it looks like the 31st of

13   March that he came in, and I did check with our medical

14   department.  He has been seen by medical 33 times.

15   Q.   Can I ask, when he came from Henderson, was he

16   quarantined prior to being put into G 4?

17   **A.**   He was -- he was housed in medical.  When he first came

18   in, he was housed in medical, and --

19       *[Indiscernible background noise]*

20        **MR. DELANEY:**  Until April 5th.

21   **BY MS. LEVY:**

22   Q.   Approximately five days of -- six days perhaps?

23   **A.**   Yes.  He came in -- it looks like I have him on intake at

24   1752 hours, and he left to go down to G 4 on the 5th at 1008

25   hours, roughly, in the system.

Examination of Brandon Delaney

1   Q.   Is that --

2        (Simultaneous crosstalk.)

3            **MR. DELANEY:**  [Indiscernible].

4   **BY MS. LEVY:**

5   Q.   -- within the 14-day -- oh, I'm so sorry.  Is that within

6   the 14-day guideline as per the CDC?

7   **A.**   Ma'am, when it's -- when he initially came into the

8   institution, we had not -- we did not implement the 14-day

9   process.  Like I had said, that was within the last week and a

10  half, two weeks that we -- we implemented that.

11  Q.   [Indiscernible] okay.

12  **A.**   Anybody -- now realize when a detainee is transported

13  they are -- their temperatures are checked at the facility

14  they're leaving.  They are checked when they come into the

15  institution.  The nurse goes out and checks them.  If at any

16  point anyone shows signs, then we would quarantine that trip.

17  Q.   Did Mr. Damato ask to speak with a doctor this morning?

18  **A.**   I would have -- I would have to check with -- with

19  medical.  Talking with the doctor or -- or -- or checking with

20  the nurse.  I -- like I said, I do have our clinical

21  supervisor, Ms. Smith, who he talked to her today, and he

22  never mentioned anything to her about talking to a doctor.

23  Q.   There was 33 times that were visits with you said a

24  doctor or -- just a nurse or a doctor?

25  **A.**   It would be a nurse or a doctor.

Examination of Brandon Delaney

1    Q.   That includes pill call, I assume; right?

2    A.   Yes.

3    Q.   Okay.  And how -- is that once a day or twice a day?

4    A.   We do pill call twice a day, but for -- from what I'm

5    being told by the medical staff here, he receives pill call

6    once a day.  But the nurse goes in twice a day, morning and

7    night.

8    Q.   Mr. Damato is in the room right now for the court

9    appearance.  Prior to this room, he was placed in the -- the

10   room that houses ICE court; is that correct?

11   A.   I was not present.  I do not know.  I'd have to go back

12   and review the... I would have to review to see where he was

13   placed, ma'am.

14   Q.   And do you know when that ICE room was cleaned last?

15   A.   Once again, without reviewing, I was not present in

16   there.  I -- I would have to go back and review the cameras.

17   Q.   I understand.

18        When was the last time the phone that Mr. Damato is

19   using to speak with me was cleaned?

20   A.   The phone that he's using?  Which phone?

21   Q.   In the room that he's in right now, sir.

22   A.   I can tell you when I went back in there, I did realize

23   that the officer did not wipe it down.  I have not review the

24   cameras for the day to see when the last time it was

25   inspected.  I do know that I put out a notice [indiscernible]

Examination of Brandon Delaney

1    with the first shift attorney visits, and we've explained to

2    them that after every use it needs to.  This was the second

3    shift oncoming.  There was a directive that was put out.

4    Without reviewing it, I cannot tell you the time frame.

5    Q.    Oh, and how many people are in the BB unit currently?

6    A.    We have 30.

7    Q.    And there's one officer per shift that handles those 30;

8    correct?

9    A.    Per shift.  Same officer per shift.  And once that

10   officer -- we have what we call the [indiscernible]

11   management.  So each officer's assigned to the pod so they

12   can -- so they have an understanding of the -- of the

13   detainees that are on the unit so they're more familiar so

14   they can pick any details if somebody is off or not doing

15   well.

16          We have these same officers scheduled for those pods

17   every day, and once they are scheduled in the high-risk pod,

18   they are not allowed to go to any other pod or cross

19   contaminate to include our rec officer who does not stay on

20   the rec pod with them.  They stand outside for a constant

21   visual.  They don't even have contact with the detainees in

22   the high risk.

23   Q.    Lastly, does Mr. Damato have regular contact with an

24   infectious disease doctor while he's in Pahrump?

25   A.    Ma'am, I'd have to refer that to medical.  I don't have

Examination of Rebecca Smith

1    access to that.

2              **MS. LEVY:**  Thank you.

3              **THE COURT:**  Mr. Dickinson, do you have any other

4    questions?

5              **MR. DICKINSON:**  No, Your Honor.

6              **THE COURT:**  All right.  Thank you, Mr. Delaney.  If

7    we could have Ms. Smith on the line?

8              **MR. DELANEY:**  Is that it?

9              **THE COURT:**  Can you hear us, Ms. Smith?

10             **MS. SMITH:**  Yes, I can.

11             **THE COURT:**  All right.  Ms. Levy, go ahead.

12                            **EXAMINATION**

13   **BY MS. LEVY:**

14   Q.   Ms. Smith, do you oversee the -- the nurses and doctors

15   there in Pahrump?

16   **A.**   I -- I am over the nurses.  The -- the health service

17   administrator is over the physicians.

18   Q.   Is there a medical director?

19   **A.**   One of the providers is considered our medical director,

20   yes.

21   Q.   Who's that?

22   **A.**   Dr. Rivas.

23   Q.   Rivas?

24   **A.**   Yes.  R-i-v-a-s.

25   Q.   What's his first name?

Examination of Rebecca Smith

1    **A.**    David.

2    Q.    Thank you for that.

3          So you oversee the nurses?

4    **A.**    I do.

5    Q.    Okay.  And I think it was testimony from Officer Delaney

6    who indicated that the nurses do not do temperature checks of

7    individuals in the BB unit; correct?

8    **A.**    Correct, not on a -- not on a daily basis.

9    Q.    If somebody is showing signs -- let's say Mr. Damato is

10   moved to BB but starts showing signs of COVID, can you tell me

11   the procedure then?

12   **A.**    Let me -- let me let you know really quick that our

13   health service administrator just came in as well.  So she is

14   also on the call.  Her name is Bonnie Holly.  So we're both

15   here.

16          The procedure if a -- if a detainee starts showing

17   symptoms, there's a few different things that we could go off

18   of.  The officer has visual eyes on the detainees on a regular

19   basis.  If they notice anything, they notify medical.  There's

20   a sick call procedure that the detainees can fill out and send

21   requests to medical as well as just telling the officer

22   verbally that they don't feel well, and we would address it

23   immediately.  The nurses are in the unit twice a day doing

24   pill call.  They would also address it if a detainee came up

25   to the pill call cart notifying them of how they were feeling,

Examination of Rebecca Smith

1  or if a nurse doing a visual assessment throughout the unit

2  noticed anything, they would address it then as well.  And

3  then Ms. Holly and myself do rounds in the unit daily as well.

4  Q.   And you -- you -- I think Mr. Delaney indicated that you

5  interacted with Mr. Damato this morning?

6  **A.**   I did this afternoon.

7  Q.   Oh.  Okay.  Are you aware of whether Mr. Damato

8  interacted with the nurse giving him his pill and requested to

9  see a doctor?

10  **A.**   I'm not.  I am aware that Mr. Damato gets evening pills,

11  so I -- I'm not aware of any interaction this morning at pill

12  call that he would have had with the nurse.

13  Q.   And you're unaware that Mr. Damato requested to speak

14  with a doctor in the morning?

15  **A.**   No, I haven't -- I haven't heard that.  Nobody notified

16  me of that.

17  Q.   And you would be the person that they should be

18  notifying; right?

19  **A.**   Either that or they would go directly to the provider.

20  Q.   And you have no notes about that; right?

21  **A.**   I do not.  In the computer I do not.

22  Q.   What would be the time frame -- you know, if Mr. Damato

23  in the morning goes to a nurse and says, I -- I'm not feeling

24  good, and obviously he's high risk, what's the time frame that

25  you would expect that he be seen by a doctor?

Examination of Rebecca Smith

1   **A.**   Well, I -- the -- the nurse should perform a quick
2   assessment right there with the detainee and determine if it
3   was urgent.  They would notify the officer immediately and ask
4   that the detainee be taken to medical.  If it was -- if they
5   determined it was not urgent, they would likely finish pill
6   call -- which sometimes can be an hour, hour and a half -- and
7   then they would speak with the doctor in person when they get
8   back to medical.
9   Q.   Would a nurse make a note in a chart?  Meaning if
10  Mr. Damato had, in fact, spoken with this nurse this morning
11  and indicated he wasn't feeling good, would she notate that in
12  his chart somewhere?
13  **A.**   She should.
14  Q.   Do -- do you have his chart?
15  **A.**   I do.
16      *[Indiscernible background noise]*
17          **MS. SMITH:**   I do, and I don't have any notes for any
18  contact this morning with Mr. Damato and the nurse.
19  **BY MS. LEVY:**
20  Q.   Do you know which nurse it was?
21  **A.**   I could find out.
22  Q.   So if Mr. Damato goes through the appropriate channels
23  and -- and requests to see a doctor from the nurse and for
24  whatever reason that does not occur, what is the next step for
25  Mr. Damato?

Examination of Rebecca Smith

1    **A.**   To notify security and security would notify medical.

2         **MR. DELANEY:**  This is Chief Delaney --

3    **BY MS. LEVY:**

4    Q.   Do you have any --

5         *(Simultaneous crosstalk.)*

6         **MS. LEVY:**  Oh.  Sorry.

7         **MR. DELANEY:**  Any time that if a detainee presents a

8    concern and is showing symptoms or anything, we have what we

9    would call a medical emergency that the security officer can

10   call at any time which would basically shut down all movement

11   inside the institution, and we would have a minimum of a

12   five-team responder along with medical go down to assess the

13   detainee.

14        **MS. LEVY:**  Thank you, Mr. Delaney.

15   **BY MS. LEVY:**

16   Q.   When you indicate showing symptoms or signs, can you walk

17   me through what those would be besides the temperature?

18        **MR. DELANEY:**  Is that in reference to my

19   [indiscernible] or Ms. Smith?

20        **MS. LEVY:**  I guess either.  Let me clarify the reason

21   I'm asking that question because I know the question's a

22   little bit broad.

23        I think you're aware that Mr. Damato has

24   particularized medical concerns because he's HIV positive.  So

25   what particularized signs and symptoms would somebody with a

Examination of Rebecca Smith

1    weak immune system might trigger that type of lockdown

2    occurring?

3           **MR. DELANEY:**  Well, Ma'am, unless the detainee

4    discloses this type of information, security would not know

5    what his medical conditions are.  As a trained professional,

6    we go through classes that would indicate if obviously there

7    was cold sweats, sweating, covered up, pale [indiscernible],

8    heavy -- heavy breath or trouble breathing, you know,

9    talking --

10          *(Simultaneous crosstalk.)*

11          **THE DEFENDANT:**  I would like to speak with my

12   attorney, Your Honor.

13          **MR. DELANEY:**  -- [indiscernible].

14          **THE COURT:**  All right.

15          **MR. DELANEY:**  [Indiscernible].

16          **THE COURT:**  So hold on, Mr. Delaney.

17          **THE DEFENDANT:**  I need to speak with my attorney.

18          **THE COURT:**  I heard you, Mr. Damato.

19          **THE DEFENDANT:**  I'm sorry.

20          **THE COURT:**  Mr. Damato --

21          **THE DEFENDANT:**  No, because I have documentation --

22          **THE COURT:**  Mr. Damato --

23          **THE DEFENDANT:**  I'm sorry.

24          **THE COURT:**  Every time you've requested to speak with

25   your attorney, the Court has given you an opportunity, and the

Examination of Rebecca Smith

```
 1    Court will continue to do so.  Okay?  So I just need you to
 2    stay calm, wait for your attorney --
 3              THE DEFENDANT:  Okay.
 4              THE COURT:  -- and we'll make sure that you have an
 5    opportunity to speak with Ms. Levy.
 6              Let's go ahead and mute Ms. Levy and Mr. Damato.
 7              COURTROOM ADMINISTRATOR:  Your Honor, the parties are
 8    muted.
 9              THE COURT:  Okay.  Let's go ahead and test it.
10    Ms. Levy?  Mr. Damato, go ahead and say something.  All right.
11    You're muted.
12         (Pause in proceedings.)
13              THE COURT:  All right.  It looks like we're ready.
14    Let's go ahead and unmute Ms. Levy and Mr. Damato.
15              All right.  Ms. Levy, are you ready to proceed?
16              MS. LEVY:  Yes.  Thank you so much.
17              I -- I think we left off -- and I could be wrong.
18    I'm sorry.  But I think we left off steps that would be taken
19    if Mr. Damato went through the -- the course that he's
20    required to, meaning speaking to the nurse, telling the nurse
21    that he didn't feel good, and that -- that concern is not
22    addressed in a timely fashion.
23              MR. DELANEY:  Correct.  We were -- I was explaining
24    the process of security if -- if they're showing signs where
25    we would call a medical emergency.
```

Examination of Rebecca Smith

1          Now, I do know talking with Ms. Smith that he did

2     talk to -- Mr. Damato did talk to Nurse Smith at around 1500

3     hours?

4          **MS. SMITH:**  Correct.

5     **BY MS. LEVY:**

6     Q.   I believe he spoke to a male nurse -- oh.  I'm so sorry.

7     But I believe he spoke to a male nurse this morning, indicated

8     concerns, including a rash, which as you know can be pretty

9     significant in a HIV positive patient, and -- and it appears

10    that that may not have been documented or addressed.

11    **A.**   I -- I do not have any documentation of that in his

12    chart.  I -- I did speak with him around 1500 today, and he

13    made no mentions to myself about that.

14    Q.   And today you went through with him how he was feeling

15    and took his temperature and did that kind of stuff with him?

16    **A.**   No, I didn't take his temperature.  I did speak with him

17    about being in G 4 and our discussion on April 5th when he

18    chose to go to G 4 versus the high-risk pod up in BB, and he

19    made no mention of not feeling well.  He did request at that

20    time to be moved to the high risk since he at that time

21    started having concerns.  And at that point in time I did go

22    and speak with security and request to have him moved to the

23    high-risk pod.

24    Q.   Are you the person who did the original intake with

25    Mr. Damato to determine whether he'd be in the BB or the G 4

Examination of Rebecca Smith

```
 1   unit?
 2   A.    I did not do the initial intake here at the facility, but
 3   I spoke with him when he was moving from medical to the
 4   general population unit and spoke with him about the option of
 5   going to the high-risk unit versus the general population
 6   unit.
 7   Q.    At that time when you were speaking with him, did you
 8   have his -- his medical chart with you?
 9   A.    Not on me.  It's on a computer, and I was speaking with
10   him at -- at his cell.  But I had reviewed his chart.
11   Q.    Were you aware of any mental health diagnosis that he
12   has?
13   A.    He was housed in medical at that time primarily for
14   mental health.
15   Q.    So when he declined being in the closed-in unit, at that
16   time you knew that he had medical -- he had mental health
17   diagnosis; right?
18   A.    Yes, correct.
19   Q.    Do you know what those are?
20   A.    I can pull them up right now.
21   Q.    That's all right.  I just -- I didn't know if you knew
22   them off the top of your head or not.
23   A.    Not off the top of my head.  We have over 700 detainees
24   here, and I don't have all of their diagnoses memorized.
25   Q.    Of course.  It must be absolutely overwhelming.  I -- I
```

Examination of Rebecca Smith

1    totally understand.

2          Are you aware that Mr. Damato had recently been

3    hospitalized three times for dehydration, and if so, how are

4    you treating that with Mr. Damato?

5    **A.**   I do not believe he came with that previous medical

6    record.  I don't believe we have that information in the

7    computer.

8    Q.   So at this point you're unaware that he suffers from

9    constant dehydration?

10   **A.**   No, I don't have that in the computer.  I do have his

11   most recent labs, which would have included information as to

12   whether he was dehydrated or not.

13   Q.   He had recently been discharged from the hospital; right?

14   **A.**   Not from our facility.

15   Q.   Okay.  So you're unaware that when he came into your

16   facility, he had been one day shy of being in the hospital?

17   **A.**   I would have to review the chart, but I do not believe we

18   have that information in the chart.

19         **THE COURT:**  All right.  Go ahead and review the chart

20   and let me know what the answer to that question is, please.

21         **MS. SMITH:**  Okay.

22         No, we do not have any of that -- any of his medical

23   information prior to him coming to the facility.

24         **THE COURT:**  So he came into your facility twice.  He

25   came into your facility first on 3/27 and April 1st was the

TRANSCRIBED FROM DIGITAL RECORDING

1    second time.  Do you have any records of his hospitalization

2    prior to April 1st?

3         **MS. SMITH:**  No, we do not.

4         **THE COURT:**  All right.  This is what we're going to

5    do.  It's 5:08.  This is going to go long.  So I'm going to

6    ask everybody to reconvene tomorrow, and I'll give you a

7    time -- a day -- a time for that.

8              Mr. Delaney, I'm going to ask you to be very familiar

9    with the entire process for which that Mr. Damato underwent

10   starting on 3/27 when he goes in.  The question is:  Was he

11   transferred from the Henderson facility?  What protocols were

12   in place at that time?  And anything that has to do with

13   Mr. Damato's medical conditions starting on 3/27 -- or, excuse

14   me, ending on 3/27.  So from the day that he was arrested

15   until 3/27, and then I want to know the entire history of

16   where Mr. Damato has been in since he was, it appears at one

17   point, in medical, then in G 4, and then the BB cell.  So

18   the -- the testimony is a little bit all over the place, and I

19   just want to make sure that I understand what protocols were

20   in place at each of these different units, at what time, and

21   how have things changed since.

22              Mr. Carpenter, I see you standing.

23         **MARSHAL CARPENTER:**  Yes, Your Honor.  As far as

24   Mr. Damato being in Henderson, the facility would not be aware

25   of that.  As far as they're concerned, he comes from the

TRANSCRIBED FROM DIGITAL RECORDING

1   street.  What happens is the arresting officer books a person

2   in, takes them to Henderson overnight.  They'll bring them --

3   they'll book him out and bring him to our cellblock

4   [indiscernible] initials but we do our thing now and send them

5   to Pahrump.

6          So as far as the facility's concerned, he's coming

7   off the street.

8          **THE COURT:**  Got it.

9          So I guess the question then I'm going to need to

10  know the answers to is once he is coming off the street during

11  the initial time that he was arrested, what were the protocols

12  in place?  Where did he go?  And, again, when he came in from

13  the streets the second time, what were the protocols in place

14  at that time?

15         As to Ms. Smith, I'm going to need you to tell me or

16  be ready to tell me what medications he has been on and for

17  how long he has been on those medications both for the first

18  period of time that he was detained as well as the second

19  period of time that he was detained.

20         **MS. SMITH:**  Okay.

21         **THE COURT:**  And I know that there was another

22  individual, Bonnie Holly, who joined the line.

23         What is the difference in positions between you and

24  Ms. Holly?

25         **MS. HOLLY:**  [Indiscernible] over the whole medical

TRANSCRIBED FROM DIGITAL RECORDING

 1    department [indiscernible].

 2           **MR. DELANEY:**  Ms. Holly is our health service

 3    administrator.

 4           **THE COURT:**  All right.  So, so long as, you know,

 5    maybe you want to make sure that Ms. Holly's available as well

 6    in the event that she may have some information that is

 7    necessary for tomorrow's hearing.

 8           Mr. Miller, what time is this courtroom available

 9    tomorrow?

10           **COURTROOM ADMINISTRATOR:**  2:00 p.m. Your Honor.

11           **THE COURT:**  There's nothing earlier?

12           **COURTROOM ADMINISTRATOR:**  No, Your Honor.  We share

13    the videoconference room with our district judges who have --

14    tomorrow morning is for the district judges.  Tomorrow

15    afternoon is for the magistrate judges.  And there are

16    hearings already booked for tomorrow morning.

17           **THE COURT:**  All right.  So we will reconvene tomorrow

18    at 2:00 p.m.

19           Are you available, Mr. Dickinson?

20           **MR. DICKINSON:**  Yes, Your Honor.

21           **THE COURT:**  Ms. Levy, are you available?

22           **MS. LEVY:**  Yes, Your Honor.

23           **THE COURT:**  As to Mr. Damato's placement today, is it

24    my understanding that he's going to be in a single cell?

25           **MR. DELANEY:**  Can you repeat the question?

TRANSCRIBED FROM DIGITAL RECORDING

1      **THE COURT:**  Is Mr. Damato going to be in the

2   high-risk/BB unit?

3      **MR. DELANEY:**  Yes, he is.

4      **THE COURT:**  And is he going to be alone in a cell?

5      **MR. DELANEY:**  Yes, he is.  And I just reviewed the

6   pill call from this morning, and he never actually went up to

7   the nurse at pill call this morning.

8      **THE COURT:**  All right.  Does anybody have anything

9   further?

10      **MS. LEVY:**  No.  Thank you, Your Honor.

11      **THE COURT:**  All right.  Very well.  I will see all of

12   you at 2:00 tomorrow.

13      **MS. LEVY:**  Thank you, Your Honor.

14      **COURTROOM ADMINISTRATOR:**  All rise.

15      *(Proceedings adjourned at 5:05 p.m.)*

16                              * * *

17      I, AMBER M. McCLANE, court-appointed transcriber, certify

18   that the foregoing is a correct transcript transcribed from

19   the official electronic sound recording of the proceedings in

20   the above-entitled matter.

21

22   /s/  *Amber M. McClane*                  4/27/2020
         AMBER MCCLANE, RPR, CRR, CCR #914      Date
23

24

25